IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

JOHN E. MCLAURIN,

      Petitioner,

v.                     Case No. 2:00-cv-00275

DAVID BALLARD, Warden,
Mount Olive Correctional Complex,

      Respondent.


PROPOSED FINDINGS AND RECOMMENDATION

On September 4, 2008, the undersigned submitted a Proposed
Findings and Recommendation (docket sheet document # 75),
recommending that the presiding District Judge grant summary
judgment to Respondent on Grounds 1(h) and 10 through 14 of
Petitioner's Amended Petition.  The undersigned further recommended
that additional briefing be submitted on Grounds 1(a) through (g),
6 through 9, and 15 of Petitioner's Amended Petition.  (Id.)  On
September 30, 2008, the presiding District Judge entered a
Memorandum Opinion and Order adopting the undersigned's Proposed
Findings and Recommendation.  (# 81).

On October 9, 2008, Respondent submitted a Supplemental
Response (# 85) addressing the remaining grounds in Petitioner's
Amended Petition, and a Supplement to the Record (# 84), which
contained reports and statements from Petitioner's state criminal
and habeas corpus proceedings that had not previously been provided

to this federal court.  On November 12, 2008, Petitioner submitted a Reply to Respondent's Supplemental Response (# 86).  This matter is now ready for final adjudication.

This matter has a convoluted and complicated procedural history which is set forth in great detail in the undersigned's prior Proposed Findings and Recommendation.  The undersigned finds it unnecessary to repeat that discussion herein, and will only address the procedural history as necessary.

**PETITIONER'S REMAINING GROUNDS FOR RELIEF**

The following grounds for relief, which were previously set forth and renumbered by the undersigned as grounds for relief in Petitioner's "Amended Petition," remain pending:

1.  McLaurin was denied his state and federal constitutional rights to the effective assistance of counsel by trial counsel.  The appellate court's decision was an unreasonable application of <u>Strickland v. Washington</u>, 466 U.S. 668, 691 (1984).

    (a)  Failure to obtain a serology expert to challenge the State's testimony.

    (b)  Failure to call Trooper Myers to testify to conflicts with Zain's testimony and report.

    (c)  Failure to investigate alibi defense regarding the Sparks crime.

    (d)  Should not have introduced victims' and other witnesses' statements to police into evidence; failed to request limiting instruction.

    (e)  Failure to seek a writ of prohibition after denial of motion for continuance in order to have competency exam.

2

(f)  Failure to seek voir dire regarding cross-racial crime bias.

(g)  Failure to seek writ of prohibition regarding denial of motion to disclose grand jury selection process and whether indictment was properly obtained.

2.  McLaurin was denied due process of law, equal protection of the law, and his state constitutional right to an indictment by a properly constituted grand jury due to racial discrimination against blacks in the selection of grand jury forepersons in Kanawha County.  The appellate court's decision was an unreasonable application of <u>Rose v. Mitchell</u>, 443 U.S. 545 (1979).

3.  McLaurin was denied equal protection of law guaranteed by the state and federal constitution when the prosecution used a peremptory challenge to exclude a black juror from the jury.  The appellate court's decision was an unreasonable application of <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).

4.  The prosecutor's improper racial comments during closing argument unfairly prejudiced McLaurin and denied him his right to due process and a fair trial.  The appellate court's decision was an unreasonable application of <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).

5.  McLaurin was denied his right to a fair trial and impartial judge because Judge Hey was intoxicated during part of the trial and consumed alcohol before some of the trial proceedings.  The appellate court's decision was an unreasonable application of <u>Tumey v. Ohio</u>, 273 U.S. 510 (1927).

6.  McLaurin was denied due process of law and effective assistance of counsel when he was not allowed to present evidence or call witnesses on his behalf during his <u>Zain I</u> habeas proceeding.

7.  McLaurin was denied due process of law and the right to confront witnesses by the State's use of false, unreliable serology testimony linking him to the three victims, particularly since the serology evidence in the Sparks case demonstrated his actual

innocence.

8.   McLaurin was denied the right to confront and cross-examine witnesses when Fred Zain testified about tests performed by other experts.

9.   McLaurin was denied his right to due process when the prosecution called Fred Zain as a witness despite forewarnings of erroneous work.

15.  Petitioner is being held in custody in violation of his constitutional due process rights because there is insufficient evidence supporting conviction for sexual assault, when the State's use of false, unreliable serology evidence linking him to the three victims, particularly since the serology in the Sparks case demonstrated his actual innocence. The appellate decision was an unreasonable application of Kyles v. Whitley, 514 U.S. 419 (1995); Giglio v. United States, 405 U.S. 150 (1972).

(a)  The record contains admissions that state witnesses lied about the serological evidence presented against McLaurin and followed unacceptable evidentiary practices.

(b)  No reasonable jury could have found guilt of sexual assault beyond a reasonable doubt in the face of the serology evidence. The appellate court decision was an unreasonable application of Schlup v. Delo, 513 U.S. 330 (1995).

(c)  McLaurin's due process rights were violated when the prosecution called Fred Zain as a witness despite forewarnings that his work was erroneous. The appellate court's decision was an unreasonable application of Kyles v. Whitley, 514 U.S. 419 (1995); Brady v. Maryland, 373 U.S. 83 (1963).

(d)  The State's misconduct in this case denied McLaurin his constitutional right to a fair trial. McLaurin was denied his state and federal constitutional rights

4

to confront and cross-examine the witnesses against him when the State's serology expert Fred Zain testified to serology tests performed by other experts after the trial court ruled that Zain could only testify regarding tests he actually performed. The appellate court's decision was an unreasonable application of <u>Mooney v. Holohan</u>, 294 U.S. at 112; [<u>Brady v. Maryland</u>], 373 U.S. at 87.

(e) When the circuit court reversed Counts 1, 2 and 3 (Capone counts) on the first habeas corpus and failed to hold a hearing to allow McLaurin to present evidence on his behalf, McLaurin was denied due process of law. This denial of a hearing further prejudiced McLaurin and denied him the effective assistance of counsel on appeal as counsel was forced to argue his appeal on an inadequate record. The appellate court's decision was an unreasonable application of <u>United States v. Lane</u>, 474 U.S. 438 [(1986)].

## **STANDARD OF REVIEW**

Title 28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

5

In <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000), the Supreme Court held that under the "contrary to" clause, a federal habeas court may grant a writ of habeas corpus with respect to claims adjudicated on the merits in State court only if (1) the State court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) if the State court decides a case differently from the Supreme Court on a set of materially indistinguishable facts.  The Court went on to note that under the "unreasonable application" test, a federal habeas court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in State court only if the State court identifies the correct governing principle from the Supreme Court's decision, but unreasonably applies that principle to the facts of the prisoner's case.  <u>Id.</u> at 413.

When a State court fails to address an issue, or fails to articulate a rationale behind its ruling, the federal courts "must independently review the record and the applicable law; however, the review is not a <u>de novo</u> review.  <u>See</u> <u>Bell v. Jarvis</u>, 236 F.3d 149, 163 (4th Cir. 2000).  Rather, it is a deferential review to determine if the State court's decision is legally and factually reasonable.  <u>Id.</u>  The undersigned will conduct such a review of the merits of the grounds which the State habeas courts did not specifically address.

In <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993)(quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)), the Supreme Court clarified that the standard for determining harmless error in federal habeas proceedings is whether the error "had a substantial and injurious effect or influence in determining the jury's verdict." In <u>Sherman v. Smith</u>, 89 F.3d 1134, 1141 (4th Cir. 1996), the Fourth Circuit explained that "[the <u>Brecht</u>] decision recognizes that a federal court's collateral review of state court convictions implicates the 'State's interest in the finality of convictions that have survived direct review within the state court system.' <u>Brecht</u>, 507 U.S. at 635, 113 S. Ct. at 1720; <u>see also</u> <u>Barefoot v. Estelle</u>, 463 U.S. 880, 887, 103 S. Ct. 3383, 3391-92, 77 L. Ed.2d 1090 (1983)." The court will further address the standards of review to be applied to Petitioner's specific claims in the analysis section.

Section 2254(e)(2) of Title 28 of the United States Code provides that:

> [i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(2).

Rule 56 of the Federal Rules of Civil Procedure applies to habeas corpus proceedings. <u>See</u>, *e.g.*, <u>Blackledge v. Allison</u>, 431

U.S. 63, 81 (1977); <u>Maynard v. Dixon</u>, 943 F.2d 407, 412 (4th Cir. 1991).  Entry of summary judgment is appropriate when there is "'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986) (quoting Rule 56(c), Fed. R. Civ. P.).

**FACTUAL BACKGROUND**

In June of 1988, Petitioner was released from the West Virginia State Penitentiary, having served prison terms for rape, robbery and felonious assault.  The instant crimes took place within 90 days of Petitioner's release.  <u>McLaurin v. McBride</u>, 640 S.E.2d 204, 207-208 (W. Va. 2006) ("<u>McLaurin II</u>").  (# 52, Ex. 30 at 2).  Following is a summary of the relevant testimony and evidence from Petitioner's trial and omnibus hearings, with citation to the record from exhibits provided by the parties.

**A.  Victim testimony and eyewitness identification.**

<u>Connie Capone</u>

On the evening of August 19, 1988, Connie Capone was entering her car outside the Montgomery Ward store at the Charleston Town Center Mall in Charleston, West Virginia, when she was abducted by a black male brandishing what he described to her as a .357 Magnum revolver.  The assailant ordered Capone into the car and directed that she drive him to Beckley.  (Tr. Vol. I, # 66, Ex. 32 at 257-261).  Capone testified that she could not see her assailant

8

clearly because he made her keep her head turned away from him, and he also repositioned the rearview mirror to obscure her view.  (Id. at 262).

Capone had only lived in Charleston for about one month at the time of this incident.  She stated that she did not know how to get to Beckley and said her assailant also seemed unfamiliar with the area.  (Id. at 261-262, 280).  Capone drove east on Interstate 64 and exited at the second exit.  After driving for about 20 minutes, her assailant ordered her to pull off the road and get in the back seat of the car.  He told her he was "going to teach her a lesson." (Id. at 262).

The assailant ordered her to take off all of her clothes and was persistent in telling her to keep her eyes closed.  He got on top of her and made her grab his penis and put it inside her vagina.  As he was sexually assaulting her, the assailant told her to act like she enjoyed it.  (Id. at 263-264).  The assailant then made Capone drive back towards Charleston.  They drove around for a while looking for a remote area where the assailant could leave undetected.  They parked somewhere near a railroad trestle, where the assailant again sexually assaulted Capone in the back seat of the car.  (Id. at 264-266).  Thereafter, they drove around the city for another 30 minutes, before driving to a lot near a Holiday Inn in Charleston, where the assailant exited the car.  (Id. at 267-268).  Before leaving, the assailant used a glove to wipe the car

9

clean of fingerprints and he messed up her side rear view mirror, so she couldn't see him as he departed.  (Id. at 269).  As he did so, he talked about how much he enjoyed being with Capone and asked her again if she enjoyed it.  He also stated he wished they had met under different circumstances.  (Id. at 268-269).

After the assailant left the car, Capone drove to her apartment in Dunbar, West Virginia, and called the police.  She also took a shower and changed clothes.  When the police arrived, Capone was taken to the Women and Children's Hospital in Charleston, where she underwent a sexual assault examination and her clothing and the vaginal swabs and slides prepared during the examination were collected by the police.  (Id. at 270-271).

Capone was unable to identify her assailant in a photographic array, and gave a very bare description of him as a "relatively stocky young individual, twenty to twenty-five years old." (Id. at 253, 280).  She also told the police that he spoke with a Jamaican accent, but she couldn't tell if it was real or fake.  (Id. at 250).  During the trial, Capone testified that she probably wouldn't be able to identify her attacker if he walked up to her, and she was not asked if she recognized Petitioner as her assailant.  (Id. at 271).

On cross-examination, Capone admitted that, in a statement she gave to the police, she did not inform them that her assailant had asked her questions about her personal life, but on redirect

10

examination, she stated that he had asked her such questions.  (<u>Id.</u> at 284-287).

Joyce Townsend

On September 4, 1988, Joyce Townsend was working as a maid at the Holiday Inn Civic Center in Charleston, West Virginia.[1] Shortly after 9:00 a.m., Ms. Townsend was by herself cleaning a bathtub in a room on the third floor of the hotel, when she was grabbed from behind by a black male brandishing what she described as an ice pick.  The assailant covered her face with his left hand and told her to keep her eyes closed and not to scream.  (Tr. Vol. II, # 66, Ex. 33 at 360-361, 368).  Townsend testified that when they stood up in the bathroom, she had her back toward the assailant, and she briefly opened her eyes and saw from the reflection in the mirror that he was wearing a light blue shirt, dark blue pants and a dark blue hat.  (<u>Id.</u> at 361).

Townsend testified that the assailant remained behind her and forced her to walk into the bedroom where he made her pull down her pants and get down on the floor on her hands and knees.  He then told her "We're going to do it doggie-style."  (<u>Id.</u> at 361-363). She further stated that her assailant asked her questions about her marital status and her family.  (<u>Id.</u> at 363).  She believed that he then inserted two of his fingers into her vagina and told her to

---

[1]  It is unclear whether this is the same Holiday Inn in Charleston where Ms. Capone's assailant left her.

act like she enjoyed it.  (Id.)  He then inserted his penis into her vagina.  When it fell out, he made her put it back in.  (Id. at 363-364).  Subsequently, he made her turn over, telling her to keep her eyes closed and he again has sexual intercourse with her.  She said she felt him ejaculate inside of her.  (Id. at 364-365).

The assailant then told Townsend to get up off of the floor, with her back to him.  When she did, he hit her on the side of the face with his fist.  He then tried to make her get under the bed, but she was unable to do so because the bed was too low.  (Id. at 365).

As she was lying on the floor, Townsend heard the door to the hotel room open and close, but then she heard her assailant say, "I'm still here."  (Id. at 366).  Shortly, thereafter, she heard the door open and close again.  After a short period of time, Townsend realized that her assailant was gone, so she got up and telephoned the front desk to report her attack.  (Id.)

Townsend testified that, after the attack, she looked out the window of the hotel room and saw a black male, who was wearing similar clothing to that of her assailant, walking out of the hotel and across a bridge, where he entered the passenger side of a red sports car that drove away.  (Id. at 371-372).

Townsend was transported by the police to the Women and Children's Hospital, where she underwent a sexual assault examination.  (Id. at 411-414).  The clothing she was wearing was

collected by the police, as were the slides and swabs prepared during the examination. (Id. at 418-419).

Townsend described her attacker as being between five feet seven inches and five feet nine inches tall, weighing about 140 to 150 pounds. She recalled that he had a bad odor about him, like he was sweaty. (Id. at 370). Shortly after the assault, Townsend incorrectly identified a man she saw on the street as her assailant, stating that she was "almost one hundred percent sure it was him." (Id. at 372-373, 376-378). Apparently, Townsend was not shown a photographic array and she was not asked if she recognized Petitioner at trial.

Two other maids at the Civic Center Holiday Inn testified about a person they saw at the hotel on the day of Townsend's assault. Carmen Hairston and Susan Toney were working on the sixth floor of the hotel on the morning in question. Around 10:30 a.m., as the two women were walking toward the elevator to go downstairs to get something to drink, a black male got off of the elevator and walked toward them. (Id. at 334-338, 380-386).

Hairston testified that she did not recognize the man as a hotel guest. She stated that he was wearing a wet gray-green jacket, jeans, high-top white tennis shoes, and had his hair styled in jheri curls. She recalled that he stuck out "like a sore thumb" because he had one arm up under the other, he would not look at them, and he had a bad odor about him. She further stated that he

13

had a wide nose, and because of that, she initially thought she recognized him as someone she knew, but he was not.  After passing them, the man entered the stairwell.  (Id. at 380-390).

Three days later, Hairston described the man to the police as being "short and skinny."  (Id. at 390, 398).  In a six person photographic array, she identified Petitioner as the man she had seen.  She also made an in-court identification of Petitioner. (Id. at 393-395).

Susan Toney testified that the man she saw leave the elevator was black, about six feet tall, with a slim face and a wide nose. (Id. at 335-337).  In her statement to the police, which was given five days later, however, she described him as being really dark, with dark curly hair, about five feet nine inches to five feet ten inches tall, in his late twenties, about 140 pounds, with a small face, and wearing a short beard.  (Id. at 345-346).  She did not describe him as having a wide nose at that time.  (Id. at 347, 350).  Toney also picked Petitioner out of the same photographic array that was shown to Hairston, and she made an in-court identification of Petitioner at trial.  (Id. at 339-342).

<u>Beth Ann Sparks</u>

On September 6, 1988, Beth Sparks was entering her car on the campus of the West Virginia Institute of Technology in Montgomery, West Virginia, when she was abducted by a black male brandishing what he told her was a .357 Magnum revolver.  Sparks testified that

she had seen the same man, who did not look like a student, as she was walking across the campus to go to her car.  She described him as being about five feet ten inches or five feet eleven inches tall, poorly dressed, wearing a tan and brown plaid shirt and a cap.  (Id. at 448-449).

Sparks testified that, after she threw her purse onto the car seat, the man put his arm around her neck, put the gun to her head, and asked her if she knew what a .357 Magnum was.  He said he would kill her if she didn't take him where he wanted to go.  (Id. at 449).  He then got into the back seat of her car, and turned the rearview mirror so she could not see him and warned her not to look around.  He told her to drive him to Charleston.  (Id. at 450-451).

Sparks further testified that, prior to reaching London, a small community outside of Montgomery, her assailant directed her to turn onto a mining road that led up a mountain.  After a short time, he told her to stop and to keep her eyes closed and her head turned away from him.  He then pulled her from the car, grabbed the back of her jacket and forced her to walk up the mountain.  Eventually, they stopped and sat down.  Sparks stated that her assailant positioned her so that her back was between his legs and he blindfolded her with gauze.  She stated that she was able to see a little out of the top and from the corners of her glasses.  (Id. at 452-455).

15

Sparks further stated that her assailant asked her about her family, then told her to lie back on the ground and open her mouth. He subsequently put four pills in her mouth and told her to swallow them.  (Id. at 456).  He continued to ask her questions about her family, but interrupted her and asked if he could have sex with her.  She did not respond.  The assailant then told her to take her pants and underwear off.  He moved on top of her and told her to put his penis in her vagina for him.  (Id. at 458-459).  When he finished sexually assaulting her, he let her dress and took her back to her car.  (Id. at 455-463).

Sparks stated that, at some point, she fell down and pretended she was hurt, hoping that her assailant would leave her.  Instead, he carried her back to the car, and forced her to drive him around again.  (Id. at 460-463).  When they reached the community of Belle, West Virginia, they drove around the parking lot of a plant. During that time, the assailant told Sparks how pretty she was and stated that he wished they had met under different circumstances. (Id. at 463).

They subsequently drove to Charleston, where the assailant instructed her to drive up a dirt road to a location overlooking the city.  There, she was forced to get into the back seat of her car, where the assailant again sexually assaulted her, and told her to enjoy herself.  (Id. at 464-468).  He taped her wrists behind her back and placed her in the back seat.  (Id. at 469).  He then

16

attempted to drive her car, but had difficulty with the standard transmission, so he made Sparks drive again.  As they attempted to drive up another steep hill, the clutch gave out, and Sparks stopped the car.  (Id. at 469-475).  Throughout this time, Sparks was able to get quick glances of her assailant, particularly the left side of his face.  (Id. at 474).

The assailant then exited the vehicle, and told Sparks not to get out of the car until he was gone.  (Id. at 476).  Sparks stated that she watched him walk away using her side rear view mirror. However, he then returned to the car and said, "I'm not gone yet." (Id. at 476-477).  He warned her that, if she got out of the car before he was gone, he would shoot her.  (Id. at 477).  Once she was sure that he was gone, she went to a local market and called the police.  (Id. at 477).

Sparks was taken to the Women and Children's Hospital and underwent a sexual assault examination.  She sustained no obvious injuries, other than a number of scratches.  (Id. at 524-525; # 66, Ex. 32 at 302).  Clothing items including her panties, a pair of blue jeans, nylon footies, and a shirt were collected by the police.  The police also took a carpet sample from Sparks' car and collected the vaginal swabs and slides from the hospital.  (Id. at 501, 522-525).

The morning following the assaults, Sparks accompanied the police to the location on the mountain where the first sexual

17

assault occurred.   The police located a prescription pill bottle there.   (Id. at 481-482).   The label on the bottle was dated "9/6/88," the date of the assaults on Sparks, and the bottle was issued to "John McLaurin." (# 66, Ex. 34 at 686).

Sparks was subsequently shown a photographic array containing 12 photographs, which consisted of frontal views and profile views of six black males.   After about five minutes, and some hesitation between two photographs, Sparks thought she recognized Petitioner as her assailant.   Sparks testified that she told the police that her concern was that the profile she had seen of her assailant was from another angle.   Allegedly, Sparks was then shown another profile picture of Petitioner, whom she then identified as her assailant.   (Id. at 486-497; # 66, Ex. 34 at 689-690).

The investigating officers who testified at trial did not recall showing Sparks an additional photograph, and there was no thirteenth photograph included in the photographic array evidence admitted at trial, or provided to the defense in discovery.   (# 66, Ex. 33 at 516; # 66, Ex. 34 at 689-690).   Sparks was permitted to give an in-court identification, and she identified Petitioner as her assailant during the trial.   (Id. at 485).

**B.   Events concerning serology evidence.**

<u>Testing of evidence and drafting of reports</u>

The Capone assault occurred on August 19, 1988.   The evidence in the Capone case that was submitted to the State Police Crime Lab

18

for testing was assigned Case No. S-88-461.  Raw data sheets
concerning testing on the Capone evidence were completed on August
24, 1988 and August 29, 1988.  (# 84, Attach. 1, Section 1, at 29).
According to Trooper Ted Smith's cover letter enclosing these
records, it appears that this testing was conducted by Trooper H.B.
Myers (hereinafter "Myers").  A case worksheet[2] for this case was
completed by Trooper Fred Zain (hereinafter "Zain") on August 22,
2008.[3]  (Id. at 28).

The Townsend assault occurred on September 4, 1988.  The
evidence in the Townsend case that was submitted to the State
Police Crime Lab for testing was assigned Case No. S-88-497.  The
testing on the Townsend evidence was performed by Trooper Ted Smith
(hereinafter "Smith") between September 6 and September 8, 1988.
(# 84, Attach. 1, Section 1, at 29).  The Townsend case worksheet
was completed by Smith on September 6, 1988.

The Sparks assault occurred on September 6, 1988.  The
evidence in the Sparks case that was submitted to the State Police

---

[2]  As explained by Troopers Smith and Myers during their
depositions in Petitioner's Zain I habeas proceedings, the case
worksheet is the principle document from which reports are drafted,
and was the document upon which the analysts would rely in support
of the results to which they testified at trial.  Smith stated that
it was not unusual for duplicate or additional test results to be
placed directly on the case worksheet, so that there would be no raw
data sheets from which to verify test results.  (# 66, Ex. 38 at 17,
58; # 66, Ex. 39 at 26-27; # 66, Ex. 36 at 13).

[3]  The undersigned notes that this case worksheet contains a
date that precedes the dates of the raw data sheets in this case.

Crime Lab for testing was assigned Case No. S-88-511. Raw data sheets indicate that testing was performed on the Sparks evidence on September 9, 1988. (Id.) Trooper H.B. Myers testified that the raw data sheet appeared to be in the handwriting of Trooper Jeff Bowles. (# 66, Ex. 36 at 9-10). Trooper Ted Smith testified that some of writing on the Sparks raw data sheets appeared to be in the handwriting of Jeff Bowles and some in the handwriting of Fred Zain. (# 66, Ex. 38 at 11-12). The case worksheet for this case is contained in # 84, Attach. 1, Section 1, at 26. The undersigned cannot read the date on which the case worksheet was completed.[4]

On September 12, 1988, Smith authored a report in the Townsend case which stated in pertinent part:

> Seminal fluid and spermatozoa were identified on the vaginal swabs and slides. Seminal fluid was identified on the panties. No seminal fluid or spermatozoa was identified on the remaining items. Insufficient known pubic hairs were submitted. Fifteen to twenty pulled pubic hairs should be submitted for comparison purposes. A known blood specimen should be submitted for comparison purposes.

(Id. at 20).

On September 19, 1988, Zain wrote reports in the Capone and Sparks cases. The Capone report stated: "Seminal fluid and spermatozoa were identified on the vaginal smear slides, swabs, panties, slacks and seat sample. Known blood specimens should be

---

[4] At the bottom of the Sparks case worksheet, Zain listed the results for McLaurin's known blood sample (S-88-555), which will be discussed infra. That part of the case worksheet is dated September 28, 1988.

submitted for comparison purposes." (Id. at 7).  The Sparks report stated: "Spermatozoa and seminal fluid was identified on the vaginal slides, swabs, blue jeans and carpet sample.  No seminal fluid was identified on the remaining items.  Known blood specimens should be submitted for comparison purposes." (Id. at 16).

On September 28, 1988, a known blood sample was taken from McLaurin.  Raw data sheets concerning testing on McLaurin's known blood sample, which appears to have been performed by Zain, are dated September 30, 1988.  That sample was assigned Case No. S-88-555. (Id. at 29).

On October 4, 1988, Zain wrote a report in the Sparks case making a comparison of the known blood sample of McLaurin to the other test results in that case.  According to that report the results were as follows:

RESULTS OF EXAMINATION:

The known blood specimen of John E. McLaurin contained the following genetic markers:

| SYSTEM | MARKER |
|---|---|
| ABO | O |
| Phosphoglucomutase (PGM) | 2+1+ |
| Glyoxalase I (GLO I) | 2-1 |
| Lewis (Le) | a-b+ |

RESULTS OF EXAMINATION (CONTINUED):

Seminal fluid identified on the vaginal slides, swabs, blue jeans and carpet sample previously submitted (S-88-511) contained the following genetic markers:

| SYSTEM | MARKER |
|--------|--------|
| ABO | O (H) |
| PGM | 2+1+ |
| GLO I | 2-1 |
| Le | a-b+ |

The known blood sample of Beth A. Sparks contained the following genetic markers:

| SYSTEM | MARKER |
|--------|--------|
| ABO | O |
| PGM | 1+ |
| GLO I | 2-1 |
| Le | a-b+ |

CONCLUSION:

Genetic markers identified from John E. McLaurin were consistent with the genetic markers identified from the seminal fluid on the slides, swabs, blue jeans and carpet.

The combination of markers identified occurs in 4.1% of the general population of West Virginia.

(Id. at 10-11).

On October 11, 1988, Zain was requested to do a comparison between McLaurin's known blood sample and the evidence in the Capone and Townsend cases.  (Id. at 19).

On October 27, 1988, Smith performed testing on a known blood sample from Leroy DeGuid, which was exculpatory when compared to the Townsend evidence.[5]  (# 84, Attach. 1, Section 2, at 12-13).

On October 28, 1988, Smith wrote a supplemental report comparing McLaurin's known blood sample to the results on the

_____

[5] It appears to the undersigned that this sample may have been taken from the suspect that Townsend had mis-identified as her attacker shortly after her assault.

22

Townsend evidence.   The report stated in pertinent part:

RESULTS OF EXAMINATION: The known blood specimen of John E. McLaurin contained the following genetic markers:

| SYSTEM | MARKER |
|---|---|
| ABO | O |
| Phosphoglucomutase (PGM) | 2+1+ |
| Glyoxalase I (GLO I) | 2-1 |
| Lewis (Le) | a-b+ |

The secretions identified on the vaginal swabs and panties (S-88-497) contained the following genetic markers:

| SYSTEM | MARKER |
|---|---|
| ABO | O (H) |
| PGM | 2+,1+,1- |
| GLO I | 2,1 |

RESULTS OF EXAMINATION CONTINUED:

The known blood specimen of Joyce Townsend (S-88-497) contained the following genetic markers:

| SYSTEM | MARKER |
|---|---|
| ABO | O (H) |
| PGM | 1+,1- |
| GLO I | 1 |
| Le | a-b+ |

CONCLUSION: The genetic marker[s] identified on the swabs and panties were indicative of a mixture of secretions.   The PGM -2+ and GLO I-2 were not consistent with the markers of Joyce Townsend, but were consistent with the markers of John E. McLaurin.

The genetic markers identified from John E. McLaurin occur in approximately 1.97% of the general male population of West Virginia.

The markers identified from Joyce Townsend occur in approximately 1.90% of the general female population of West Virginia.

(# 84, Attach. 1, Section 1, at 21-22).

23

McLaurin was indicted in April of 1989.  Zain left employment with the State Police Crime Lab on or about July 1, 1989.

In anticipation of testifying at Petitioner's trial, Myers reviewed the evidence and wrote supplemental reports in the Capone and Sparks cases on July 26, 1989.[6] Ultimately, however, Myers did not testify at the trial, and Zain was brought back from Texas to provide testimony.

<u>Myers' supplemental reports</u>

Myers' supplemental report in the Capone case did not alter the results for the known blood samples of either McLaurin or Capone.  However, Myers modified the description of the results on the crime evidence to reflect that the secretions could have been a mixture of seminal and vaginal fluids by putting a comma between the 2+ and the 1+.  Thus, the second page of the report was modified as follows:

<u>RESULTS OF EXAMINATION (CONTINUED):</u>

The mixture of secretions identified on the vaginal slides, swabs, panties, slacks and seat sample (S-88-461) contained the following genetic markers:

| SYSTEM | MARKER |
|--------|--------|
| ABO | O (H) |
| PGM | 2+,1+ |

<u>CONCLUSION:</u>

The combination of genetic markers previously identified from

---

[6]  Myers did not do any additional testing of the evidence at that time.

the vaginal slides, swabs, panties, slacks and seat sample (S-88-461) were consistent with the known genetic markers of both John E. McLaurin and Connie Capone and could have originated from either of them.

(# 48, Attach. 1, Section 1, at 5-6).  Myers' supplemental report

in the Sparks case also did not alter the results from the known

blood samples of McLaurin or Sparks, but modified the section on

the results of the crime evidence as follows:

The mixture of secretions identified on the vaginal slides, swabs, blue jeans and carpet sample (S-88-511) contained the following genetic markers:

| SYSTEM | MARKER |
|--------|--------|
| ABO | O (H) |
| PGM | 2+,1+ |
| GLO | 2,1 |

CONCLUSION:

The combination of genetic markers identified from the vaginal slides, swabs, blue jeans, and carpet samples (S-88-511) were consistent with the known genetic samples of John E. McLaurin and could have originated from him.  The PGM marker 2+ was not consistent with the known PGM of Beth A. Sparks and could not have originated from her.

The combination of genetic markers identified from the known blood specimen of John E. McLaurin occur in approximately 4.1% of the general population of West Virginia.

The combination of markers identified from the known blood specimen of Beth A. Sparks occur in approximately 13.5% of the general population of West Virginia.

(Id. at 12-13).

Defense motion to suppress serology evidence

During Petitioner's trial, defense counsel moved to suppress

the serology reports based on the differences in the percentages

derived by Zain and Smith, and also based upon the discovery that Myers and another serologist, Jeff Bowles, had done some of the testing in the various cases, and because Myers had written revised reports in the Capone and Sparks cases. The trial court heard in camera testimony from Zain, who clarified the issue concerning the percentage differences, but who could not state why Myers had revised his reports. The trial court subsequently denied the motion to suppress the reports and testimony, but ordered that testimony could only be provided by the persons who performed the testing and wrote the reports. In other words, Zain could not testify about testing or reports drafted by Myers, Smith or Bowles. Those individuals were expected to testify about their own work. As previously mentioned, only Zain and Smith were called to testify at trial.

<u>Serology evidence presented at trial</u>

Petitioner's trial took place on November 14-16, 21, 22 and 27, 1989.[7] Zain testified about the serology testing conducted on the evidence from the Capone and Sparks crimes. (# 66, Ex. 33 at 531-532, 579-583). Smith also testified at Petitioner's trial. (# 66, Ex. 34 at 700-728). Zain and Smith testified generally about serology testing and methodology, and the acceptance of those methods in the forensic science community. Both testified that

---

[7] Petitioner's trial fell around the Thanksgiving holiday, so there was a break in the trial proceedings.

there are four blood typing systems that they generally tested for and reported. (# 66, Ex. 33 at 594-596; # 66, Ex. 34 at 705-708). The first is the ABO blood typing, which has four blood types: A, B, O and AB.   The second typing involves an enzyme called phosphoglucomutase, which is abbreviated as "PGM."  There are ten PGM blood types.   Another enzyme that can be tested for is glyoxalase, which is abbreviated as "GLO-I," which has three blood types.  A fourth blood characteristic that they can test for is called the Lewis factor ("LE").  The LE indicates whether an individual is a secretor, someone whose ABO blood type is secreted into, and detectable in, bodily fluids, such as vaginal fluid or semen, saliva and perspiration, etc.  The three possible LE types are a-b+ (secretors), a+b- (non-secretors), or a-b- (can include secretors or non-secretors).  (# 66, Ex. 34 at 649).

Zain further testified that evidence in these cases was submitted pursuant to standard protocol, and the procedure for testing included identifying whether bodily fluids were on the evidence, identifying the blood characteristics in the bodily fluids, and then comparing those results with the blood characteristics of known blood specimens from the victim and a suspect, if available.  (# 66, Ex. 33 at 616).  Thus, known blood samples were taken from Petitioner and the victims and compared to the results from the evidence in these cases.

27

The methodology used for identification of semen on a particular piece of evidence is done by a process called electrophoresis, which involves passing an electrical current through a particular substance which separates into certain bands, so semen can be identified.  Zain further stated that ABO typing for the semen is done by means of a process called absorption inhibition.  Electrophoresis is also used to identify enzyme markers such as PGM and GLO-I.  (Id. at 616-617).

Zain testified that he could identify three relevant blood type characteristics from the known blood sample from Petitioner. He stated that Petitioner's ABO blood type was O; that his PGM type was 2+1+; and that his LE factor was a-b+, which identified Petitioner as a secretor.  (Id. at 602).

Zain also testified about the test results of the evidence in the Capone and Sparks cases.  His testimony about the results for each victim is summarized below.

Zain and Smith also testified about the percentage of males in West Virginia and, more specifically, in Kanawha County, who could have been the semen depositor in each case, based on the combination of genetic markers found in the samples from the evidence.[8]

---

[8]    The percentages were derived from population statistics. It appears that Zain's calculations were based upon an assumption that the State of West Virginia has a population of 1,000,000 adults.  Smith's were based upon an assumption that the adult population in West Virginia was 1,750,000.  The percentages were

<u>Connie Capone</u>

Zain told the jury he identified seminal fluid and spermatozoa on Capone's panties, slacks and the cutting from her car seat. (<u>Id.</u> at 592). He also identified seminal fluid and sperm cells on the vaginal smear slides and swabs taken during her sexual assault examination. Zain said that a dribbling-type semen stain sample, with no mixture of additional secretions, such as vaginal fluid, was taken from the car seat. (<u>Id.</u> at 603-604).

According to Zain, testing demonstrated that the semen depositor on the car seat sample was an ABO type O secretor, with a PGM of 2+1+, characteristics that were consistent with those of Petitioner. Zain reached similar conclusions concerning the comparison of Petitioner's known blood characteristics and those on the clothing sample stains, and vaginal slides and swabs. (<u>Id.</u> at 603-605, 624). Although Capone also had these same blood characteristics (O secretor and PGM 2+1+), she obviously could not have been the semen depositor. (<u>Id.</u> at 625). Thus, Zain testified that Petitioner could have been the semen depositor.

Zain further testified that the combination of those same three blood type characteristics could be found in approximately 5.2 percent of the general population of West Virginia, or

---

calculated for each genetic factor result, and to obtain a percentage for the combination of those factors, the percentages were multiplied by one another.

approximately 2.5 percent of the male population.  (Id. at 605-606).  For Kanawha County, Zain testified that, excluding race as a factor, this percentage resulted in approximately 2,500 males out of 100,000 with the same combination of blood type characteristics. (Id. at 633-634).  Zain rejected the use of race as a statistical factor in estimating genetic frequency because of the resulting reduction in the population sample.  (Id. at 629-630).

Smith was also asked about the percentage of the population that might have the same combination of blood type characteristics as Petitioner, and his testimony differed slightly from Zain's. Smith stated that approximately 4.2 percent of a randomly selected group of individuals, male or female, could have that combination of blood type characteristics.  He added that since the blood type characteristics were identified from seminal fluid, roughly half of the randomly selected group would be excluded, based on West Virginia's statistics of having 48 percent males and 52 percent females.  (# 66, Ex. 34 at 652).  Thus, the 4.2 percent would be taken from the 48 percent of West Virginia's population to determine how many males could have contributed these markers, or 1.97 percent.  (Id. at 655).

Smith was asked to calculate his own percentages in the Capone case.  Smith testified that in the State of West Virginia, he would expect to find about 14,000 males with the combination of factors possessed by the Capone semen depositor.  (Id. at 723).  When asked

30

for the number of males in Kanawha County, he placed that number at approximately 8,000, assuming a population of 200,000 adults in Kanawha County.  (Id.)

Smith also testified that three percent of the West Virginia population was black, and that factoring that into the calculations would decrease the percentages, so they normally did not consider race in their calculations.  (Id. at 726-727).  During closing arguments, the prosecutor told the jury to consider the racial percentage and work their own statistical calculations concerning the serology results.  (Id. at 872).

### Beth Ann Sparks

Zain also testified about the test results on the evidence from the Sparks assaults.  He testified that he received panties, a pair of jeans, nylon footies, a shirt, carpet samples, and the vaginal swabs and slides from the sexual assault examination.  (# 66, Ex. 33 at 606, 612).  Zain stated that the vaginal swabs and slides, the jeans and the carpet samples contained semen with a particular combination of blood characteristics.  No semen was found on Sparks' panties.

A known blood specimen was taken from Sparks, which was used "to eliminate blood typings that could have originated from her." (Id. at 612-613).  Zain placed his findings concerning the Sparks sample on a blackboard for the jury, but did not provide much narrative concerning his findings.  (Id. at 613).  Zain did testify

31

that Sparks and McLaurin possessed the same genetic markers in three of the four characteristics tested.    Their PGM markers, however, were different.    (Id. at 625-626).

Zain further testified that, because he was able to identify the GLO-I factors in the Sparks case, he estimated that the number of possible semen depositors in that case was reduced from 2.5 percent of the general population of West Virginia to 1.9 percent. (Id. at 620-622).  Smith agreed with this percentage and estimated that the percentage figure equaled approximately 34,775 males in the State of West Virginia, and approximately 3,940 males in Kanawha County.  (# 66, Ex. 34 at 724).

Although Zain testified to the results that were contained in his written reports in the Capone and Sparks cases, it does not appear that the reports themselves were admitted into evidence and provided to the jury.

<u>Joyce Townsend</u>

Smith testified that he performed all of the testing in the Townsend case.   Smith submitted a forensic report concerning the Townsend test results on October 28, 1988.   Again, it does not appear that the report itself was admitted into evidence and provided to the jury.

Smith stated that he identified seminal fluid and spermatozoa on the vaginal swabs and slides, and identified seminal fluid on Townsend's panties.  (Id. at 704).  He did not identify any seminal

32

fluid, spermatozoa or blood on any of the other items that were submitted for testing. (Id.) The swabs, slides and panties indicated results of an ABO blood type of O; a PGM blood type of 2+1+1-, and a GLO-I blood type of 2.1 or 2-1. (Id. at 708). Townsend's known blood sample yielded results of ABO type O; PGM type 1+1-, which means that the 2+ in the PGM result from the panties and swabs and slides did not originate from her; a GLO-I type of 1, which means the 2 in the 2.1 result did not originate from her. (Id. at 708-709).

Comparing these results to the known blood sample of Petitioner, Smith stated that the PGM 2+ and the PGM 1+ in the results on the panties, swabs and slides could have originated from Petitioner, and the GLO-I 2.1 was consistent with Petitioner's; thus, he could not be excluded as the semen depositor on this evidence. (Id. at 709). Smith further testified that 5.5 percent of the male population in West Virginia could have the genetic markers that would have resulted in the combination of characteristics on the Townsend evidence. (Id. at 713). Assuming a male population of approximately 100,000 in Kanawha County, 11,000 males could have contributed to the Townsend evidentiary sample. (Id. at 719-720).

Both Zain and Smith testified that, based on the test results, the semen depositor in each of these cases could have been the same person. (# 66, Ex. 33 at 624; # 66, Ex. 34 at 726). Thus, the

33

only discrepancy in the serology testimony presented to the jury concerned the percentages of the population who would have the same blood type characteristics as those found in the evidence in these cases.  Myers did not testify and the jury was not informed of the differences in his findings from those of Zain.

<u>The Investigations of the Serology Lab</u>

On June 2, 1993, then Prosecuting Attorney for Kanawha County, William Forbes, filed a petition with the SCAWV requesting the appointment of a circuit judge to conduct an investigation into the policies, procedures and records of the West Virginia State Police Crime Lab's Serology Division to determine whether habeas corpus relief should be granted to prisoners whose convictions were obtained through the willfully false testimony of Fred Zain.[9]  The Honorable James O. Holliday, a retired circuit judge, was appointed to supervise the investigation.

On November 4, 1993, following a five-month investigation, Judge Holliday filed his report with the SCAWV.  Judge Holliday made the following findings of fact:

> The acts of misconduct on the part of Zain included (1) overstating the strength of results; (2) overstating the

[9]    This request was made following the 1992 reversal of defendant Glen Dale Woodall's conviction by the SCAWV, after DNA testing had conclusively established that he was not the perpetrator of his crime of conviction.  Zain had offered inculpatory evidence at Woodall's trial.  Woodall subsequently filed a civil suit against the State of West Virginia.  Thereafter, an internal audit of Zain's work was conducted by the State Police, which identified certain improprieties.  This investigation was then ordered by the SCAWV.

frequency of genetic matches on individual pieces of evidence; (3) misreporting the frequency of genetic matches on multiple pieces of evidence; (4) reporting that multiple items had been tested, when only a single item had been tested; (5) reporting inconclusive results as conclusive; (6) repeatedly altering laboratory records; (7) grouping results to create the erroneous impression that genetic markers had been obtained from all samples tested; (8) failing to report conflicting results; (9) failing to conduct or to report conducting additional testing to resolve conflicting results; (10) implying a match with a suspect when testing supported only a match with the victim; and (11) reporting scientifically impossible or improbable results. Moreover, the [American Society of Crime Laboratory Directors/Laboratory Accreditation Board [ASCLD]] concluded that this misconduct was "the result of systematic practice rather than an occasional inadvertent error." [Footnote omitted].

* * *

The overwhelming evidence of a pattern and practice of misconduct by Zain completely undermines the validity and reliability of any forensic work he performed or reported during his tenure in the serology department of the state police crime laboratory.  If the information which is now available concerning the pattern and practice of misconduct by Zain had been available during the prosecution of cases in which he was involved, the evidence regarding the results of serological testing would have been deemed inadmissible.

In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division, 438 S.E.2d 501, 516, 518 (W. Va. 1993)("Zain I").  Judge Holliday concluded that the findings of fact made in his report constituted newly discovered evidence, and recommended that "as a matter of law, any testimonial or documentary evidence offered by Zain at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in any subsequent

habeas corpus proceeding." Id. at 520.

On November 10, 1993, the SCAWV issued its opinion in Zain I. The SCAWV found that "Trooper Zain's pattern and practice of misconduct completely undermined the validity and reliability of any forensic work he performed or reported, and thus constitutes newly discovered evidence." Id. at 506.  The opinion then sets forth the appropriate standards of review for granting a new trial based on newly discovered evidence, and for granting habeas relief based on the use of falsified evidence. Id. at 504-505.

The SCAWV agreed with Judge Holliday's recommendation that:

> in any habeas corpus hearing involving Zain evidence, the only issue is whether the evidence presented at trial, independent of the forensic evidence presented by Trooper Zain, would have been sufficient to support the verdict. As we earlier stated, once the use of false evidence is established, as here, such use constitutes a violation of due process.  The only inquiry that remains is to analyze the other evidence in the case under the [State v. Atkins, 261 S.E.2d 55 (W. Va. 1979)] rule to determine if there is sufficient evidence to uphold the conviction.

Id.  The SCAWV applied the Atkins rule in its review of claims concerning falsification of evidence by Zain, stating:

> Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must be made to determine whether the error had any prejudicial effect on the jury.

Id.

## Petitioner's serology-based claims

From a review of the documents that have been submitted to this court, it appears that the first time Petitioner raised any issue concerning the serology evidence in his case was in a Petition for a Writ of Habeas Corpus filed in the SCAWV, under its original jurisdiction, on December 29, 1992 (No. 922332).[10]  In the first original jurisdiction petition, Petitioner asserted as follows:

> 6.    That Trooper Fred S. Zain, former Chief of Serology for the State of West Virginia, blotched [sic; botched?] or otherwise presented false testimony at petitioner's trial which, without a hearing in the Circuit Court to develop the issue, will deny the petitioner due process and equal protection of the law.

> 7.    That Trooper Zain testified at petitioner's trial that he performed testing on certain scientific evidence which was reported by yet another serology expert, Trooper H.B. Myers, and the conclusions of the two experts are in sharp conflict.   An evidentiary hearing with the appointment of counsel will be necessary to afford the petitioner the right to inspect and study the lab notes of Trooper Fred Zain and H.B. Myers to determine what caused

---

[10]  In Petitioner's initial habeas corpus petition filed in the Circuit Court of Kanawha County on or about October 29, 1991, Petitioner raised a claim alleging that he was denied the right to a fair trial because the trial court admitted expert testimony regarding forensic serology testing without a determination of the acceptance and reliability of such testing in the scientific community (# 48, Ex. 3 at 14-15, Ground Eight).   This claim for relief did not challenge the specific serological test results in Petitioner's case.   (Id.)  On December 23, 1991, the Circuit Court entered an Order denying the claims in that petition on the merits, but without detailed discussion of each claim.

conflicting results on serology evidence presented at petitioner's trial. Also, a determination on who actually tested the material that was ultimately testified to by Zain needs addressed.

8.   That reports prepared and submitted by Trooper H.B. Myers excluded the petitioner as the perpetrator of the crime when the testimony and interpretation of the same report by Trooper Fred Zain placed the petitioner in a small percentage of the population of the State of West Virginia which could have committed the crimes charged. An evidentiary hearing is needed to further develop the record on this contention.

9.   That the Circuit Court denied the petitioner a fair trial when it allowed the prosecuting attorney to improperly and unfairly vouch for the investigation procedure by telling the jury "the reason is these police officers didn't manufacture any evidence, didn't investigate this case in a wrongful manner." When, in fact, the testimony of Trooper Zain and H.B. Myers was in sharp conflict without explanation to the jury. This issue has not been fully developed below and an evidentiary hearing is needed to further develop the record on this contention.

10.  That the Circuit Court denied the petitioner a fair trial when it allowed the prosecuting attorney to improperly and unfairly vouch the record by telling the jury that "the police if they were going to manufacture something or do something impermissible, would have manufactured some hair samples." An evidentiary hearing is needed to further develop the record on this contention.

11.  That Trooper Fred Zain was permitted to testify to certain percentages of population which were inaccurate and misleading to the jury. An evidentiary hearing is needed to further develop this contention.

* * *

21.  That petitioner suffered ineffective assistance of counsel when counsel failed to request independent scientific testing on the serology evidence

38

>presented at trial. This is especially true given the procedure utilized by the State of West Virginia in testing the evidence and presenting conflicting results. An evidentiary hearing will be necessary to supplement the record and permit the petitioner to make a showing that his counsel was ineffective by not hiring or consulting an independent scientist.

(# 48, Ex. 6). This petition was summarily refused on February 23, 1993. (Id., Ex. 7).

Petitioner filed another original jurisdiction Petition for a Writ of Habeas Corpus in the SCAWV on March 12, 1993 (No. 930363). (Id., Ex. 8). In that petition, Petitioner raised some of the same allegations concerning the serology evidence; however, those allegations appeared in differently numbered paragraphs. (Id., ¶¶ 6, 7, 9, 10, 11, 22). This second original jurisdiction petition added the following allegations:

>8.   That the petitioner will be unable, without an evidentiary hearing in a state court, to present a constitutional violation to this Court with respect to the serology evidence without first making some determination as to which expert actually tested the material that was ultimately testified to by Zain at trial. The basis of which was heavily relied upon by the jury and resulted in substantial prejudice to the petitioner.

>                    * * *

>12.   That Trooper Fred Zain was permitted to testify to mathematical probabilities which was [sic; were] used by the prosecution in a manner that infected the case with fatal error and distorted the jury's role of determining guilt or innocence according to long settled rules. Moreover, the percentages of population testified to below were inaccurate and totally misleading to the jury. An evidentiary hearing will be necessary to further develop this

39

> contention.  *See*, e.g., <u>People v. Collins</u>, 66 Cal.
> Rptr. 497, 434 P.2d 33 (1968); <u>State v. Boyd</u>, 331
> N.W.2d 170 (Minn. 1983); <u>State v. Carlson</u>, 267
> N.W.2d 170 (Minn. 1978); <u>State v. Joon Kye Kim</u>, 198
> N.W. 2d 544 (Minn. 1987).

(<u>Id.</u>, ¶¶ 8 and 12).  This original jurisdiction petition was summarily refused without prejudice on November 17, 1993, in order to allow Petitioner to file a petition for a writ of habeas corpus pursuant to the Court's <u>Zain I</u> decision, which was issued on November 10, 1993.  (<u>Id.</u>, Ex. 9).

On December 12, 1993, Petitioner filed his <u>Zain I</u> habeas petition in the SCAWV on the form prepared by the Court.  (<u>Id.</u>, Ex. 10).  The form petition simply stated:

> I, <u>  John E. McLaurin  </u>, hereby petition for relief under
> the West Virginia Post-Conviction Habeas Corpus Act, W.
> Va. Code § 53-4A-1 et. seq., due to the involvement in my
> prosecution of former West Virginia State Police
> Serologist Fred Zain.  I hereby consent to DNA testing by
> an independent laboratory selected by the Supreme Court
> of Appeals of any forensic evidence, such as blood,
> semen, saliva, hair, or other material, still available
> in my case.  I further consent to the taking of a fresh
> sample of my blood for purposes of such DNA testing.

(<u>Id.</u> at 1).  Given the standard of review set forth by the SCAWV in the <u>Zain I</u> decision, the form petition did not provide for the assertion of specific claims for relief concerning the serology evidence.  (<u>Id.</u>)

On December 16, 1993, the SCAWV issued an opinion directing the Circuit Court of Kanawha County to produce Petitioner, to appoint counsel, and to "do and receive what shall be ordered by such court concerning the petitioner pursuant to the opinion of

40

this Court in [Zain I]."  (Id., Ex. 11).  Kanawha County Public
Defender George Castelle was appointed to represent Petitioner in
that proceeding.  It does not appear that Mr. Castelle filed any
subsequent or more detailed amended petition.

## Zain II opinion

On May 20, 1994, before any proceedings had taken place in
Petitioner's Zain I habeas proceeding, the SCAWV issued its opinion
in In re: An Investigation of West Virginia State Police Crime Lab
Serology Division, 445 S.E.2d 165 (W. Va. 1994) ("Zain II").  In
that proceeding, Judge Holliday was asked to investigate and report
on whether other serologists at the State Police Crime Lab had
committed acts similar to Zain.  Judge Holliday found some evidence
of errors by other serologists, but concluded that they were
"relatively minor," "occasional" and "not the result of an
intentional and systematic subversion of the criminal justice
system."  Id. at 167.  Furthermore, the errors found "did not
appear to have 'significantly compromised the prosecutions of the
cases in which these other serologists were involved.'"  Id.  The
ASCLD team that conducted the investigation noted that "No instance
was found in which an error or omission was likely to have had a
significant impact on the conclusion, nor the weight given to the
conclusion, on an apparently probative item of evidence."  Id. at
167 n.2.  On the basis of this report, the SCAWV held that
"serology reports prepared by employees of the Serology Division of

41

the West Virginia State Police Crime Laboratory, other than Trooper Zain, are not subject to the invalidation and other strictures contained in Zain I." Id. at 168.

Petitioner's Zain I habeas proceedings

On April 3, 1995, Trooper Smith wrote a letter to Mary Beth Kershner, Assistant Prosecuting Attorney for Kanawha County, enclosing documentation from the Capone, Sparks and Townsend cases and included a summary of what is supported by the records. The letter states:

> Enclosed you will find the material requested regarding the John McLaurin case: reference numbers S-88-511, S-88-555, S-88-461, and S-88-497.
>
> The case worksheets indicate that in addition to the basic fluid identification work performed, both ABO (elution and inhibition) and enzyme testing were performed. All of the case worksheets are contained in the files. The reports match the case worksheets. Based solely on the case worksheet data; which, as you are well aware from our past discussions, was the principle and only required record in a case, the data is fairly reported. However, all of the data listed on the worksheets cannot be confirmed through the existence of raw data sheets. Below is a summary of my evaluation of the completeness of the raw data records.
>
> Case S-88-511 [Sparks]:
>
> The case worksheet is contained in the file and reflects testing on the items reported. The worksheet[] suggests duplicate testing on items. There is a general lack of raw data records on the testing in this case. The only data located was found in the records kept by Trooper J.A. Bowles. (Fred was doing a lot of his own work in this time period, he was training Jeff). All of the entries on the worksheets are in the writing of Fred Zain. Without additional extant raw data, it is practically impossible to ascertain the "reliability" of the data reported in this case.

42

Case S-88-555 [McLaurin's known blood sample]:

The case worksheet is also present for this case, at the bottom of the S-88-511 worksheet. The entries are made in the writing of Fred Zain. The raw data sheets indicate that Trooper H.B. Myers performed the enzyme testing on this item. The results are consistent with the report and worksheet. The records do not indicate who performed the ABO test on the blood specimen. (My guess would be Bowles, but it is impossible to say.) At this point in time I cannot be sure, but I deduce that Myers issued the supplemental report on the S-88-555 case because he performed the bulk of the testing on the known blood sample of John McLaurin.

Case S-88-461 [Capone]:

The case worksheet is present for the case. The entries are made in the writing of Fred Zain. The worksheet entries suggest duplication. The only raw data that could be located was on the sheets of H.B. Myers, it could be the duplicate testing, or the original testing, I cannot positively say based on the extant records. The work of Myers confirms the data reported on the case worksheet for four of the six items listed.

Case S-88-497 [Townsend]:

The case worksheet is present for the case. The entries are made in the writing of Trooper T.A. Smith. The raw data sheets accurately reflect the reported data. There is an "inconsistency" with the GLO I type reported on the panties. Several options are available to explain this single inconsistency in the records: it could be the product of a transcription error, it could be the product of duplicate testing, or it could reflect a change of mind by the reviewing analysts (Smith and Myers). It is impossible to say at this point in time. I am inclined to think the latter option is appropriate (this happened frequently). Results first judged to [be] weak often developed with additional exposure time (especially the GLO I system). Since no conscious effort was made on our part to insure that the raw data sheets reflected a change of mind in such occurrences, (the opinion was always noted on the case worksheet), I am not surprised (nor was ASCLD) when occasionally this type of "inconsistency" surfaces.

> At this point in time, the Cappone [sic; Capone] and
> Townsend data appear to be generally intact.  There are
> no "major" problems in the records that would cause me
> any great concern, the reports to a greater or lesser
> degree, fairly reflect the data we have on hand.
> However, the Sparks data is a different matter.  The
> general lack of supportive records and the incompleteness
> of the data that we have, make it impossible to access
> [assess?] what may or may not have happened in this case.
> It fits the pattern of the other Zain cases that we have
> identified; we are just not sure of what was tested or of
> how testing was conducted.

(# 84, Attach. 1, Section 1, at 2-4).

On October 17, 1995 and November 8, 1995, Smith gave deposition testimony for use in Petitioner's <u>Zain I</u> habeas proceeding.  (# 66, Exs. 38 and 39).  On November 8, 1995, Myers gave deposition testimony for use in Petitioner's <u>Zain I</u> habeas proceeding.  (# 66, Ex. 36).  One focus of the deposition questioning concerned the prosecution's knowledge of discrepancies and potential false evidence in Zain's work prior to trial.

Myers testified that he altered Zain's report to make a "more conservative" interpretation of the evidence, because Zain had not accounted for the fact that some of the samples may have contained a mixture of fluids in the same way he would.  (# 66, Ex. 36 at 23).  During his deposition, Myers answered as follows:

> Q.  Does it make a significant difference as to whether
>     something is reported as a mixture or something is
>     not?
>
> A.  The real significance comes in court.  If it is
>     testified that, yes, there is a possibility of
>     mixtures and that is explained, then the
>     significance of the report is lessened a lot.  If
>     the report is stated that it does not indicate a

mixture and it is not explained as a mixture in trial, then that could pose a problem.

(Id. at 31).

Myers stated that Zain's report in the Sparks case did not account for the fact that the secretions on the vaginal swabs and slides would logically be a mixture that included vaginal fluids, as well as semen.  Thus, he added a comma between the PGM 2+1+ that Zain had reported to suggest that the result was from a mixture of fluids.  So, Myers' report listed this result as "2+,1+."  In essence, Myers was saying that the PGM result in that sample could have included a 2+, a 1+ or a 2+1+.  Myers further testified that the 2+ in the PGM result could not have come from Sparks, so there had to be a foreign depositor.  (Id. at 21).  Myers also changed the GLO-I result in the Sparks case to read "2, 1" instead of "2-1" to indicate that it could be a mixture that included a 2, a 2-1 or a 1.  (Id. at 23).

Myers further testified that, at the time he wrote his reports, he did not believe that Zain had faked his results, but that he was uneasy about testifying to Zain's results.  (Id. at 35-36).  Myers specifically stated, "Mine is simply a more conservative interpretation.  He [Zain] would have had more access to the evidence and may have made conclusions that I was not able to make.  So I cannot say that his is wrong."  (Id. at 23-24).  Myers also testified in Petitioner's omnibus hearing, and largely repeated these statements.  (# 70, Ex. 47 at 36-67).

45

In his deposition, Smith stated that he and Myers met with the prosecution in advance of Petitioner's trial and discussed their concerns with Zain's work.   Smith stated that, in the Sparks results, the vaginal swab sample had to be a mixture because the PGM 2+ marker could not have come from the victim.  (# 66, Ex. 38 at 25, 27).   He further testified that Petitioner could not be excluded as the depositor of the seminal fluid in the Sparks case. (Id. at 26, 45-46).

Smith further testified about the lack of underlying raw data for some of the items tested, and the discrepancies on some of the case worksheets and other lab records.

On October 24, 1995, Mark Stolorow, the Director of Orchid Cellmark Diagnostics in Germantown, Maryland, who had been brought in as a consultant in the Zain I cases, wrote a letter to George Castelle in which he provided his opinion concerning the serology records in Petitioner's case.  On November 27, 1995, Mr. Stolorow wrote a second letter to George Castelle and included a supplemental report detailing additional problems with the records and results in these cases.  Stolorow's reports made the following findings:

a.   In contrast with Zain's trial testimony regarding the Capone case (in which Zain included Petitioner within 2.5 percent of the population that could have been the source of semen), the actual lab records apparently showed that there were no genetic

46

markers identified that were foreign to the victim, so that "no male can be eliminated." Thus, rather than being part of 2.5 percent of the population, Petitioner was in 100 percent of the population that could have been the source of the fluids. (# 84, Attach. 2, at 4, 26).

b. "Lewis test" results were totally fabricated. (Id. at 14).

c. Zain purported to find the genetic markers AD and AKA in the sexual assault fluids, yet neither genetic marker ever exists in semen or vaginal secretions. (Id. at 14-18).

d. Genetic markers were reported to be found on the vaginal slides when, in fact, "the worksheet clearly shows that no genetic marker analysis at all was performed on the vaginal slides." (Id. at 4).

e. Numerous discrepancies in the recorded test results for all three victims render the data untrustworthy and unreliable in all three cases. (Id. at 11-20, 30-31).

However, Stolorow also stated:

The conclusions stated by Fred Zain and Ted Smith that the defendant, John McLaurin is included as a possible contributor of semen in all three cases appear to be consistent with the serological data appearing in the reports and worksheets. If one assumes that the testing is accurate and reliable, Mr. McLaurin cannot be eliminated as a possible semen donor in these cases.

(Id. at 4).

47

On December 18, 1995, the Honorable Irene Berger gave deposition testimony for use in Petitioner's <u>Zain I</u> habeas proceeding. Her testimony concentrated on her knowledge of the discrepancies between Zain's reports and Myers' reports in the Capone and Sparks cases, and the State's decision to call Zain as a witness in Petitioner's case, and not to call Myers. (# 66, Ex. 37). Judge Berger testified that, while she was aware of the discrepancies concerning the populations percentages, she did not question Zain's work and she was the one who decided to call him as a witness. (# 66, Ex. 37 at 9-22). She specifically stated:

> I didn't question his work in the McLaurin case. There were no questions about his work then even. There was a situation where two experts disagreed, as I remember, about the population percentage, but the question about his work, even in the McLaurin case, I never suspected, what has, you know come to light now.

(<u>Id.</u> at 9-10).

Hearings were held in Petitioner's <u>Zain I</u> habeas proceedings on December 20, 1995 and July 11, 1996 before the Honorable Herman Canady, Kanawha County Circuit Judge. No evidence was received during those hearings. (# 66, Ex. 35; # 70, Ex. 44).

During the December 20, 1995 hearing, Mr. Castelle requested discovery of evidence he believed to be necessary to the adjudication of Petitioner's claims. Prior to this hearing, Mr. Castelle had requested and received copies of the raw data from the State Police Crime Lab, and had taken the depositions of Troopers Smith and Myers and Judge Berger, as discussed above. Mr.

48

Castelle's discovery motions attempted to determine whether there was any exculpatory evidence in the investigative files that had not been produced to the defense.  In essence then, Petitioner was attempting to assert a claim under Brady v. Maryland, 373 U.S, 83 (1963), and Kyles v. Whitley, 514 U.S. 419 (1995), concerning the failure to disclose exculpatory or impeachment evidence.

During the hearing, Mr. Castelle stated:

MR. CASTELLE: No, Judge.  As I set forth in the motion, John McLaurin, the petitioner is entitled to a habeas corpus proceeding and is entitled to the discovery of relevant materials.  Particularly, he's entitled to exculpatory materials.

And based on the deposition of Ted Smith and Trooper Myers, they met with the prosecutor or prosecutors, at least one of the prosecutors in this case, in advance of Fred Zain testifying and expressed their reservations about his work.

In the deposition of Irene Berger this past Monday, her memory is different.  She remembers that they met, but that disagreement over Fred's work was minor.  The records indicate that Brent Myers in the case involving one of the victims, rewrote Fred Zain's report because Fred Zain's report was incorrect.

It wasn't a minor disagreement over population percentages.  It was a very different disagreement over whether the fluids were a mixture or were not a mixture, which has a very significant bearing on culpability.

So since the United States Supreme Court has ruled that petitioners are entitled to all exculpatory information and that information affecting the credibility of a witness is included in that if, in fact, the prosecutors received information regarding Fred Zain's credibility or lack of it before he testified in this trial, it's a Brady violation and a very different standard on review than the Fred Zain[] standard.

> When the State Supreme Court set up Fred Zain
> proceedings, they did not overrule Brady versus Maryland
> and the consequences of withholding exculpatory
> information.  That's the basis of this motion.

(# 66, Ex. 35 at 7-8).

The State's counsel, Mary Beth Kershner, stated that she was

not aware of any undisclosed Brady material.  (Id. at 18).  She

further stated:

> First of all, the deposition of Ted Smith was not -- Ted
> Smith's statements were not as nearly black and white as
> Mr. Castelle has attempted to represent to this Court.
>
> In his deposition, he indicated that he did raise the
> fact probably with Irene Berger, although it might have
> been Irene Berger or Bill Forbes.  But it was probably
> Irene Berger.  It was probably in Irene Berger's office.
> And he probably said something about some disagreement
> with Ted Smith's [sic; Fred Zain's] work, whether or not
> that was simply the difference as presented to the jury
> between Ted Smith's opinion about population percentages
> or whether it was a more problematic disagreement.  Ted
> Smith didn't remember.  He never said he had told Irene
> Berger or anyone else in the prosecutor's office that he
> believed that Fred Smith's [sic; Zain's] work itself was
> inaccurate and improper.  He never said that.
>
> Irene Berger, on the other hand, said he did not say that
> she was aware of a disagreement on the use of population
> percentages, which was the testimony from Ted Smith and
> Fred Zain that went before the jury.  The jury knew they
> didn't agree about population percentages and what
> percentages this blood type represents.
>
> Neither one of them exculpated the petitioner.  It was a
> question of how inculpatory is their testimony, ten
> percent versus five percent, two percent versus three
> percent.  Neither one of them exculpated to any degree
> the petitioner.
>
> Irene Berger was very clear that if Ted Smith had said to
> her something to the effect that he had questions about
> the accuracy of Fred Zain's work she would remember that
> and she would have acted upon that knowledge, that the

50

first she had any inkling was when everybody saw it in
the paper, in the newspapers, that there was some serious
questions about Fred Zain's work.  That was the first
inkling.  Her testimony was very clear on that point.

(<u>Id.</u> at 27-29).

Ms. Kershner further argued that the Circuit Court's first
obligation was to exhaust all of the "<u>Zain</u> issues" under the
standard set forth by the SCAWV in the <u>Zain I</u> opinion, and that, if
Petitioner "had issues about non-disclosure of exculpatory
evidence, he can file a new petition to that effect." (<u>Id.</u> at 31-
33).  The Court agreed.  In its Order addressing Petitioner's <u>Zain
I</u> habeas petition, which was filed on March 24, 1997, the Circuit
Court stated:

> Therefore, this Court proceeded first to exhaust its
> responsibilities to review this case under the criterion
> of <u>Zain In Re: An Investigation of the West Virginia
> Police Crime Laboratory, (Supra),</u> and thereby stayed the
> petitioner's request under <u>Brady</u> <u>Brady v. Maryland</u>, 373
> U.S. 83 (1963) until the Zain issues were completed.

(# 48, Ex. 13 at 2-3).

At a hearing on July 11, 1996, the State moved for DNA testing
of the remaining evidence in this case.  The Court granted the
motion and had the evidence submitted for DNA testing by Laboratory
Corporation of America ("LabCorp").

In a report dated October 4, 1996, LabCorp reported that
Petitioner could not be excluded as the source of DNA on any of the
evidence submitted in the three cases.  Because of a mixture of DNA
in the samples provided in two of the cases (Capone and Sparks),

51

statistical estimates were unable to be prepared in those cases.
However, in the Townsend case, a statistical estimate found that:

> The probability of randomly selecting an unrelated
> individual with a DNA profile consistent with the major
> contributor of the sperm fraction from [the Townsend
> vaginal swabs] and the [known blood sample from
> Petitioner] at the genetic systems listed above
> (excluding HBGG)is approximately . . . 1 in greater than
> 5,500,000,000 for the African American population.

(# 48, Ex. 12 at 2). The data on page 2 of the October 4, 1996
report appeared to exclude Petitioner as the source of DNA in the
Capone case. (Id.) LabCorp subsequently mailed an Amended Report
dated October 16, 1996 with a substitute page 2 providing data that
did not exclude Petitioner. (Id.) According to the Petition for
Appeal, Petitioner's counsel submitted the amended report to the
Circuit Court of Kanawha County on November 6, 1996. (# 48, Ex. 14
at 14).

As previously noted, the Circuit Court entered an Order
concerning Petitioner's Zain I habeas petition on March 24, 1997.
The Circuit Court made the following findings concerning
Petitioner's conviction on the Sparks counts:

> This Court in disregarding the testimony adduced herein
> of State Chemist Fred Zain (which for purposes of review
> the Court presumes to be unreliable), and considering the
> remaining balance of the evidence for its sufficiency,
> notes that one of the alleged victims, Beth Sparks, was
> able to make a positive identification as to the
> perpetrator of the sexual assault and the kidnap
> committed upon her and she identified that perpetrator as
> being the petitioner, John McLaurin (as to Counts 7, 8
> and 9 of the indictment herein). Her testimony on this
> point is strongly corroborated by her testifying that the
> perpetrator tried to get her to ingest a tablet from his

pill bottle.  The evidence reveals that a search of the remote crime scene produced a prescription bottle with the petitioner, McLaurin's name on it.  Further, the modus operandi shows that the perpetrator held a gun to Ms. Sparks head; he inquired whether Mrs. Sparks enjoyed sex; he inquired if she had children.  This "MO" is identical to other victims in this case.  It is the opinion and *finding* of this Court that sufficient evidence was presented to the jury in this case to be able to convince a determiner of fact, if they believed such evidence, beyond a reasonable doubt, and the evidence was sufficient to sustain a verdict of guilty as charged in counts 7, 8 and 9 of the indictment herein. This Court makes this finding after excising all of the serological and other evidence presented by State Laboratory Chemist Fred Zain in accordance with [Zain I].

(# 48, Ex. 13 at 3-4).

Concerning Petitioner's convictions on the Townsend counts,

the Circuit Court found as follows:

This court further finds that the evidence presented herein in respect to the alleged victim Joyce Townsend, a maid employed at the Holiday Inn, although lacking in direct eye witness identification by Mrs. Townsend, contains very strong circumstantial evidence consisting of two eye-witnesses who identified the petitioner, McLaurin as the person that they saw in the hallway of the Holiday Inn within the hour of the perpetration of the sexual assault upon Mrs. Townsend.

Lastly, there is strong circumstantial evidence in the record that implicates petitioner, McLaurin, including evidence concerning the modus operandi of the perpetrator in which he, just two days before the assault on Sparks, directs Townsend to act like she enjoyed it and inquired of her if she is married and has kids.  This Court finds, therefore, that the evidence that was presented to the jury in this case in respect to the alleged victim Joyce Townsend, recited in Counts 4, 5 and 6 of the indictment in this case was sufficient, if believed, to meet the burden of proof imposed upon the state, and was sufficient to sustain the verdicts of "guilty as charged" returned in respect to Counts 4, 5 and 6 in respect to the indictment in this case; this finding having been made after excising all of the serological evidence

53

offered by State Chemist Fred Zain in this case in accordance with [Zain I].

Now it is to be noted that this finding (supra) regarding the sufficiency of the evidence upon Counts 4, 5 and 6 of the indictment in this case concerning Joyce Townsend is strengthened to the point of being conclusive when the DNA test results ordered by this court are reintroduced into the total picture. Court-ordered tests conducted by LabCorp of North Carolina (October 4 and 16, 1996) not only failed to acquit petitioner, McLaurin, but established that the likelihood of randomly selecting another unrelated individual with a DNA profile consistent with the major contributor of the sperm from the vaginal swab of Joyce Townsend would be one in greater than 5.5 billion, both in terms of the world population, as well as when racial and ethnic subgroups are statistically analyzed.

(Id. at 4-5).

Finally, concerning Petitioner's convictions on the Capone counts, the Circuit Court found:

The alleged victim, Connie Capone, recited in Count 1, 2 and 3 of the indictment of this case was unable to make positive identification of the petitioner, although her general description of her assailant conforms to that of Sparks and Townsend. She testified that on August 19, 1988 her assailant held a gun to her head in order to accomplish the act of sexual assault and kidnapping, as Counts 1, 2 and 3 of the indictment alleges. He adhered to the same MO as previously by demanding that she act like she enjoyed it, and by inquiring whether she enjoyed it. He also made inquiry concerning her family. Although the evidence produced by Connie Capone provided strong motive, intent, and plan evidence that strengthened the cases of Sparks and Townsend, it is doubtful that the Capone counts, standing alone could be sufficient to meet the burden of proof to sustain the verdict herein pertaining to Counts 1, 2 and 3, absent the serological evidence provided by State Chemist Fred Zain.

The Court ordered DNA test herein in respect to both Sparks and Capone proved to be inconclusive as far as the sperm fraction was concerned, or at least the laboratory

results indicated that no statistical estimates were
worthy of calculation.

In view of the analysis by this Court of the evidence
against petitioner, John McLaurin in support of the
charges contained in counts 1, 2 and 3 of the indictment
herein pertaining to the victim Connie Capone, it is the
finding of this Court that absent the serological
evidence of State Chemist Fred Zain the evidence is
insufficient to sustain the jury finding as to the
element of *identity* and, hence, insufficient to sustain
the verdict of guilty as to counts 1, 2 and 3 herein.

(Id. at 5-6).

The Circuit Court then addressed Petitioner's discovery

motions as follows:

Petitioner is unable to specifically identify the
evidence that is supposedly exculpatory but petitioner
theorizes and conjectures that such evidence might exist
among the field notes of the police officers involved in
the investigation.  Secondly, petitioner contends that
there was prosecutorial misconduct in respect to the
prosecution of this case, insofar as the prosecutors knew
prior to the trial herein that State Police Crime Lab
Expert Fred Zain was inclined to embellish his testimony
regarding serological results.

* * *

Concerning the motion and supplemental motion by
petitioner, John McLaurin, for production of Reports and
Notes within the possession of Law Enforcement Agencies
this Court considered the following:

This Court considered the subpoenas issued in
the underlying deck action, Criminal
Indictment No. 89-F-60; as well as the
December 18, 1995 deposition taken of now
Judge Irene Berger, former prosecuting
attorney of this case.

This Court notes a review of the deposition of now Judge
Irene Berger, former prosecuting attorney in this case,
simply reveals that petitioner's counsel consistently
confronted Judge Berger with the suggestion that the

55

prosecuting attorney's office sought to favor Fred Zain
as a witness in this case, to the exclusion of other
witnesses, and that Judge Berger persistently denied such
assertion.  Petitioner, McLaurin, by argument of counsel,
insinuates and suggests that the files of the prosecuting
attorney <u>may</u> contain something that would reveal the true
intentions of the prosecutors in their decision to
subpoena Fred Zain as a witness.    The petitioner,
McLaurin, by counsel, further engages in conjecture by
his motion by speculating that if the field notes of the
investigating officers were examined they may contain
exculpatory material, especially in respect to out of
court identity.  This Court reviewed the testimony of the
two motel maids who made positive identifications of
petitioner on behalf of Joyce Townsend.  The testimony of
Susan Toney and Carmen J. Hairston appeared unequivocal
on the subject of identity.  Cross-examination hoped to
impeach the witness, but did not contradict the witness.
This Court finds nothing in the arguments in support of
petitioner's Motion to Open Law Enforcement Agencies
files that gives probable cause to believe that such
perusal will produce anything.    The petitioner, John
McLaurin's Motion for Production of Reports and Notes
Within Possession of Law Enforcement Agencies is
therefore DENIED.

(<u>Id.</u> at 6-8).

Petitioner filed a Petition for Appeal from that decision on

or about March 2, 1998.  (# 66, Ex. 14).  On July 6, 1998, the

SCAWV issued an opinion affirming the Circuit Court's decision on

Petitioner's <u>Zain I</u> habeas petition.    The SCAWV characterized

Petitioner's grounds for relief on appeal as follows:

In this appeal, the appellant contends that the circuit
court erred by not setting aside all of the convictions
and awarding a new trial because: (1) the State was
forewarned that Mr. Zain's work was erroneous; (2) the
circuit court failed to hold a hearing on the petition
for writ of habeas corpus; (3) the circuit court
considered DNA test results which were not introduced at
trial; (4) all of the counts were tainted by Mr. Zain's
testimony; (5) the appellant's motion for production of
reports and notes within the possession of law

56

enforcement agencies involved in the case was denied; and (5) [sic; (6)] the circuit court erroneously concluded that there was the same modus operandi with respect to all the victims.

McLaurin v. Trent, 506 S.E.2d 322, 324 (W. Va. 1998) ("McLaurin

I").

The SCAWV first addressed Petitioner's Brady claim as follows:

As his first assignment of error, the appellant contends that the State called Mr. Zain as a witness despite forewarning that his work was erroneous thereby violating Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed.2d 215 (1963). [Footnote omitted.]   In Brady, the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S. Ct. at 1196-97, 10 L. Ed.2d at 218.   In making this assertion, the appellant relies upon deposition testimony from Trooper Ted Smith, a former colleague of Mr. Zain. Trooper Smith testified that the reports of Trooper H.B. Myers were more accurate than those of Mr. Zain.  Trooper Smith stated that he informed the State of the differences in the reports prior to appellant's trial. Nevertheless, the State called Mr. Zain to testify. Consequently, the appellant claims he was never made aware of the fact that Mr. Zain's credibility had been called into question.

After reviewing the record, we find no support for the appellant's contention that Mr. Zain's credibility was called into question prior to or during his trial, or if it was, that the State was aware of such allegations.

*  *  *

Based upon [Judge Berger's] testimony, it is clear that the State had no forewarning that Mr. Zain's work was unreliable.   At the very most, the prosecution was informed that there was a difference of opinion between experts regarding population statistics.   Knowledge of such disagreement does not give rise to the inference that the State was alerted that Mr. Zain might have falsified evidence in the appellant's case.  Accordingly,

57

we find no merit to this assignment of error.

Id. at 326.  (# 48, Ex. 15 at 5-7).

Concerning Petitioner's other claims of error, the SCAWV made
the following findings:

> In this case, it is evident that the circuit court
> thoroughly reviewed the transcript from the appellant's
> trial.  In addition, the circuit court considered the
> results from the subsequent DNA testing as we instructed
> in Zain I [footnote omitted].  Therefore, we find that
> the circuit court did not err in deciding the case
> without holding a hearing on the merits of the case.
>
> The appellant also contends that the circuit court erred
> by considering the post-trial DNA test results because
> they were not introduced at trial.  Upon review of the
> final order, we find that the circuit court simply
> followed the procedure set forth in Syllabus Point 3 of
> Zain I, supra.  The circuit court disregarded the
> testimony adduced by Mr. Zain and considered the
> remaining evidence for its sufficiency to sustain the
> convictions.  The post-trial DNA testing did not form the
> basis of the decision to deny the appellant a new trial
> on counts four through nine.  Instead, the test results
> merely confirmed that the Zain evidence had no
> prejudicial effect on the jury.  Therefore we find no
> merit to this assignment of error.
>
> The appellant further contends that the circuit court
> erred by not setting aside all of the convictions because
> the guilty verdicts on all counts were based on a
> cumulation of all the evidence including evidence
> relating to the counts which were dismissed.
> Essentially, the appellant asserts that dismissal of any
> of the counts required dismissal of all the counts.  We
> disagree.
>
> The circuit court's order reflects a thoughtful and
> thorough analysis of the evidence offered during the
> trial.  In analyzing the evidence, the circuit court,
> pursuant to Zain I, excluded the evidence offered by Mr.
> Zain from its review.  Thus, it was not merely the
> tainted Zain evidence that resulted in reversal of the
> convictions pertaining to count one, two and three.
> Rather, the circuit court determined that the remaining

evidence was not sufficient to support the convictions for those counts. As to the additional counts relating to the other two victims, the circuit court found that even after the Zain testimony was excluded, the evidence was sufficient to uphold those convictions. We find no error in this regard. Accordingly, the circuit court did not err by vacating only three of the convictions.

* * *

As discussed above, after discarding the Zain evidence, the circuit court carefully reviewed the remaining evidence in the case to determine whether the relevant evidence on each count was sufficient to uphold the convictions. Counts one, two and three were dismissed because the evidence was insufficient. However, with regard to the other charges relating to the other two victims, the evidence was found to be sufficient and the convictions were upheld after it was determined that the Zain evidence did not have any prejudicial effect on the jury. While the circuit [court] indicated the same modus operandi appeared in all three cases, that evidence alone was not the basis for the circuit court upholding the convictions for count four through nine. Instead, witness identifications along with other compelling evidence provided the basis for sustaining the jury's verdicts of guilt with respect to these counts.

504 S.E.2d at 327-329. (# 48, Ex. 15 at 9-13).

<u>Petitioner's omnibus habeas corpus proceedings</u>

On January 4, 2000, Petitioner filed an omnibus habeas corpus petition in the Circuit Court of Kanawha County. Kanawha County Assistant Public Defender Gregory Ayers was appointed to represent Petitioner in that proceeding. In that petition, Petitioner again challenged his convictions based upon the use of "fabricated" serology evidence, and again asserted that the State had been forewarned of Zain's erroneous work. Petitioner also raised a claim of ineffective assistance of counsel claiming that his

counsel should have challenged Zain's evidence with the reports of Trooper Myers and/or called an independent serology expert.

Hearings were held in Petitioner's omnibus habeas corpus proceeding on May 7, 2002, April 22, 2003, April 23, 2003, April 25, 2003, May 14, 2003, and August 3, 2004. (# 70, Exs. 45-51). During those hearings, Petitioner was permitted to address issues on his own that were not raised or addressed by his appointed counsel, including issues related to the serology evidence. Petitioner cross-examined Troopers Smith, Myers and Bowles during these hearings.

On July 11, 2005, Judge Frazier entered an Opinion Order in Petitioner's omnibus proceeding. (# 52, Ex. 23). In that Opinion Order, Judge Frazier found that the serology issues had already been fully and fairly litigated in Petitioner's <u>Zain I</u> habeas proceeding. Specifically, the Opinion Order stated, "Petitioner has raised no new issues here; therefore, these issues have been fully and fairly litigated previously and cannot be raised again here." (<u>Id.</u> at 14).

On July 20, 2005, Petitioner filed a <u>pro se</u> Motion to Alter or Amend Order, in which he requested that Judge Frazier reconsider his Opinion Order on certain grounds. (# 52, Ex. 24). In that motion, Petitioner challenged Judge Frazier's finding that Petitioner had failed to raise any new issues concerning the serology evidence. Petitioner asserted that in the course of his

60

omnibus proceedings, he had presented the court with evidence demonstrating that he was actually innocent of the Sparks crime, which had not been addressed by the court, and that the court had also not addressed a number of his claims of ineffective assistance of counsel, including the claims related to calling Trooper Myers and a defense serology expert. (Id. at 2-3). Petitioner's motion also challenged Judge Frazier's finding that "Petitioner's blood sample contained factors consistent with seminal fluid in all three cases." (Id. at 3-4).

Judge Frazier summarily denied Petitioner's Motion to Alter or Amend Order on August 31, 2005; however, the Order was not entered on the docket, so, on November 14, 2005, Judge Frazier entered it nunc pro tunc to August 31, 2005. (# 52, Ex. 25).

Also on November 14, 2005, Mr. Ayers filed a Petition for Appeal from the decision in Petitioner's omnibus habeas corpus proceeding. (# 52, Ex. 26). While that appeal was pending, Petitioner attempted to file a pro se Petition for Appeal concerning grounds not raised in the Petition for Appeal filed by Mr. Ayers. (# 52, Ex. 27). The grounds Petitioner was attempting to raise appear to be grounds he included in his Motion to Alter or Amend Judgment, which included all of the serology-based claims. (# 52, Ex. 24). The Clerk of the Court lodged the pro se filing, and wrote a letter to Mr. Ayers stating that Petitioner was represented by counsel and should raise any and all claims for

relief through his counsel.  (# 52, Ex. 28).  Mr. Ayers, however, refused to pursue the claims that Petitioner had raised in his pro se petition.  (# 52, Ex. 29).  Thus, those claims were never specifically addressed by the SCAWV; although they were mentioned in a footnote of the SCAWV's opinion affirming the judgment of the Circuit Court.  McLaurin II, 640 S.E.2d at 217 n.18.  (# 52, Ex. 30 n.18).

### Zain III opinion

On June 16, 2006, the SCAWV issued its opinion in In re: Renewed Investigation of the State Police Crime Laboratory, Serology Division, 633 S.E.2d 762 (W. Va. 2006) ("Zain III").  In that decision, the Court again addressed whether serologists in the State Police Crime Lab, other than Fred Zain, falsified evidence in criminal prosecutions.  In the course of this third investigation, Mark Stolorow, who had previously reviewed the records in Petitioner's case, and Ronald Linhart, an inspector with the ASCLD, authored a joint report that was filed on December 2, 2004. (hereinafter the "Stolorow/Linhart report").  Id. at 765.  The Stolorow/Linhart report concluded:

> The errors found by this investigation were frequent, recurring and multifaceted, spanning the spectrum of examiners.  However, it must be stressed that in only one instance does it appear that erroneous procedures, documentation, reporting or testimony led to a false, but non-probative, association between a defendant and the biological evidence (State v. Gray and Finney) . . . The authors of this report do not ascribe any particular motive, intent or design to the scientists in regard to the errors made . . .

> Finally, there is a significant qualitative difference
> between the errors discovered during this investigative
> review and the shocking and egregious misconduct
> documented in <u>Zain I</u>.  The intentional and willful
> malfeasance and reckless disregard of both truth and good
> scientific practice exhibited by Fred Zain were not found
> to exist in these cases among the remaining serologists
> in the laboratory.

<u>Id.</u> at 766.  The report described the work product of the other

serologists as "potentially unreliable."  <u>Id.</u>

Following receipt of a report from the Honorable Thomas A.

Bedell, who succeeded Judge Holliday as special judge assigned to

these matters, the SCAWV issued its decision, which held:

> After careful review of the Stolorow/Linhart findings,
> the special judge's report, and the briefs of the
> prisoners and the State, this Court concludes that there
> is insufficient evidence of intentional misconduct to
> justify invalidating the work of serologists other than
> Zain.

<u>Id.</u> at 767.  However:

> because of the significant number, frequency, and types
> of errors which Stolorow discovered in the work of the
> Crime Lab serologists, this Court finds it necessary to
> enact additional safeguards to ensure that prisoners
> against whom serologists offered evidence receive a
> thorough, timely and full review of their challenges to
> the serology evidence.

<u>Id.</u> at 769.  Thus, the SCAWV set up a special habeas corpus

procedure to be utilized by those prisoners against whom

serologists, other than Zain, had offered evidence.

Accordingly, in habeas corpus cases involving serologists

other than Zain, "a prisoner who challenges his or her conviction

must prove that the serologist offered false evidence in his or her

63

prosecution." Also the prisoner must satisfy the following standards indicating that a new trial is warranted: (1) The evidence must appear to have been discovered since trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained; (2) It must appear from facts stated in his affidavit that the defendant was diligent in discovering the new evidence, and that it could not have been discovered with due diligence before the trial; (3) Such evidence must be new and material, and not merely cumulative; (4) The evidence must be such that it ought to produce an opposite result at a new trial on the merits; and (5) A new trial will generally be refused if the sole object of the new evidence is to discredit or impeach an opposing witness. Id. at 769 (citing State v. Frazier, 253 S.E.2d 534 (W. Va. 1979)).

Concerning the special procedures, the SCAWV further held that a prisoner against whom a serologist other than Zain offered evidence is to be granted a full habeas corpus hearing on the issue of the serology evidence, with counsel appointed to represent him or her. The Court further held that the Circuit Courts must review the serology evidence "with searching and painstaking scrutiny" and must draft "a comprehensive order" which includes "detailed findings as to the truth or falsity of the serology evidence." If the Circuit Court finds that the evidence was false, then the Circuit Court must determine whether the prisoner has shown the

64

necessity of a new trial based on the five <u>Frazier</u> factors.   <u>Id.</u>
Finally, the SCAWV held that such proceedings must be conducted in
as reasonably timely manner as possible, and that such proceedings
are not subject to the <u>res judicata</u> limitations normally applied to
state habeas corpus proceedings.   <u>Id.</u>

> The SCAWV further specifically held:
>
> In order to guarantee that the serology evidence offered
> in each prisoner's prosecution will be subject to
> searching and painstaking scrutiny, this Court now holds
> that a prisoner who was convicted between 1979 and 1999
> [footnote omitted] and against whom a West Virginia State
> Police Crime Laboratory serologist, other than Fred Zain,
> offered evidence may bring a petition for a writ of
> habeas corpus based on the serology evidence despite the
> fact that the prisoner brought a prior habeas corpus
> challenge to the same serology evidence and the challenge
> was finally adjudicated.

<u>Id.</u> at 770.  Petitioner's omnibus habeas corpus appeal was pending
before the SCAWV at the time of this decision.

On November 15, 2006, the SCAWV issued an opinion concerning
Petitioner's appeal in his omnibus proceeding.  The SCAWV did not
specifically address the serology issues, as they were not
addressed in the Petition for Appeal filed by Petitioner's counsel.
Rather, in the sentence in which the court affirmed the order of
the Circuit Court denying habeas corpus relief, the SCAWV dropped
a footnote listing the other grounds for relief upon which the
Circuit Court had denied habeas relief.  <u>McLaurin II</u>, 640 S.E.2d at
217 n.18.  (# 52, Ex. 30 at 27 n.18).

Petitioner then filed his Amended Petition in this section 2254 proceeding on February 17, 2007.

## ANALYSIS

### I.   GROUNDS BASED UPON SEROLOGY EVIDENCE.

In Grounds 6, 7, 8, 9 and 15 of his Amended Petition, Petitioner raises claims related to the serology evidence. Pursuant to the mandate from the SCAWV in <u>Zain I</u>, the State habeas court reviewed the sufficiency of the evidence, absent Zain's testimony and evidence, and, without having an evidentiary hearing at which Petitioner could present evidence and cross-examine witnesses, the court upheld Petitioner's convictions on the Sparks and Townsend counts, and vacated Petitioner's convictions on the Capone counts.  The court in Petitioner's <u>Zain I</u> habeas proceeding did have access to the deposition testimony from Smith and Myers, as well as former Assistant Prosecuting Attorney, and then-sitting Circuit Judge Irene Berger.  The Circuit Court also had the underlying serology reports, the reports from Mark Stolorow, and the DNA test results from LabCorp.

In addition to the claim that Petitioner was convicted based upon the newly discovered evidence that Fred Zain's work was presumptively unreliable, and his <u>Brady</u>-type claim, Petitioner has made other constitutional claims based upon the serology evidence that was presented, or not presented, at his trial.  Specifically, Petitioner claims that the serology evidence in the Sparks case

66

demonstrates that he is actually innocent of those crimes, that he was denied the right to confront and cross-examine witnesses on the serology evidence, and that he was denied the effective assistance of counsel because his trial attorneys did not properly address or confront the serology evidence with their own expert testimony.

Petitioner's serology-related claims can be placed into five categories. They are: (1) false evidence claims; (2) a Brady/Kyles-type claim asserting that the State withheld exculpatory or impeachment evidence based on the fact that the State was forewarned that Zain's evidence was erroneous; (3) an actual innocence claim concerning the Sparks case; (4) a Confrontation Clause claim, asserting that Petitioner was denied the right to confront witnesses; and (5) ineffective assistance of counsel claims concerning the failure to call an expert witness on serology and to call Trooper Myers as a defense witness.

As noted above, although it appears that Petitioner attempted to raise these claims in his omnibus habeas corpus proceedings, in which he was afforded an evidentiary hearing, and, during those proceedings, Petitioner was permitted to cross-examine the other serologists who performed testing on the evidence in his case, and was also permitted to question his trial counsel about their decision not to use their own expert witness, the Circuit Court found that Petitioner had already had full and fair litigation of those claims in the Zain I proceeding, and the court did not

67

address the merits of those claims in the omnibus habeas corpus decision.  The undersigned will address each claim in turn.

**A.   Petitioner's false evidence claims**.

In Ground 7 of his Amended Petition, Petitioner contends that Fred Zain falsified evidence, which caused prejudice to his defense and denied him a fair trial.  He repeats these allegations in Ground 15(a) of his Amended Petition.

It is a violation of due process for the State to convict a defendant based upon false evidence.  Napue v. Illinois, 360 U.S. 264 (1959).  Furthermore, the State is responsible for false testimony even if the prosecutor is unaware of the falsity.  Giglio v. United States, 405 U.S. 150 (1972); Miller v. Pate, 386 U.S. 1 (1967).  However, a conviction will not be set aside unless it is shown that the false evidence had a material effect on the jury verdict.  A new trial will only be granted if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury." Napue, 360 U.S. at 271; Giglio, 405 U.S. at 154.

The SCAWV applied an analogous standard in its Zain I opinion, holding:

> Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must be

68

made to determine whether the error had any prejudicial effect on the jury.

In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division, 438 S.E.2d 501, 506 (W. Va. 1993)("Zain I").

There has been a great deal of confusion, however, concerning the SCAWV's use of the word "nonconstitutional" in its standard of review.  Upon further review of the Zain I opinion and the other authority discussed therein, the undersigned has derived the following explanation.

In Zain I, the Court, relying upon the Supreme Court's decisions in Napue, Brady, and Giglio, supra, confirmed the principle that, whether or not the State knew about it, the presentation of false evidence at a trial results in a due process violation.  However, the conviction will not be set aside as a result of the due process violation, unless it is shown that the admission of the false evidence had a material effect on the jury verdict.  438 S.E.2d at 505.  The Court further stated that a "material effect" means that "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . ." Id. (citing Napue, 360 U.S. at 271).

The court then noted that there is a divergence in the federal courts concerning how to determine "what impact false testimony will have on the ultimate question of whether a criminal conviction should be set aside."  Id.  For example, the Tenth Circuit has

stated:

> "The test for materiality is the same as the test for harmless constitutional error. United States v. Bagley, 473 U.S. 667, 679 n.9, 680, 105 S. Ct. 3375, 3382 & n.9, 87 L. Ed.2d 481 [492 n.9] (1985).  The test for harmless constitutional error is 'whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."' Yates v. Evatt, 500 U.S. 391, [403,] 111 S. Ct. 1884, 1892, 114 L. Ed.2d 432 [448] (1991)(quoting Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L. Ed.2d 705 [710] (1967). 'To say that an error did not contribute to the verdict is, rather to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record.' Yates, [500 U.S. at 403] 111 S. Ct. at 1893 [114 L. Ed.2d at 449]. Yates thus instructs us 'to make a judgment about the significance' of the tainted evidence relative to the remaining evidence."

United States v. Langston, 970 F.2d 692, 700 (10th Cir.), cert. denied sub nom, Francis v. United States, 506 U.S. 965, 113 S. Ct. 439, 121 L. Ed.2d 358 (1992).  The Zain I court then stated:

> Where evidentiary error is concerned, however, the ultimate question is the impact on the verdict. Our test for evidentiary error is contained in Syllabus Point 2 of State v. Atkins, 163 W. Va. 502, 261 S.E.2d 55 (1979), cert. denied, 445 U.S. 904, 100 S. Ct. 1081, 63 L. Ed.2d 320 (1980) [quotation omitted]. . . .

Id. at 506.

In Atkins, the SCAWV discussed the distinction between "constitutional" and "nonconstitutional" error, as recognized by the Supreme Court in Chapman v. California, 386 U.S. 18 (1967) and Cooper v. California, 386 U.S. 58 (1967).  In Chapman, the Supreme Court determined a harmless error standard of review for a federal constitutional error on direct review by holding that "the court

70

must be able to determine a belief that [the error] was harmless beyond a reasonable doubt." 386 U.S. at 24. In <u>Cooper</u>, the Court stated that, where no constitutional error was found, "the State is free, without review by us, to apply its own state harmless-error rule to such errors of state law." 386 U.S. at 62. This appears to be where the <u>Atkins</u> court derived the use of the term "nonconstitutional" in its description of the standard of review for evidentiary error in state criminal proceedings.

Throughout his Amended Petition, Petitioner contends that the SCAWV applied an improper standard of review in <u>Zain I</u>, considering that the court had determined that the use of Zain's testimony and evidence in any criminal case was a violation of the defendant's due process rights and was, thus, constitutional error. Petitioner appears to be contending that the SCAWV should have used the standard set forth in <u>Chapman</u>, <u>supra</u>, which would have required the court to determine if the error was harmless beyond a reasonable doubt before it could disregard it and deny habeas corpus relief.

The duty of this federal court in this federal habeas corpus proceeding is to determine whether the state courts' decisions are contrary to, or an unreasonable application of, clearly established federal law. In <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1992), the Supreme Court determined that in habeas corpus proceedings, the standard for determining whether trial errors, including constitutional errors, are harmless, is to determine whether the

71

error "had a substantial and injurious effect or influence in determining the jury's verdict." (citing Kotteakos v. United States, 328 U.S. 750, 776 (1946)). More recently, in Fry v. Pliler, 127 S. Ct. 2321, 2328 (2007), the court clarified that, in Brecht, it "rejected the Chapman standard in favor of the more forgiving standard of review applied to nonconstitutional errors on direct appeal from federal convictions." The Fry Court further stated:

> We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in Brecht, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed.2d 353, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the "harmless beyond a reasonable doubt" standard set forth in Chapman, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed.2d 705.

Since the SCAWV had already determined that there was constitutional error involved in the use of Zain's evidence, the only question for the state habeas courts and this federal court to determine is whether the error "had a substantial and injurious effect on the jury's verdict," which is essentially the same standard of review as that set forth in Zain I and Atkins.

The undersigned proposes that the presiding District Judge **FIND** that, based upon the clearly established Supreme Court precedent discussed above, the standard of review applied by the SCAWV to Petitioner's Zain I petition was appropriate to address Petitioner's false evidence claims. See Ward v. Trent, 188 F.3d

505 (Table), 1999 WL 638606, at ** 5 (4th Cir. (W. Va.) 1999)(unpublished)("We conclude that the West Virginia Supreme Court of Appeals set forth the proper standards to be applied in reviewing Zain/serology claims.")

Excluding the serology evidence, there was sufficient evidence to support Petitioner's convictions in the Townsend and Sparks cases. See Jackson v. Virginia, 443 U.S. 307, 319 (1986) (evidence is sufficient to convict if, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt). There were eyewitness identifications in both cases, and, although Petitioner has questioned the reliability of those identifications, they were found to be admissible and the jury was able to weigh the credibility of those witnesses at trial. Furthermore, in the Sparks case, a pill bottle with Petitioner's name on it was found at the crime scene. While Petitioner used entries in medical records indicating that the patient to whom this prescription was issued was described as a "well-nourished white male," to dispute that the pill bottle belonged to him, the medical records also indicated that the patient had the same birth date as Petitioner, and that the prescription was issued at Montgomery General Hospital, near where Sparks was abducted, on the same date as the Sparks assault.

Thus, this court need only determine whether Zain's testimony had a prejudicial effect on the jury verdict.  In an attempt to show the requisite prejudice, Petitioner claims that the cumulative effect of serology results implicating him in each of the crimes caused the jury to believe he was guilty of all three crimes.  The Amended Petition states:

> The prosecutors argued in opposition to McLaurin's motion for severance of the Capone, Townsend and Sparks counts that the serology evidence in each case linked McLaurin to each crime.  (Tr. Vol. I 1, 13-21).  Indeed, in closing argument, the prosecutor asserted:
>
>> The evidence in this case in terms of common scheme or plan, modus operandi, in terms of the blood test results, and in terms of all the essential elements match only one person, and he's setting right over there, John E. McLaurin.
>>
>> So, therefore, ladies and gentlemen, go back and do your duty, okay?  The State of West Virginia asks that you convict this gentleman of these horrible crimes and that you do the appropriate thing in terms of mercy, okay, the same kind of mercy he extended to these young girls.
>>
>> Thank you.  (emphasis added).
>
> (Tr. Vol. III 875).  We now know that this prejudicial serology evidence, elicited via the testimony of Fred Zain, was false.  See In re: An investigation of the West Virginia State Police Crime Laboratory, Serology Division, 190 W. Va. 321, 438 S.E.2d 501 (1993); McLaurin v. Trent, 203 W. Va. 67, 506 S.E.2d 322 (1998).

(# 30 at 28).  Petitioner then recites excerpts from the reports of Mark Stolorow, Director of Operations for Cellmark Diagnostics, who reviewed the serology testimony and evidence (raw data sheets, case

worksheets and lab reports) from the three cases, and gave his opinion concerning the unreliability of the results. (Id. at 29-30). The undersigned notes that Mr. Stolorow did not do any re-testing of the evidence.

Respondent addresses the issue of false evidence in several respects, but bases his entire argument in his Supplemental Response on the fact that all of the serology evidence was deemed to be unreliable and was removed from the case in the Zain I habeas proceeding. Respondent's Supplemental Response first states:

> What the Petitioner did not understand then, and seems not to understand fifteen years later, is that he did not need to litigate the integrity, reliability or admissibility of the Zain evidence; it was already fully discredited and out of the case. With this in mind, the Supreme Court of Appeals correctly found that in order for the habeas judge to do the Zain habeas analysis outlined in [Zain I], it was sufficient for him to review the transcript and consider the results of subsequent DNA testing. 506 S.E.2d at 327.

> In any event, any claim Petitioner might have about having been denied an evidentiary hearing in his Zain habeas was completely mooted in his omnibus habeas where he was permitted to put on any evidence he chose. He called only one serology witness, Trooper Howard Myers, who certainly impeached Fred Zain's testimony on a number of points (an unnecessary exercise, in light of the case history excluding Zain's evidence) but did not support any claim the Petitioner is now making that any of the reports ruled the Petitioner out as the rapist in any of the three rapes. (# 70, Ex. 47 pp. 35-67).

(# 85 at 11). In addressing this claim as it was raised in Ground 15(a) of Petitioner's Amended Petition, Respondent further adds:

> Assuming arguendo that the Petitioner shows the serological evidence at his trial to have been unreliable, unacceptable, or even false, it would not

75

change a thing in this case since the serological evidence has already been discredited and struck by the Supreme Court of Appeals of West Virginia. [Zain I].

Thus, the only serological issues affecting Petitioner are first, whether the non-serological evidence was sufficient to convict, and if so, whether the serological evidence had a prejudicial effect. Both of these issues were decided in the Petitioner's Zain habeas proceeding.

Sufficiency: Judge Canady evaluated the evidence to determine whether the evidence at trial, excluding the Zain evidence, which was already out of the case, was sufficient to sustain the conviction. With respect to victim Capone, the habeas judge ruled that the non-serological evidence was not sufficient, and the Capone convictions were overturned and the charges dismissed. With respect to victims Townsend and Sparks, the judge ruled that the non-serological evidence was sufficient, and the Townsend and Sparks convictions were affirmed.

The habeas judge further concluded that the Zain evidence did not have any prejudicial effect on the Townsend and Sparks convictions.

All of these ruling were affirmed in [McLaurin I]. Significantly, the Supreme Court of Appeals first rejected the Petitioner's argument that the guilty verdicts were based on a cumulation of all the evidence including evidence related to the counts which were dismissed. The Court then specifically addressed the allegedly prejudicial effect of the Zain evidence, concluding that:

> The post-trial DNA testing did not form the basis for the decision to deny the appellant a new trial on counts four through nine. Instead the test results merely confirmed that the Zain evidence had no prejudicial effect on the jury.

None of these rulings were either (1) ". . . contrary to, or involved and unreasonable application of, clearly established Federal law," or (2) ". . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d). Therefore, the Petitioner is not entitled to relief in this proceeding.

76

(Id. at 16-17).

Petitioner's Reply simply re-adopts his prior arguments on this issue, and contends that the DNA report that was used to make the finding that the serology evidence did not prejudice Petitioner's defense was never verified, authenticated or testified about in court. (# 86 at 10).

The undersigned proposes that the presiding District Judge **FIND** that, absent the serology evidence, there was sufficient evidence to support Petitioner's convictions on the Sparks and Townsend sexual assault counts, and that the admission of the unreliable serology evidence at Petitioner's trial did not have a "substantial and injurious effect or influence in determining the jury's verdict." At most, the serology evidence that was presented to the jury demonstrated that Petitioner was included in the pool of males who could have been the semen depositor in each of the three cases, and that he could not be eliminated as the assailant in each case. Petitioner has not established any evidence to the contrary.

Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions concerning Petitioner's false evidence claims were neither contrary to, nor an unreasonable application of, clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court

77

proceedings.  The undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on Petitioner's false evidence claims as stated in Grounds 7 and 15(a) of his Amended Petition.

### B.   Petitioner's <u>Brady/Kyles</u>-type claims.

In Ground 9 of his Amended Petition, Petitioner contends that his due process rights were violated because the State called Fred Zain as a witness despite forewarning that his work was erroneous. He repeats this claim in Ground 15(c) of his Amended Petition. Specifically, Petitioner asserts that, based upon Ted Smith's deposition given on October 17, 1995, "it became obvious that the prosecution had been forewarned about the unreliability of the serology work performed by Fred Zain." (# 30 at 32).  As noted by Petitioner, Trooper Smith testified as follows:

> Q.   [by George Castelle]: Am I not correct that Brent's report is more accurate than Fred Zain's?
>
> A.   I think so.
>
> Q.   And Brent's percentages are correct, unlike Fred Zain's?
>
> A.   I think so.
>
> Q.   Do you know why Fred Zain was then flown all the way back from Texas to testify to an incorrect report when Officer Myers was available a few miles away to testify to a correct one?
>
> Q.   Did you ever ask how that came about?

                         *  *  *

A.    No, I honestly can't.  I get subpoenas, and they tell me to come to court, and they ask me questions, and I answer them.  That's what I do.  I was told to come and testify, and we're going to ask you questions, and at that time I answered them to the best of my skill and judgment.

Q.    Did you ever explain to anybody that -

A.    I know that it was understood that there was a problem.  I do know that.

Q.    By understood, understood by whom?

A.    By the prosecutor's office, that there was a difference between what I was willing to testify to and what Fred was willing to testify to.

* * *

Q.    Do you remember what problems she [Irene Berger] told you?

A.    Basically that there was a difference in the way that the reports were written or something, and I just testified to, I hope--I don't remember exactly what I testified, but I hope I testified basically the same way that I have today.

Whether I did or not, I may have to get my knuckles rapped in the past for not, but basically it was understood at that particular time, and I think, from what I gather, the decision was made to put us both on and let the jury sort it out.

(# 66, Ex. 38 at 49-52).  When asked about why the State chose to fly Zain back to Charleston to testify when Myers was available to testify to his own report, Trooper Smith stated:

A.    I have no idea.  All I know is we had meetings, we discussed.  Basically, at that time, I told them Brent could testify to this, and barring - hopefully, before Brent testified, he would have caught this error.  We have found errors in our reports before and corrected them on the stand, so I am hoping that would have happened.

79

Maybe not.  Maybe Brent may have testified exactly to what his report said, but as to why or how the decision was made to opt for Fred to testify in the Capone case and the Sparks case as opposed to Brent, only the prosecutor's office can answer that question.  Because we told them we would be more than happy to testify, but we would testify based on the results in the reports we issued.  That is all I can say.

Q.   An[d] expressed your reservation about Fred Zain's version?

A.   Yeah, we told them.

(Id. at 88-89).

Petitioner contends that the action of withholding this evidence regarding the credibility of Zain as a witness is "a blatant violation of McLaurin's due process rights and justifies the awarding of a new trial."  (# 30 at 35).  Petitioner cites to the Supreme Court's decisions in Giglio v. United States, 405 U.S. 150 (1972), Brady v. Maryland, 373 U.S. 83 (1963), and Kyles v. Whitley, 514 U.S. 419 (1995) in support of his claim.  Petitioner repeats these allegations in Ground 15(c) of his Amended Complaint.

Respondent asserts that the Circuit Court's ruling denying Petitioner's discovery motions during his Zain I habeas proceedings disposed of Petitioner's Brady claim.  The Circuit Court's opinion, however, did not directly address Petitioner's Brady claim.  It simply denied Petitioner's request for discovery of additional information that might have supported his Brady claim.

Petitioner again addressed the issue of exculpatory or impeachment evidence in his Zain I habeas appeal.  In his Petition

for Appeal, Petitioner discussed the discovery motions made in the underlying proceeding as follows:

> On June 13 and July 5, 1996, the Appellant filed Motions for Production of Reports and Notes within the Possession of Law Enforcement Agencies.  The Motions were based on an emerging pattern in Fred Zain cases of apparent withholding of exculpatory evidence.  The issue of withholding of exculpatory evidence is significant because, as set forth in the Motions, in habeas corpus cases based on the fraudulent testimony of Fred Zain, the Circuit Court is required to disregard the evidence tainted by Fred Zain and weigh the sufficiency of the remaining evidence.  In re: An Investigation of the West Virginia State Police Crime Laboratory, Serology Division, 190 W. Va. 321, 438 S.E.2d 501, 506 (1993) [Zain I].  A fair review of the sufficiency of the remaining evidence cannot be conducted if evidence of innocence has been withheld by the State and, therefore, is not included in the review.

(# 48, Ex. 14 at 12-13).  Petitioner then addressed his claim that the prosecution in his case was forewarned that Fred Zain's work was erroneous, based upon the deposition testimony of Ted Smith. Petitioner's Petition for Appeal added, "the Petitioner in the present case cannot receive a full and fair resolution of his habeas corpus claim without a similar opportunity to determine if the apparent pattern of withholding exculpatory evidence extends to his case.  (Id. at 46).

The SCAWV addressed Petitioner's Brady claim as follows:

> As his first assignment of error, the appellant contends that the State called Mr. Zain as a witness despite forewarning that his work was erroneous thereby violating Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed.2d 215 (1963). [FN 4]

> [FN 4 - The appellant also contends that Mr. Zain's testimony violated the trial judge's order that only the

analyst who performed the tests could testify.  However, it appears from the record that Mr. Zain did in fact perform some testing or at least, authored some reports in the case.  Moreover, an expert is permitted to testify and provide opinion evidence based upon the work of others.  See W. Va. R. Evid. 703.]

In Brady, the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S. Ct. at 1196-97, 10 L. Ed.2d at 218.  In making this assertion, the appellant relies upon deposition testimony from Trooper Ted Smith, a former colleague of Mr. Zain.  Trooper Smith testified that the reports of Trooper H.B. Myers from the appellant's case were more accurate than those of Mr. Zain.  Trooper Smith states that he informed the State of the differences in the reports prior to the appellant's trial. Nevertheless, the State called Mr. Zain to testify. Consequently, the appellant claims he was never made aware of the fact that Mr. Zain's credibility had been called into question.

After reviewing the record, we find no support for the appellant's contention that Mr. Zain's credibility was called into question prior to or during his trial, or if it was, that the State was aware of such allegations.

* * *

Based on [the testimony of Irene Berger], it is clear that the State had no forewarning that Mr. Zain's work was unreliable.  At the very most, the prosecution was informed that there was a difference of opinion between experts regarding population statistics.  Knowledge of such disagreement does not give rise to the inference that the State was alerted that Mr. Zain might have falsified evidence in the appellant's case.  Accordingly, we find no merit to this assignment of error.

State ex rel. McLaurin v. Trent, 506 S.E.2d 322, 326 (W. Va. 1998)

[McLaurin I].

Respondent's Supplemental response contends that Petitioner had a chance to put on his evidence in support of his <u>Brady</u> claim and that it was found to be insufficient.  Respondent further contends that the SCAWV's decision was not contrary to or an unreasonable application of clearly established federal law. (# 85 at 14-15).

Petitioner re-adopted his prior arguments on this issue. (# 86 at 8).

Based upon the evidence presented during all of Petitioner's state habeas corpus proceedings, the undersigned proposes that the presiding District Judge **FIND** that the prosecution did not have any forewarning that Fred Zain's work was unreliable and that Petitioner has not satisfactorily demonstrated that the State knowingly withheld or failed to disclose exculpatory or impeachment evidence.  Petitioner was in possession of Trooper Myers' reports, which appear to be the only evidence upon which Petitioner can base his claim that the State had forewarning of problems with Zain's work, at the time of his trial.  Moreover, even if the State failed to disclose any favorable evidence, or evidence that could have been used to impeach Zain's testimony, such evidence was not reasonably likely to have affected the judgment of the jury, as none of the evidence was exculpatory.

Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions

denying Petitioner habeas corpus relief on his <u>Brady</u>-type claims were neither contrary to, nor an unreasonable application of, clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  The undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on Petitioner's claims as stated in Grounds 9 and 15(c) of his Amended Petition.

### C.   Petitioner's actual innocence claim.

In Ground 7 of his Amended Petition, Petitioner claims that the serology evidence in the Sparks case demonstrates that he is actually innocent of that crime.   In particular, Petitioner contends:

> For example, as noted by Stolorow, at page 2 of his Supplemental report the lab reports prepared by State's expert Fred Zain (to which he testified at trial) indicating that the Sparks vaginal swab contained the genetic marker phosphoglucomutase (PGM) 2+1+ is inconsistent with the raw data sheet indicating PGM 1 was found on the vaginal swab.  If the raw data sheet is correct, McLaurin must be excluded as the donor of the genetic marker PGM found on the vaginal swab since his PGM was identified as 2+1+.

> In addition, Trooper Howard Myers, who did not testify at McLaurin's trial, prepared a lab report on the Sparks serology evidence, Exhibit E in the Appendix, stating the mixture of secretions on the vaginal swab, slides, blue jeans, and carpet sample contained the genetic marker glyoxalase I (GLO) 2,1, but Zain reported in his lab report, Exhibit F in the Appendix, that the GLO I on the same items was a 2-1, a different genetic marker [FN 1 - omitted], which was consistent with McLaurin's GLO of 2-1.  Myers' GLO I evidence is further evidence excluding McLaurin as Sparks' assailant.

Because the above serology evidence excludes McLaurin as Sparks' assailant, and is therefore evidence of his innocence, McLaurin was severely prejudice by Fred Zain's false testimony regarding the serology evidence. Zain's testimony misrepresented the Sparks serology evidence demonstrating McLaurin's innocence.

The prosecution's use of false evidence and suppression of exculpatory evidence denied McLaurin his due process right to a fair trial and his right to confront witnesses against him. Fourteenth and Sixth Amendments, U.S. Constitution, respectively; Article III § 10 and 14, respectively, W. Va. Constitution.

(# 30 at 30-31). Petitioner repeats this claim in Ground 15(b) of his Amended Petition, claiming that no reasonable jury could have found him guilty beyond a reasonable doubt of sexual assault in the face of the serology evidence. (# 44 at 31-32).

Respondent's Supplemental Response addresses Petitioner's actual innocence claim as follows:

The Petitioner's "actual innocence" claim, which first saw the light of day not in either of the habeas hearings but in the Petitioner's appeal from the omnibus hearing (# 52, Ex. 27), is based solely on the <u>Petitioner's</u> interpretation of serological reports, not on the interpretation of anyone with serological expertise. In his Zain habeas proceeding, the Petitioner submitted the testimony of two serologists, Trooper Smith (# 66, Exs. 38, 39) and Trooper Myers (# 66, Ex, 36), neither of whom testified that the post-trial DNA reports demonstrated Petitioner's innocence of anything. In his omnibus habeas proceeding, the Petitioner called Trooper Myers to testify (# 70, Ex. 47, pp. 35-67); again, Trooper Myers' testimony did not support the Petitioner's claim that the post-trial DNA reports demonstrated his (Petitioner's) innocence of the Sparks rape. Petitioner called no other witnesses who could, or did, testify about what the post-trial DNA reports signify, despite the fact that Judge Frazier gave him every opportunity to do so.

Therefore, Petitioner's claim of "actual innocence"
as to the Sparks rape has no evidentiary basis and is
waived.  Indeed, in his discussion of this issue in his
Petition for Appeal (# 52, Ex. 27, Claim VII), Petitioner
recites findings from the Stolorow report that deal with
only one issue, whether Fred Zain's work was trustworthy,
not with any finding that any of the evidence exonerated
the Petitioner.

(# 85 at 12).

Petitioner's Reply to Respondent's Supplemental Response on

this issue states:

Perhaps the respondent finally got a partial answer right
and therefore will agree with Petitioner's request for an
evidentiary hearing to resolve . . . "the interpretation
of these reports."  The petitioner readopts all prior
arguments relevant to this issue.  And it is obvious that
respondent is attempting to construct petitioner's
argument of innocence, basis [sic; based] on the work of
Mr. Stolorow is also erroneous, in actuality petitioner's
basis for his argument on the analysis rendered by the
Kanawha County Public Defenders Office. The petitioner is
requesting should this court grant him an evidentiary
hearing that he be allowed to call such witnesses, Former
United States Assistant Attorney General Nancy Hill, Mr.
George Castelle[,] Mr. Mark Stolorow, and the individual
responsible for issuing the DNA report because there were
two (2) such reports, which seem to contradict the other
report.

(# 86 at 7-8).

The Supreme Court has established that there are two types of

"actual innocence" claims: substantive and procedural.  Where a

petitioner contends that he is entitled to habeas relief because

newly discovered evidence shows that his conviction is factually

incorrect, that is a substantive claim, and it is not cognizable in

federal habeas corpus.  See Herrera v. Collins, 506 U.S. 390, 400

(1993)("claims of actual innocence based on newly discovered

86

evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding"). The Herrera Court also noted that, in the capital punishment context, "a truly persuasive demonstration of 'actual innocence,' made after trial, would render the execution of a defendant unconstitutional and warrant federal habeas relief if there were no state avenue open to process such a claim" and that the burden in such a case would be "extraordinarily high." 506 U.S. at 417-418. The instant case is obviously not a capital case and Petitioner's life sentences have already been overturned. Thus, Petitioner's case is not analogous to Herrera.

The Supreme Court has also held that a showing of actual innocence can serve as a "gateway" to the review of otherwise procedurally defaulted constitutional claims. In Schlup v. Delo, 513 U.S. 298 (1995), the Supreme Court clarified that a federal habeas petitioner who is asserting actual innocence as a procedural gateway is obliged to demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." The Court stated that, as set forth in its prior decision in Murray v. Carrier, 477 U.S. 478 (1986), a habeas petitioner claiming that new evidence demonstrates that he is actually innocent "must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Id. at 327. Furthermore, "[t]he habeas court

must make its determination concerning the petitioner's innocence 'in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." Id. at 328.  In other words, the district court must make "a probabilistic determination about what reasonable, properly instructed jurors would do."  Id. at 329.

As noted by Respondent, Petitioner did not assert his actual innocence claim until the appeal of the denial of his omnibus habeas corpus petition, and it is unclear which type of actual innocence claim Petitioner is raising.  Petitioner has cited the Schlup decision in his Amended Petition and Memorandum of Law, claiming that the serology evidence in the Sparks case demonstrates his actual innocence, and that the admission of false serology evidence denied him his right to due process of law and a fair trial.  However, Petitioner also cites to Herrera in his argument that the subsequent analysis of the serology evidence by Mark Stolorow "proved actual innocence."  A further discussion of the basis of Petitioner's actual innocence claim is warranted.

In his Zain I habeas proceedings, Petitioner's counsel made a motion for discovery of all relevant law enforcement files from Petitioner's cases, in an attempt to discover whether any exculpatory information had been withheld.  In the order denying

the discovery motion and addressing Petitioner's <u>Zain I</u> petition,

the Circuit Court stated:

> This Court has considered the original motion herein on
> its face as well as the supplemental motion which raises
> additional grounds; the serology testing review reports
> from Cellmark Diagnostics authored by Mark Stolorow dated
> October 24, 1995 and November 27, 1995; the October 4,
> 1996 serological/seminal DNA Analysis Report from
> Laboratory Corporation of America (LabCorp) of North
> Carolina (Zip 27709) in respect to samples pertaining to
> McLaurin, Sparks, Townsend and Capone; the October 16,
> 1996 Amended Analysis Report from LabCorp of North
> Carolina in respect to the same subjects, and the
> argument of counsel at the two hearings scheduled upon
> these particular motions herein. Petitioner is unable to
> specifically identify the evidence that is supposedly
> exculpatory but petitioner theorizes and conjectures that
> such evidence might exist among the field notes of the
> police officers involved in the investigation. Secondly,
> petitioner contends that there was prosecutorial
> misconduct in respect to the prosecution of this case,
> insofar as the prosecutors knew prior to the trial herein
> that State Crime Lab Expert witness Fred Zain was
> inclined to embellish his testimony regarding serology
> results.

(# 48, Ex. 13 at 1-2).

In support of his actual innocence claim, Petitioner relies

upon a raw data sheet that indicates that the PGM result on the

vaginal swabs and jeans in the Sparks case was a 1, when

Petitioner's PGM result is a 2+1+. According to the raw data

sheet, a 2+1+ result was found on the carpet sample that was taken

from Sparks' car. In the deposition that Trooper H.B. Myers gave

in Petitioner's <u>Zain I</u> habeas proceedings, Trooper Myers testified

as follows about the difference in the raw data sheet and the case

worksheet in the Sparks case, which showed a 2+1+ result for the

vaginal swabs and jeans:

> Q.    . . . Why would 2+1+ be entered everywhere on the
> worksheet for Sparks, that's page 25, and yet the
> raw data has the 2+1+ only for what appears to be
> the carpet sample?

> A.    Again, it could be that the plate that these tests
> were performed on was left in to develop and that
> the 2+ developed later and was not recorded on the
> raw data sheet.

(# 66, Ex. 36 at 22).  This deposition transcript was submitted and

considered by the judge in Petitioner's <u>Zain I</u> habeas proceedings.

Furthermore, in Petitioner's omnibus habeas corpus proceedings,

Trooper Myers testified as follows about this issue at the

evidentiary hearing:

> Q.    Now, you reported in this case with respect to the
> victim Beth Sparks that the PGM factor, one of the
> blood factors in the testing of Mr. McLaurin's
> blood, was 2 plus 1 plus.

> A.    You are right.

> Q.    Is that correct?

> A.    Mr. McLaurin's 2 plus 1 plus.

> Q.    And that mixture of secretions identified on the
> vaginal slide, swabs, blue jeans and carpet sample
> contained the PGM genetic marker 2 plus comma 1
> plus?

> A.    Correct.

> Q.    Not the same as Mr. McLaurin's?

> A.    Well, the reason the comma is there is to indicate
> that the individuals involved could be a 2 plus, a
> 1 plus, and a 2 plus 1 plus.  In this case, the
> semen donor would have to have at least a 2 plus.
> So he could be a 2 plus or a 2 plus 1 plus.

90

(# 70, Ex. 47 at 61-62).

Trooper Ted Smith also gave a deposition in Petitioner's <u>Zain</u> <u>I</u> habeas proceedings, in which he testified as follows on this issue:

> Q.    You discussed some inconsistencies and contradictions in the Sparks case; possible mistakes or differences of opinion or of interpretation in the Sparks case. Are there other matters of that nature, are there any errors of any sort that you are aware of, that I have overlooked?
>
> A.    No, not that I can tell. Basically, it just falls into the category of the other cases. We just are not exactly sure what happened, simply because of raw data not being present. The only person that knows for sure exactly what was done was Fred or Jeff, but with some supportive data, ten years after the fact, you just can't be sure.
>
> Q.    In your cover letter, Page 1 of the Deposition Exhibit 1, you write in the bottom paragraph, second sentence, "The worksheets suggests duplicate testing on items."
>
> A.    Uh-huh.
>
> Q.    How do you know that?
>
> A.    Well, this is, like I say, just an educated guess. If you look at Page 25, go down to the third column where it says, "vaginal swabs." You see a big 1+, and then you see a little tiny 2+. Now that could mean duplication; duplicate testing.
>
> The first time through they were a 1+, which if I'm not mistaken, if you look at Jeff's raw data sheet, it says 1+ on that particular item, if I'm not mistaken. On the VS he shows a PGM type of a 1 and a PGM sub-type of a 1+.
>
> Well, based on that and the fact that there is a 2+ there, tells me that either there was other testing done, or we've got magic involved here. So that's why I make that statement.

The case worksheet itself, and I'm making an
assumption here, that the case worksheet is
accurate.  That means that, then, which it was
supposed to be an accurate reflection, not
necessarily the raw data sheet, but the case
worksheet was always supposed to be exactly what we
were 100 percent sure of that we could report.

Based on that, the fact that Jeff's data only has a
1+ indicates to me that there should have been or
there had to be additional testing done in order
for that 2+ to be reported.

* * *

Q.   Well referring back to the vaginal swabs, the 1+
     with the 2+ written above it [on the case
     worksheet].  If that 2+ hadn't been added and that
     1+ remained, since John McLaurin is a 2+1+, if the
     PGM really is on the vaginal swab is just a 1+,
     would that not exclude John McLaurin as a suspect
     in this case?

A.   Yes and no; another interpretive thing.  Depending
     on the levels of seminal fluid that may be present,
     there is a phenomenon in conventional testing
     called masking.

     Basically, what that means is you have an imbalance
     in material.  You've got a little bit of seminal
     fluid, lots of vaginal.  Unlike modern testing, you
     can't split them out and separate them.

     So, what can happen is, you can have enough seminal
     fluid to register on your ABO and not register on
     your PGM, or you could have enough seminal fluid
     there to register on your ABO and your PGM, and not
     your glyoxalase.  Or you could have seminal fluid
     there and it not be sufficient to even register on
     your ABO or your PGM or any of them.

Q.   Now, am I correct that there is no raw data to
     support that 2+ that has been inserted above the
     1+?

A.   That's correct; not anything I could find.

92

Q.   So that if the 2+ was inserted there by the use of
     a magic wand, it would certainly make this a more
     incriminating report?

A.   Well, that's correct.

Q.   If not changing a report excluding John McLaurin to
     one including him?

A.   Well, let me look for a second before I say
     something I may later regret.  My answer would be
     no.  He could not be excluded because you have
     other items in the case where I have raw data to
     support.

     So, on the vaginal swab, basically, let's assume no
     PGM, okay.  There was a stain on the carpet, if I'm
     not mistaken, that we can support, that was 2+1+.
     **So, therefore, based upon the stain that was on the
     carpet, Mr. McLaurin could not be excluded.**

(# 66, Ex. 38 at 57-61)[emphasis added].

Both Myers and Smith further testified that Petitioner cannot

be excluded as the depositor of the semen in any of the cases. (#

66, Ex. 38 at 26, 45-46, 61, 84; # 70. Ex. 47 at 58).  Moreover, to

the extent that Petitioner is relying upon the reports from Mark

Stolorow to support his claim of actual innocence, at the beginning

of Petitioner's omnibus habeas corpus hearing, his counsel, Gregory

Ayers, represented to the court that he had consulted with Mr.

Stolorow and determined that he could not provide any exculpatory

evidence relating to Mr. McLaurin.  (# 70, Ex. 47 at 29).

According to the amended DNA report, Petitioner could not be

excluded as a depositor of DNA in either the Sparks or Capone

cases, and was certainly the depositor of DNA in the Townsend case.

Therefore, there appears to be no basis for an actual innocence

93

claim based upon the DNA evidence that is before the court.

Assuming that Petitioner is asserting that the raw data sheets that show a PGM result of 1 for the vaginal swabs and jeans in the Sparks case are evidence that he is "actually innocent" of the Sparks crime, Trooper Myers and Trooper Smith explained that additional testing may have shown additional results of a PGM 2+1+, and that, at any rate, Petitioner could not be excluded as the depositor of semen in that case because the carpet sample PGM result was a 2+1+. Accordingly, in light of all of the evidence, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that it is more likely than not that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt.

Therefore, the undersigned further proposes that the presiding District Judge **FIND** that Petitioner cannot demonstrate that he is "actually innocent" of the Sparks crime, as stated in Grounds 7 and 15(b) of his Amended Petition, and that the state courts' decisions denying him habeas corpus relief were neither contrary to, nor an unreasonable application of, clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. The undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on those claims.

**D.    Petitioner's Confrontation Clause claim.**

In Ground 8 of his Amended Petition, Petitioner contends that he was denied the right to confront and cross-examine witnesses because Zain testified about tests performed by other serologists in his lab.  Petitioner repeats these allegations in Ground 15(d) of his Amended Petition.  Petitioner's Amended Petition states:

> The trial court ruled at McLaurin's trial that the State's serology expert, Fred Zain, could only testify to serology tests he performed. (Tr. Vol. II 565-66, 601). Fred Zain testified he alone performed the serology tests involving victim Beth Sparks (Tr. Vol. II 543), and that the blood typings and genetic markers found in the seven samples taken from Sparks were consistent with those found in McLaurin's blood. (Tr. Vol. II 619). Thus, there is little question the jury relied upon Zain's testimony in finding McLaurin guilty of the Sparks assault.

> However, it was discovered subsequent to McLaurin's trial that another State Police serologist, Jeff Bowles, participated in testing in the Sparks case, as stated by Mark Stolorow, Director of Operations at Cellmark Diagnostics, in his November 27, 1995, Supplemental Report, pages 20-21, regarding the serology testing in this case:

> **DISCREPANCIES IN TESTIMONY REGARDING WHO ACTUALLY CONDUCTED TESTING:**

> An unresolved issue emerges from Ted Smith's testimony in the 10-17-95 deposition regarding uncertainty about who actually conducted testing in the Sparks case.  He stated that the handwriting on the two tables on the lower right portion of the raw data sheet for the Sparks case (S-88-511) is actually that of Jeff Bowles and Fred Zain (RT 11-13).  Tpr. Smith described the upper of the two tables as a combination of the handwriting by Jeff Bowles ". . . in terms of the setting up of the samples" (Deposition, 10-17-95, RT 11) and at least some of the test results in the

handwriting of Fred Zain. He further described the entire lower table to appear to have been written by Jeff Bowles.

This raises a dilemma. How can the disclosures of Tpr. Smith be reconciled with the testimony of Fred Zain? Mr. Zain testified that "All tests performed on Beth Sparks's case were performed by myself alone" (RT 543). There appears to be a discrepancy between testimony of the experts on this point.

Without reporting every relevant citation from testimony in contrast to that which can be pieced together from the raw data, case worksheets, and laboratory reports, there is also a conflict regarding who actually conducted the testing in the Capone case and who testified as to the results of that testing.

Examination of the documents and testimony of Tpr. Smith in his deposition of 10-17-95 make it increasingly difficult to avoid the conclusion that the analysis and reporting of the Capone case and at least some of the Sparks case was performed by Tpr. Myers and/or Tpr. Bowles. Despite this appearance, however, Mr. Zain testified to the results of both the Capone and the Sparks cases.

McLaurin had a fundamental constitutional right to confront witnesses against him. Sixth Amendment, U.S. Constitution; Article III, § 14, W. Va. Constitution. Davis v. Alaska, 415 U.S. 308 (1978); Syllabus Point 1, State v. Crockett, 164 W. Va. 435, 265 S.E.2d 268 (1979). He was denied that right when Zain falsely testified to serology tests performed by others. Moreover, the jury clearly relied upon this testimony in concluding McLaurin committed the Sparks assault.

(# 30 at 31-31).

Petitioner further contends:

The reasons why the failure to present both versions to the jury is significant is because the difference to

96

what Trooper Myers could testify to and to what Fred Zain
actually testified to was enormous.  Mark Stolorow, the
Director of Operations of Cellmark Diagnostics, described
the difference between Fred Zain's false testimony and
Trooper Myers' reports.  (Stolorow Report, October 24,
1995, p.3).   Stolorow  explains  that  Myers'  report
involving victim Capone correctly recognizes that all
genetic markers that were obtained by the lab testing may
be from the victim alone, that the testing revealed
nothing about the identity of the assailant.  Because
nothing is known about the assailant, no male could be
excluded: 100 percent of the male population could be the
source of the fluids.  (Stolorow Report, oct. 24, 1995,
p. 3, Stolorow Supplemental Report, Nov. 27, 1995, pp.
16-17).

     Instead of testifying that 100 percent of the male
population could be included, Fred Zain testified at
trial that only 2 ½ percent of the male population could
have contributed the fluids in the case involving Capone,
and that John McLaurin was included in that 2 ½ percent.
(Tr. Vol. II 606).  In the Sparks case, Zain testified
that McLaurin was included within 1.9 percent.  (Tr. Vol.
II 620).

     Thus,  the  prosecutors'  efforts  and  Ted  Smith's
efforts to lessen the magnitude of the differences are
misleading.   The  Kanawha  County  prosecutors  were
forewarned that Zain's work in McLaurin's case was false,
and despite those warnings the disputed issues were
presented to the jury on the testimony of Fred Zain and
Fred Zain alone.

     As stated above, (1) the prosecution had a duty to
disclose that Fred Zain's assistants forewarned them that
Fred Zain's work was unreliable; (2) that Fred Zain was
not the principal analyst who performed the tests,
despite his testimony to the contrary; (3) that Fred Zain
should not have been permitted to testify at all, because
Judge Hey ruled that only the person who performed the
tests could testify; and (4) that the difference between
what Fred Zain testified to and what Trooper Myers would
have testified to was of major significance.

(# 30 at 37-38).

Respondent asserts that this claim was fully and fairly litigated in Petitioner's <u>Zain I</u> habeas proceedings.  Respondent states:

> [S]everal depositions were taken, including the deposition of Trooper Ted Smith who testified that " . . . he informed the State of the differences in [Trooper Myers' and Trooper Zain's] reports prior to the appellant's trial . . . ," (# 66, Exs. 38 & 39) and the deposition of then-Assistant Prosecuting Attorney Irene Berger, who testified that " . . . the question about [Zain's] work, even in the McLaurin case, I never suspected what has, you know come to light now." (# 66, Ex. 37).  The forewarnings issue was raised on appeal from the Petitioner's Zain habeas, and specifically addressed by the Supreme Court of Appeals in <u>State ex rel. McLaurin v. Trent</u>, 506 S.E.2s 322, 327 (W. Va. 1998), <u>cert. denied</u>, 525 U.S. 1078 (1999) [<u>McLaurin I</u>].  The Court found that:
>
> > Based upon this testimony, it is clear that the State had no forewarning that Mr. Zain's work was unreliable.  At the very most, the prosecution was informed that there was a difference of opinion between experts regarding population statistics.  Knowledge of such disagreement does not give rise to the inference that the State was alerted that Mr. Zain might have falsified evidence in the appellant's case.  Accordingly, we find no merit to this assignment of error.
>
> [<u>Id.</u> at 326].

(# 85 at 14-15).

Respondent asserts that this issue is moot because all of the serology evidence was thrown out of the case in Petitioner's <u>Zain I</u> habeas proceeding.  (# 85 at 13).  Nevertheless, this federal court must address the Petitioner's claims in the vein in which he raised them.  In this ground for relief, Petitioner contends that

he was denied the right to confront witnesses against him, in violation of the Sixth Amendment.  As noted by Petitioner, the Supreme Court addressed the Sixth Amendment right to confront witnesses in Davis v. Alaska, 415 U.S. 308 (1978).

> The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'  This right is secured for defendants in state as well as federal criminal proceedings under Pointer v. Texas, 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed.2d 923 (1965). Confrontation means more than being allowed to confront the witness physically.   'Our cases construing the (confrontation) clause hold that a primary interest secured by it is the right of cross-examination.' Douglas v. Alabama, 380 U.S. 415, 418, 85 S. Ct. 1074, 1076, 13 L. Ed.2d 934 (1965).  Professor Wigmore stated:
>
>> 'The  main  and  essential  purpose  of confrontation is to secure for the opponent the opportunity of cross-examination.  The opponent demands confrontation, not for the idle purpose of gazing upon him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers (emphasis in original).   5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940).
>
> Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.

415 U.S. at 315-316.  Thus, the undersigned sees the issue before the court as this: would the ability to cross-examine the other serologists who performed testing on the evidence in McLaurin's case have affected the outcome of the verdict?  Phrased another way, in accordance with Brecht, supra, did the inability to cross-examine the other serologists who performed testing in McLaurin's

case have a substantial and injurious effect or influence in determining the jury's verdict?

As previously discussed, Trooper Myers testified in a deposition in Petitioner's <u>Zain I</u> habeas proceeding, and again in Petitioner's omnibus habeas corpus proceeding. Although Myers stated that he did conduct the testing in the Capone case and some of the testing in the Sparks case, he offered no testimony or evidence that would have changed the ultimate facts that the jury heard from Fred Zain at Petitioner's trial; that is, that Petitioner could not be excluded as a possible contributor of the genetic factors found in the evidence in all three cases.

Furthermore, Petitioner was in possession of Myers' reports prior to trial and, despite the fact that the State chose not to call Myers as a prosecution witness, if Petitioner thought that Myers' testimony could have been helpful to his defense, he could have called Myers in his own case in chief. It is more likely than not, however, that Myers' testimony would not have helped Petitioner's case, as he would have testified that Petitioner could not be excluded as the assailant in any of the cases.

Trooper Jeff Bowles also testified at Petitioner's omnibus hearing. He testified that he was in training at the time these cases were pending, and that he did not do any testing on his own. He stated:

A.   Sir, you're indicating that I did the work.  I
     don't know if I can agree completely with that.  At

100

> this time period, this was September of 1988, I
> graduated from the academy I believe in March of
> '88, late march, the first of May.  I was in a
> training phase at this time.  So to say that I did
> the work, I was participating in the work being
> done, but at this time I wasn't working cases by
> myself. * * * I would have been placing samples
> where they would have been tested.  I would have
> been mixing solutions and things like that.  But
> all of that was done under supervision.

(# 70, Ex. 47 at 78-79).

The State was not required to call Myers or Bowles in its case in chief.  However, to the extent that Petitioner is claiming that it was error to allow Zain to testify to the results of testing performed by other serologists, that error was harmless, as the other serologists would have testified that Petitioner could not be excluded as the assailant in any of the three cases.  Thus, under the harmless error analysis in <u>Brecht</u>, <u>supra</u>, Petitioner has not demonstrated that the alleged denial of Petitioner's right to confront the other serologists who performed testing in Petitioner's case had "a substantial and injurious effect or influence in determining the jury's verdict."

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the state courts' decisions denying Petitioner habeas corpus relief on this claim were neither contrary to, nor an unreasonable application of, clearly established federal law, and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  The undersigned further proposes that the presiding

101

District Judge **FIND** that Respondent is entitled to judgment as a matter of law on Grounds 8 and 15(d) of Petitioner's Amended Petition.

The undersigned will address Petitioner's ineffective assistance of counsel claims that concern serology evidence when it addresses Petitioner's other claims of ineffective assistance of counsel, <u>infra</u>.

**II.   OTHER REMAINING GROUNDS FOR RELIEF.**

**A.   Non-cognizable claims.**

In Ground 6 as stated above, Petitioner asserts that he was denied due process of law and the effective assistance of counsel when he was not allowed to present evidence or call witnesses on his behalf during his <u>Zain</u> habeas proceedings.  These allegations are repeated in Ground 15(e).  Specifically, the Sixth Claim of Petitioner's Memorandum in Support of his section 2254 petition states in pertinent part:

> [T]he trial court refused McLaurin's request to conduct a hearing on the merits of his Zain habeas corpus petition.  As a result, McLaurin was denied the right to present evidence on his own behalf which would have undermined the Court's critical findings on the Zain issues and evidence.  In addition, the denial of a hearing allowed the West Virginia Supreme Court of Appeals to erroneously affirm his convictions without any record evidence from McLaurin, thus denying McLaurin his Sixth Amendment right to counsel and due process right to appeal.  <u>McLaurin v. Trent</u>, 203 W. Va. 67, 506 S.E.2d 332 (1998).

\* \* \*

In the present case, there were numerous newly-discovered issues of which McLaurin would have been unaware at trial, including the perjury of Fred Zain, the forewarning to the prosecution that his work was erroneous, and the overall unreliability of all of the State's serology tests and lab results.

As set forth by the United States Supreme Court in Herrera v. Collins, 506 U.S. 390, 400, 113 S. Ct. 853, 860 (1993)(quoting Townsend v. Sain, 372 U.S. 293, 317, 83 S. Ct. 745, 759 (1963):

> Where newly discovered evidence is alleged in a habeas application, evidence which could not reasonably have been presented to the state trier of facts, the federal court must grant an evidentiary hearing.

Consequently, the failure to hold a hearing on the merits of the Zain habeas violated state habeas corpus requirements and foreclosed McLaurin from presenting expert testimony of his own regarding the reports and testimony of Fred Zain and his assistants showing the unreliability of the serology evidence, and its prejudicial effect on the jury verdicts in the Townsend and Sparks cases. The failure to allow McLaurin to develop an adequate record during the Zain habeas further denied him an adequate record for appeal which deprived counsel of the evidence and arguments needed for the appeal. McLaurin was thereby denied due process of law and the effective assistance of counsel. Fourteenth and Sixth Amendments, U.S. Constitution, respectively; Article III, §§ 10 and 14, respectively, W. Va. Constitution.

(# 30 at 26-28).

This same claim is addressed in the heading of what the undersigned has now designated Ground 15(e), which appears on page 38 of Petitioner's Amended Petition (# 44). The heading states:

> When the Circuit Court reversed Counts 1, 2 and 3 (Capone Counts) on the first habeas corpus and failed to hold a hearing to allow McLaurin to present evidence on his behalf, McLaurin was denied due process of law. This denial of a hearing further prejudiced McLaurin and

> denied him the effective assistance of counsel on appeal
> as counsel was forced to argue his appeal on an
> inadequate record.  The appellate court's decision was an
> unreasonable application of United States v. Lane, 474
> U.S. 438, 446 n.8, 106 S. Ct. 725, 730 n.8 (1986).

(# 44 at 38).   The Amended Petition does not elaborate on the

denial of an evidentiary hearing in the Zain I proceeding.

Respondent's Supplemental Response asserts that any claim

Petitioner might have about being denied an evidentiary hearing was

completely mooted in his omnibus habeas proceedings where he was

permitted to put on any evidence he chose.   (# 85 at 11).

Nevertheless, these claims are not cognizable in federal habeas

corpus.   Bryant v. Maryland, 848 F.2d 492 (4th Cir. 1988)

(infirmities in state post-conviction proceedings cannot serve as

a basis for federal habeas corpus relief).   Generally, a federal

court cannot grant habeas relief based on errors occurring during

state collateral review proceedings.   See Wright v. Angelone, 151

F.3d 151, 159 (4th Cir. 1998).   Furthermore, Petitioner does not

have a constitutional right to counsel in a state court habeas

corpus proceeding.   See Murray v. Giarratano, 492 U.S.1 (1989);

Pennsylvania v. Finley, 481 U.S. 551 (1987).   To the extent that

Petitioner is asserting that the failure to hold an evidentiary

hearing in his Zain I habeas proceeding was a fundamental

miscarriage of justice that denied him due process of law, his

claim lacks merit.

The standard of review established by the SCAWV for _Zain I_ habeas proceedings was extremely limited.  The Circuit Courts were to review the sufficiency of the evidence presented to the jury, after the removal of all of the Zain-related testimony and evidence, to determine whether the admission of such evidence was harmless.  That is exactly what the Circuit Court of Kanawha County did in Petitioner's _Zain I_ habeas proceeding.  Petitioner's counsel took the depositions of Troopers Myers and Smith, and former prosecutor Irene Berger as part of those proceedings.  Thus, he was able to examine those witnesses and develop evidence in support of Petitioner's claims for habeas corpus relief, and that evidence was presented and reviewed by the judge in the _Zain I_ habeas proceedings.

To the extent that Petitioner asserted other grounds for relief, such as his claim that the State withheld exculpatory evidence, or that the State knowingly presented false evidence, or that he was denied his right to confront the witnesses against him, those claims were raised in Petitioner's separate omnibus habeas corpus proceeding, in which Petitioner was granted evidentiary hearings, and an appeal therefrom.  Accordingly, Petitioner cannot demonstrate a violation of his federal constitutional rights based on the failure to conduct an evidentiary hearing in his _Zain I_ habeas proceeding.

Petitioner reliance on <u>Herrera v. Collins</u> and <u>Townsend v. Sain</u> in support of these claims is also misplaced, as those cases govern when a federal court should grant an evidentiary hearing on a state habeas petition.  Petitioner's claim concerns the alleged failure of the state courts to hold an evidentiary hearing, which was mooted by Petitioner's omnibus proceeding.

For these reasons, the undersigned proposes that the presiding District Judge **FIND** that Petitioner's claims that he was denied the right to present evidence on his behalf through an evidentiary hearing in his <u>Zain I</u> habeas proceeding, and further denied the right to effective assistance of counsel in his habeas appeal proceeding are not cognizable in this federal habeas corpus matter and, thus, Respondent is entitled to judgment as a matter of law on Petitioner's claims as stated in Ground 6 and 15(e) of his Amended Petition.

**B.   Racial discrimination in selection of grand jury foreperson.**

As stated in Ground 2 above, Petitioner asserts that he was denied due process of law and equal protection of the law due to alleged racial discrimination against blacks in the selection of grand jury forepersons in Kanawha County.  In his Amended Petition, Petitioner addresses this claim as follows:

> For McLaurin presented evidence and records for a period of time from 1979 through 200[0], 63 grand jury forepersons had been selected in Kanawha County where approximately 5-6% of the population was black.  All grand jury forepersons for the above years were white,

106

allegedly except for one, in September 1980 Term, i.e.
Bernard Hawkins.  McLaurin's evidence covers a 21 year
period.   Some federal cases involving similar claim
(involving black defendants) have found 15 and 20 years
periods  of  time  relevant.   See, e.g., <u>Guice v.
Fortenberry</u>, 722 F.2d 276, 280 (5th Cir. 1984); and
<u>Johnson v. Puckett</u>, 929 F.2d 1067, 1072 (5th Cir. 1991).
In <u>Rose v. Mitchell</u>, 443 U.S. 545, 99 S. Ct. 2993 (1979),
the  Supreme  Court  explained  that  a  black  criminal
defendant  may  challenge  his  conviction  when  the
discrimination  extends  only  to  the  grand  jury
forepersons.  In the context of grand juries, it is clear
that a black criminal defendant has standing to object to
race based exclusion of blacks from the grand jury.

* * *

McLaurin submits that there was affirmative evidence
produced at the habeas evidentiary hearing establishing
that  black[s]  had  been  systematically  discriminated
against in the selection of the grand jury foreperson in
Kanawha  County.   His  indictment  must  therefore  be
declared invalid.

(# 44 at 45-46).

Petitioner  addresses  this  claim  in  greater  detail  in  his

Memorandum in Support of his Amended Petition (# 30).  He states:

On April 10, 1998 [sic; 1989], McLaurin was indicted
by  a  Kanawha  County  Grand  Jury  on  two  counts  of
kidnapping,  and  seven  counts  of  first-degree  sexual
assault, where historically McLaurin contends the grand
jury  forepersons  have  been  selected  in  a  racially
discriminatory manner.  McLaurin believes he can present
proof showing that for a period of 21 years, all of the
grand jury forepersons in Kanawha County have been white
except  for  one.   The  State  or  its  prosecutor  cannot
dispute  this  evidence.   McLaurin  argues  that  this
challenge to the racial discrimination in the selection
of  grand  jury  forepersons  was  part  of  his  pretrial
challenge to the grand jury selection process, which the
trial  court  denied,  thereby  violating  his  state  and
federal  constitutional  rights  under  the  Fourteenth
Amendment . . . .

(# 30 at 15).  Petitioner further discusses the basis for this

107

claim as follows:

> On November 15, 1989, McLaurin filed a pretrial "Motion of Defendant to Require the State to Disclose the Manner of Selecting Grand Jurors," which was denied by the trial court (Tr. Vol. I 159-60), without giving McLaurin the right to challenge racial discrimination in the selection of grand jury forepersons.  A contemporaneous objection was noted by the trial court on McLaurin's behalf.  (Tr. Vol. I 160).  There is no question that McLaurin had a right to challenge racial discrimination in the selection of grand jury forepersons because he is of the class as those excluded from service.  McLaurin asserts that the grand jury foreperson selection process in Kanawha County excluded blacks and was discriminatory and violated the equal protection clauses of both the United States Constitution and the West Virginia Constitution. Additionally, McLaurin asserts that the grand jury foreperson selection process violated his due process and fair cross-section rights guaranteed by the United States Constitution and the West Virginia Constitution.

(Id. at 16).

Petitioner cites the following authority in support of his

claim:

> It is well established law that a criminal defendant can challenge the race-based exclusion of petit jurors. Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986). For over fourscore years it has been federal statutory law, 18 Stat. 336 (1875), 18 U.S.C. § 243, and the law of the United States Supreme Court as applied to the States through the Equal Protection Clause of the Fourteenth Amendment, that a conviction cannot stand if it is based on an indictment of a grand jury or the verdict of a petit jury from which Negroes were excluded by reason of their race.  Strauder v. West Virginia, 100 U.S. 303, 10 Otto 303 (1880), overruled on other grounds by Taylor v. Louisiana, 419 U.S. 522, 95 S. Ct. 692 (1975).  See also Pierre v. Louisiana, 306 U.S. 354, 59 S. Ct. 536 (1939); Whitus v. Georgia, 385 U.S. 545, 549-50, 87 S. Ct. 643, 646 (1967).

* * *

108

The Supreme Court initially set out a three step test to determine whether a defendant establishes a prima facie case of discrimination in an equal protection claim in <u>Castaneda v. Partida</u>, 430 U.S. 482, 97 S. Ct. 1272 (1977), a case involving a Mexican-American criminal defendant objecting to the exclusion of Mexican-Americans from the grand jury.   And in <u>Rose</u>, the Supreme Court applied the three step process for establishing a prima facie case of discrimination in the context of grand jury foreperson selection:

> That is "in order to show that an equal protection violation has occurred in the context of grand jury [foreman] selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs. <u>Castaneda v. Partida</u>, 430 U.S., at 494, 97 S. Ct. at 1280.   Specifically, respondents were required to prove their prima facie case with regard to the foreman as follows:

> "The first step is to establish that the group is one that is [a] recognizable, distinct class, singled out for different treatment under the laws, as written or applied . . . . Next, the degree of under representation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as [foreman], over a significant period of time . . . . This method of proof, sometime[s] called the 'rule of exclusion,' has been held to be available as a method of proving discrimination in jury selection against a delineated class . . . . Finally . . . a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing."

> Only if respondents established a prima facie case of discrimination in the selection of the foreman in accordance with this approach, did the burden shift to the State to rebut the prima facie case.

Rose, 443 U.S. at 565, 99 S. Ct. at 3005; Castaneda, 430 U.S. at 494-95, 97 S. Ct. at 1280.

(Id. at 17-18).

Respondent was ordered to address this claim in an Order entered on September 9, 2008.  (# 76).  Respondent's Supplemental Response (# 85 at 8) cites to Judge Frazier's Opinion Order denying Petitioner's omnibus habeas corpus petition, which states:

> The Petitioner failed to present sufficient evidence to sustain his claims for relief on the issue of the racial makeup of the grand jury.  West Virginia law requires that jurors (and grand jurors) be selected through the use of voter registration records from the County Clerk's Office and from records of licensed drivers within the county from the Department of Motor Vehicles.  W. Va. Code § 52-1-5; § 52-2-2.  The statutes are racially neutral on their face and there is no indication that either the Circuit Clerk or the County Clerk applied these statutes incorrectly or in a way that created a discriminatory pattern.  Furthermore, there was no evidence that the Circuit Judges were racially bias[ed] in their selection of grand jury forepersons.  Therefore, this claim by the Petitioner must fail.

(# 52, Ex. 23 at 11-12).  Respondent further argues:

> It is the Petitioner's obligation to present all evidence in support of his claim to the state court and " . . . whether a state court's decision was unreasonable must be assessed in light of the record *the court has before it*."  Holland v. Jackson, 542 U.S. 649, 652 (2004)(emphasis supplied and citations omitted).  The bottom line is that the Petitioner did not prove his claim.

(# 85 at 8).

Petitioner's Reply to Respondent's Supplemental Response simply reasserts that he presented "conclusive evidence and testimony that from 1989 to 2003 only one individual who was appointed foreperson by a Circuit Court Judge ever identifies

110

themselves as African-American."  Petitioner further states:

> And the Circuit Court Clerk Cathy S. Gatson testified
> that from the time she was elected Clerk [in 1987] until
> around 2001, no individual had ever identified themselves
> as African-American.   Therefore, such evidence and
> testimony constituted substantial proof of discrimination
> against African-American[s] in the grand jury selection
> process.

(# 86 at 5).

In Rose v. Mitchell, the Supreme Court held that racial discrimination in grand jury selection is a valid ground for setting aside a criminal conviction, despite a finding of guilt beyond a reasonable doubt by a petit jury.  443 U.S. 545, 565 (1979).  Quoting from its prior decision in Castaneda v. Partida, 430 U.S. 482, 494 (1977), the Court further stated that "in order to show that an equal protection violation has occurred in the context of grand jury [foreman] selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs."  Id. [alteration in original].

Judge Frazier conducted an extensive evidentiary hearing on Petitioner's omnibus habeas corpus petition over the course of four days.  Petitioner spent a great deal of time in those hearings attempting to gather evidence concerning the selection process for grand juries and grand jury forepersons in Kanawha County during the time period between 1979 and 2003.

111

Petitioner called Kanawha County Circuit Clerk Cathy Gatson to testify on several different occasions about the selection process. Ms. Gatson indicated that, as required by West Virginia statute, the jury pools for both grand juries and petit juries are developed from lists of all registered voters and from lists of all licensed drivers in Kanawha County, according to lists provided by the Voter's Registration Office in Kanawha County and from the West Virginia Division of Motor Vehicles every two years. (# 70, Ex. 47 at 90). Those lists are merged and duplications are removed to form a master list. (Id. at 91). The master list does not contain any information related to a prospective juror's race.

Once the master list is compiled on computer, a program randomly selects a number of jurors based upon a starting number provided by the presiding judge. (Id.) After the number of potential jurors have been randomly selected, those individuals are asked to complete a juror questionnaire, which does ask for the individual to indicate his or her race; however, not every juror responds. (Id. at 93). Information from these juror questionnaires is ultimately compiled and provided in an annual report to the SCAWV. That report also provides race information. However, it does not distinguish between grand jurors and petit jurors. (Id. at 92-93). The Circuit Court is only required to retain those reports and the master lists for a period of four years. Thus, at the evidentiary hearings in 2003, when Petitioner

112

was requesting copies of those reports or the master lists for the period of 1979-2003, Ms. Gatson was unable to provide specific information for that time period.  She did testify as follows:

> Q.   Ms. Gatson, do you recall from those reports that you sent out to the Supreme Court the last 15 years or so, the percentage of African Americans in the grand jury pool?
>
> A.   The report does not make any distinction between petit and grand.  It is the total number of jurors selected from the master list for the year.
>
> Q.   Out of that total number, do you recall roughly the percentage of African Americans?
>
> A.   No.

(Id. at 93-94).  Ms. Gatson was also asked if she had any records from Petitioner's grand jury.  She stated that she had payment records for those grand jurors, but the records did not indicate who the foreperson was.  (Id. at 94-95).

At an evidentiary hearing held on May 14, 2003, Ms. Gatson was questioned about two letters she had written in response to Petitioner's requests for jury selection information.  The first was a letter dated September 13, 2001, from Ms. Gatson to Judge Frazier, which stated in pertinent part:

> For period 1996 through 2000, there is no record of any African Americans serving as forepersons of the Kanawha County grand jury.  The foreperson of the current special grand jury, 2001, had indicated race as African American.

(# 70, Ex. 59 at 65-66).  The second letter, dated October 26, 2001, is from Ms. Gatson to Mr. Ayers, which states:

> I received your letter dated September 24th concerning
> the above referenced matter pursuant to the request for
> research identifying the grand jury forepersons for the
> period between 1979 and 1989.  My office conducted a
> search of individual case files to determine the names of
> forepersons for the time period requested.  Please find
> below the following information.

Ms. Gatson then stated that the letter listed the forepersons for

each of the grand juries during that ten-year time period.  (Id. at

77-78).  The following colloquy then occurred:

> Q.   And this I will represent, you can get it here, but
>      this represents each year since 1979, that there
>      were three grand juries called except for the years
>      of '85, '86, '87, and '89.  Ms. Gatson, I'll
>      represent that on here there's approximately 33
>      names on here and we have, Your Honor, I know we
>      can submit this at a later time to the Court --
>
>                          * * *
>
> Q.   There is approximately 33 names on this list Ms.
>      Gatson, and could you tell us how many of these
>      individuals from the information that you have
>      obtained relevant to their race, what individual
>      had listed themselves as African American from this
>      list?
>
> A.   I don't have that information.

(Id. at 79-80).  Judge Frazier also asked Ms. Gatson whether she

had "any personal sense that there was a systematic exclusion of

Blacks from serving on the grand jury during that time period," to

which she stated, "I had no personal sense of any such thing."

(Id. at 88-89).

Beyond this evidence, the undersigned is not aware of any

additional evidence offered by Petitioner concerning this claim for

relief.  Judge Frazier's Opinion Order denying this claim further

114

stated:

> The extensive testimony taken at the evidentiary
> hearing on the issue of the racial makeup of the petit
> and grand jury demonstrated that neither the State nor
> the Circuit Clerk's Office did anything improper with
> regard to the petit or grand jury's racial makeup.  The
> jurors were selected in a racially neutral manner which
> is consistent with the requirements of West Virginia.

(# 52, Ex. 23 at 6, ¶ 4).

The SCAWV did not specifically address this claim in its opinion in McLaurin II because it was addressed in Petitioner's pro se Petition for Appeal, and all of those claims were summarily addressed in a footnote in the opinion.  640 S.E.2d at 217 n.18.

Clearly, Petitioner can meet the first prong of the prima facie case set forth in Rose because he is African American, a class that has been historically singled out for different treatment under the laws as written or applied.  Furthermore, although the evidence presented during Petitioner's omnibus habeas corpus hearings indicates that only one out of 33 grand jury forepersons in the time period of 1979-2003 reported his race as African American, Petitioner has not shown that the selection procedure was susceptible to abuse or was not racially neutral.

In fact, the evidence presented at the omnibus hearings demonstrates that the selection procedure for the grand and petit juries during that time period was racially neutral, as the master lists from which those names were derived contained no information about race.  Moreover, considering that Petitioner's claim concerns

discrimination in the selection of grand jury forepersons, Petitioner provided no evidence concerning that selection process other than to establish that the foreperson was selected from the grand jury pool during each term by the rotating Administrative Judge. Petitioner has not established that the procedure for selection of the grand jury forepersons was not racially neutral, and thus, cannot establish a prima facie case under Rose.

The undersigned proposes that the presiding District Judge **FIND** that the state court's decision denying Petitioner habeas corpus relief on this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. The undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on this claim.

### C. Racial discrimination in petit jury selection.

As stated in Ground 3 above, Petitioner contends that he was denied his right to equal protection of the law when the prosecution in his state criminal case used a peremptory challenge to exclude a black juror from the jury panel. Petitioner asserts that the denial of his claim for habeas corpus relief on this basis was an unreasonable application of the Supreme Court's decision in Batson v. Kentucky, 476 U.S. 79 (1986). (# 44 at 42-44; # 30 at

116

18-22).

During jury selection, the State used one of its peremptory challenges to remove a potential juror who was black. Petitioner's counsel immediately objected and brought the issue before the trial court as follows:

> MR. EARLES [defense counsel]: I believe, Your Honor, that Juror No. 7, who was struck as one of the two strikes by the prosecution, was done so because he was black and for no other reason. And I would ask the Prosecuting Attorney to state whether or not that is the case. This is the inference I have drawn, and I would object to the empanelling [sic; empaneling] of this jury on that basis, if, in fact, the Prosecutor did strike that one --

(Tr. Vol. I, #66, Ex. 32, at 200). The trial court responded:

> THE COURT: Number one, there is a Supreme Court case to that effect. Number two, I would note for the record that of the twelve jurors seated in the jury box right now two of the twelve are black. And I will either let Mr. Forbes, the Prosecutor, who is white, or Mrs. Berger, the Assistant Prosecutor, who is black, place on the record the reason for that strike.

(Id.)

Mr. Forbes objected to providing a reason at that time for their decision to strike the juror, indicating that, if necessary, they would provide a reason to the appellate court. (Id.) After additional discussion and debate, the trial court agreed with Mr. Forbes that, if the issue came up on appeal, the State could provide its reason for the strike at that time. (Id. at 201-202). However, the following morning, prior to opening statements, the trial court again addressed this issue as follows:

There is one matter I want to take up.  Yesterday
defense counsel raised the point that the State
peremptorily struck a black from the jury, in violation
of case law.  And I thought that I had made the position
of the Court clear.  There were something like five
blacks on the jury.  Only one was struck.  And the State
argued at that point if they had to give the reasons for
striking the one that they did strike they would do so at
an appropriate time, if this matter ever reached the
appellate level.

However, I came across a case, <u>State of West
Virginia v. Anthony D. Marrs</u>.  It's a 1989 case written
by Justice Neely in which the Court held, among other
things, "It is a violation of the Equal Protection Clause
of the Fourteenth Amendment of the U.S. Constitution for
a member of a cognizable racial group to be tried on
criminal charges by a jury from which members of his race
have been purposely excluded."  This Court doesn't find
that they have been purposely excluded.  As I indicated,
there were five blacks on the panel, and four of them are
still on the jury or three -- Three or four, I forget
which.

* * *

But I will ask Mr. Forbes, in light of the <u>Marrs</u> case to
place on the record -- I believe there was one black
challenged by the State.  And I would at this time ask
Mr. Forbes or Mrs. Berger to place on the record the
reasons therefor.

(<u>Id.</u> at 208-210).   Mr. Forbes then offered the following

explanation:

During the course of extensive questioning, one of the
things that happened, and obviously we studied the jurors
and their actions and responses, whether verbal or non-
verbal.  The defendant's motion for supplemental voir
dire contained a list of questions that they asked the
Court to rule on.  One of those questions, and I'm not
sure which question the response was made on, whether it
was 18 or 20, but I believe 18 was, "Would any of you be
more apt to believe a witness just because he or she
testifies on behalf of the Government than if he or she
testifies on behalf of the defense?  Would any of you be
more apt to believe a witness just because he or she

118

> testifies on behalf of the defense than if he or she
> testifies on behalf of the Government?"  I think that was
> the question that that particular juror responded to, but
> it could have been No. 20: "Do you know of any reason why
> you may be prejudiced for or against the Government or
> for or against the defendant because of the nature of the
> charges or otherwise?"
>
> What I noticed was on the first part of the question
> dealing with the government, the individual has nodded
> his head or made an affirmative gesture to the Court.
> And when the Court got to the part of the question about
> did he know of any reason why he would be prejudiced on
> behalf of the defense or in favor of the State, he put
> his head down and lowered his eyes and did not make the
> same sort of affirmative gesture.  So that concerned me
> in terms of that.

(Id. at 210-211).  Mr. Forbes further indicated that, when he and

Assistant Prosecuting Attorney Irene Berger reviewed this potential

juror's questionnaire, Mrs. Berger thought she recognized the man

from somewhere, and they were also concerned because he had not

answered some of the questions on the questionnaire.  (Id. at 211-

213).

Petitioner asserts that the State has not provided a non-

racial, credible reason for striking the black juror.  (# 30 at

22).

Respondent was ordered to address this claim on September 9,

2008.  (# 76).  Respondent's Supplemental Response contends that

"Judge Frazier carefully analyzed the evidence under the Batson

standard" and that his decision was not contrary to or an

unreasonable application of clearly established federal law.  (# 85

at 9).

119

Petitioner's Reply to Respondent's Supplemental Response addresses this claim as follows:

> The habeas Court made credible [sic; credibility?] assessments of witnesses without having heard these witnesses, but from a transcript of their reasons. The petitioner therefore contends that the Habeas Court error by making a credibility assessment without understanding its legal requirement. Judge Frazier failed in his analysis to acknowledge that the state only placed its position on the record . . . "the next day" and not when requested by the Court, in fact, the prosecuting attorney stated to the Trial Court when requesting their reasons for striking such juror, stated that he (prosecutor) didn't have to answer such and would only inform an Appeals Court should it be necessary. Lastly, Petitioner readopts all arguments on this claim.

(# 86 at 5-6).

The State habeas court found as follows on this claim:

> Under <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S. Ct. 1712 (1986) and <u>State v. Marrs</u>, 180 W. Va. 693, 379 S.E.2d 497 (1989), the State cannot use peremptory challenges to exclude jurors of a cognizable racial group to which the defendant belongs. However, if the State gives a credible, non-racial reason for excluding a juror, there is no bar to the use of the peremptory challenge.
>
> In this case, one black juror remained on the jury and there was one black alternate juror, both of which were accepted by the State. The remaining black juror, for which the State used a peremptory challenge, had failed to answer several questions on the juror questionnaire. Additionally, Assistant Prosecuting Attorney Irene Berger thought she recognized him, and the Prosecuting Attorney, William Forbes, told the Court that he felt the juror's body language was inconsistent with the responses he was giving to questions.
>
> This Court cannot say, from the Record presented, that the State purposefully excluded members of Petitioner's racial group from the jury. The State was able to articulate credible, non-racial grounds for the exclusion. While these reasons would not be sufficient

120

> to sustain a challenge of a juror for cause, they are
> sufficient to sustain the State's burden in the case of
> a peremptory challenge.

(# 52, Ex. 23 at 21-22).  The SCAWV did not specifically address
this claim in its McLaurin II opinion, as it was another claim that
was raised in Petitioner's pro se petition, which was summarily
addressed in a footnote in the opinion.  640 S.E.2d at 217 n.18.

In Batson, the Court discussed the burden of proving an equal
protection violation on the basis of a peremptory challenge as
follows:

> As in any equal protection case, the "burden is, of
> course," on the defendant who alleges discriminatory
> selection of the venire "to prove the existence of some
> purposeful discrimination."  Whitus v. Georgia, 385 U.S.
> [545] at 550, 87 S. Ct, [] at 646-47 (citing Tarrance v.
> Florida, 188 U.S. 519, 23 S. Ct. 402, 47 L. Ed.2d 572
> (1903)).  In deciding if the defendant has carried his
> burden of persuasion, a court must undertake "a sensitive
> inquiry into such circumstantial and direct evidence of
> intent as may be available."  Arlington Heights v.
> Metropolitan Housing Development Corp., 429 U.S. 252,
> 266, 97 S. Ct. 555, 564, 50 L. Ed.2d 450 (1977).
> Circumstantial evidence of invidious intent may include
> proof of disproportionate impact.  Washington v. Davis,
> 426 U.S. [229] at 242, 96 S. Ct. [2040] at 2049.
>
> *  *  *
>
> Once the defendant makes the requisite showing, the
> burden shifts to the State to explain adequately the
> racial exclusion.  Alexander v. Louisiana, 405 U.S. [625]
> at 632, 92 S. Ct. [1221] at 1226.  The State cannot meet
> this burden on mere general assertions that its officials
> did not discriminate or that they properly performed
> their official duties.  See Alexander v. Louisiana,
> supra, 405 U.S., at 632, 92 S. Ct., at 1226; Jones v.
> Georgia, 389 U.S. 24, 25, 88 S. Ct. 4, 5, 19 L.Ed.2d 25
> (1967).  Rather, the State must demonstrate that
> "permissibly racially neutral selection criteria and
> procedures have produced the monochromatic result."

121

> Alexander v. Louisiana, supra, at 632, 92 S. Ct., at
> 1226; see Washington v. Davis, supra, 426 U.S., at 241,
> 96 S. Ct., at 2048.

476 U.S. 79, 93-94 (1986).

In the instant case, blacks were not systematically excluded from Petitioner's petit jury venire, and only one out of five black jurors was peremptorily removed from the panel. The State, who was represented by an Assistant Prosecuting Attorney who was also black, provided racially neutral reasons for its decision to strike the one black juror. Thus, based upon both direct and circumstantial evidence in the record, it does not appear that the State purposefully struck the juror because of his race.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that Petitioner has failed to demonstrate that the State's use of a peremptory challenge to strike a black juror violated his right to equal protection of the law under the Fourteenth Amendment to the United States Constitution. Furthermore, the undersigned proposes that the presiding District Judge **FIND** that the state habeas court's decision denying Petitioner habeas corpus relief on this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. The undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a

matter of law on this claim.

**D.   Prosecutor's racial comments during closing arguments.**

As stated in Ground 4 above, Petitioner also asserts that racial comments made by the prosecutor during his closing argument were improper and violated his right to due process and a fair trial.   This claim was addressed as the fourth claim in Petitioner's Memorandum of Law in Support of his section 2254 petition.   Petitioner states:

> To ensure a conviction the prosecutor violated his quasi-judicial role requiring him to act fairly and impartiality [sic; impartially].   See Syllabus Point 3, State v. Boyd, 160 W. Va. 234, 233 S.E.2d 710 (1977). The prosecuting attorney abandoned this role and delivered a prejudicial closing argument, making repeated racial references.   Although defense counsel did not object until the prosecutor made his final comments, these prejudicial references denied McLaurin a fair trial and due process of law.   The prosecuting attorney's thirteen (13) references to race during closing are set forth below:

> 1.   "They all described him as a black male."   (Tr. Vol. III 821).

> 2.   "Both of them were together on the sixth floor on September 4, 1988, and they both observed a suspicious black male on the sixth floor, who they knew was not someone who had a room there at the Holiday Inn."   (Tr. Vol. III 821).

> 3.   "Then with the Sparks case you will recall that she indicated to you that she looked at the black male who abducted her when she was walking towards her car.   (Tr. Vol. III 822).

> 4.   "You have to believe that there was a black male meeting this man's description who sexually assaulted Connie Capone, Joyce Townsend and Beth Sparks."   (Tr. Vol. III 824-25).

123

5.    "You have to believe further that there was another suspicious black male at the Holiday Inn on September 4, 1988." (Tr. Vol. III 825).

6.    "I want each of you to look at this first page and the second page of the Admission sheet, the first page of this record, where it says, 'Name, McLaurin, John E., Sex, M' for male, 'Race, B' for black." (Tr. Vol. III 864).

7.    "John McLaurin, who is black according to the admissions sheets, maybe not when the typist typed up his discharge summary a couple of weeks' time later, got these pills on September 6." (Tr. Vol. III 866).

8.    "The black man that raped me, the black man who sexually assaulted me, the black man that kidnapped me, took me up on the mountainside and made me eat four pills two at one time and two at another." (Tr. Vol. III 866).

9.    "How many were named John E. McLaurin were black according to the admitting sheets at the hospital, who had a pill bottle, were up on the mountain with Beth Sparks, who wanted to know about her personal life, and pardon me for this, but wanted you to grab hold of him and stick it in, in all three cases?" (Tr. Vol. III 869).

10.   "He's black, he's in the hospital wearing a green shirt." (Tr. Vol. III 871).

11.   "No, we don't do those numbers because we haven't run the statistics because only 3 percent of the population in the state is black." (Tr. Vol. III 872).

12.   "You heard him say that 3 percent of them are black." (Tr. Vol. III 872).

13.   "He was black, according to that little 'B' right there in the first block, where it says 'Race, B'." (Tr, Vol. III 873).

(# 30 at 23-24). Petitioner then cites to various West Virginia cases discussing prosecutorial misconduct. (Id. at 24-25).

124

Respondent was ordered to address this claim on September 9, 2008. (# 76). Respondent's Supplemental Response addresses this claim as follows:

> Judge Frazier carefully analyzed the evidence and concluded that the alleged improper remarks of the prosecutor did not form the basis for habeas corpus relief for two reasons. First, there had been no objection to the remarks at trial, and the remarks did not rise to the level of "plain error" under West Virginia law. Syl. Pt. 5, State v. Grubb, 364 S.E.2d 824 (W. Va. 1987): "To trigger the application of the 'plain error' doctrine, there must be (1) an error; (2) that it is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Second, even if the remarks of the prosecutor could be reviewed on appeal, Judge Frazier concluded that " . . . any error in these remarks does not rise to the constitutional level that would justify habeas corpus relief." (# 52, Ex. 23, p. 20).
>
> Judge Frazier's adjudication of this claim did not result in a decision that was either (1) " . . . contrary to, or involved an unreasonable application of, clearly established Federal law," or (2) " . . . based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).

(# 85 at 9-10).

Petitioner's Reply to Respondent's Supplemental Response re-adopts his prior arguments on this claim and further asserts that "the prosecuting attorneys blatantly appeal to any potential racial bias that the jury may have made, considering there was no voir dire of the jury on this issue." (# 86 at 6).

The United States Supreme Court has held that "a criminal conviction is not to be lightly overturned on the basis of a

125

prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether [a] prosecutor's conduct affected [the] fairness of the trial." United States v. Young, 470 U.S. 1, 11 (1985). In fact, courts have applied what has come to be known as the "invited response" or "invited reply" rule, whereby courts look at the remarks within the context of the entire trial to determine whether the prosecutor's behavior amounted to prejudicial error. Id. at 12.

"Prosecutorial misconduct may warrant habeas relief only if the relevant misstatements were so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process deprivation." Caldwell v. Russell, 181 F.3d 731, 736 (6th Cir. 1999)(citations omitted), abrogated on other grounds, Mackey v. Dutton, 217 F.3d 399, 406 (6th Cir. 2000); see also Darden v. Wainwright, 477 U.S. 168, 181 (1986)("The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process'") (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).

The State habeas court made the following findings on this claim:

> Petitioner claims that the Prosecuting Attorney made improper remarks during closing arguments that prejudiced his right to an impartial jury. Specifically, Petitioner complains that the prosecutor appealed to the juror's

126

> sympathy on behalf of the victims as being sufficient to
> warrant a new trial.   There was no contemporaneous
> objection to the remarks in question at trial; therefore,
> this ground can form the basis for relief only if the
> remarks constitute "plain error."

(# 52, Ex. 23 at 19).

In the instant case, the prosecutor specifically rebutted a comment made during defense counsel's closing argument wherein defense counsel argued that the medical records submitted from Montgomery General Hospital indicated that a prescription for Flexeril that was prescribed to a John McLaurin, was for a patient described in the medical records as "a well-nourished white male." Thus, defense counsel argued that the pill bottle that was found on the mountain where Beth Sparks was assaulted did not belong to Petitioner.   The prosecuting attorney merely pointed to other references in the same medical records that indicated that the patient was a black male.

Furthermore, because the identity of the assailant of the three victims was at issue, and all three victims had described their attacker as a black male, it was necessary for the prosecutor to discuss evidence that supported that the race of the assailant was black.   Given that the evidence was sufficient to find Petitioner guilty of the crimes with which he was charged, and looking at the argument in the context of the entire proceedings, these comments by the prosecutor did not infect the trial with unfairness or deny Petitioner due process.   See Buell v. Mitchell,

274 F.3d 337, 364-65 (6th Cir. 2001); <u>Kinder v. Bowersox</u>, 272 F.3d 532 (8th Cir. 2001); <u>Sublett v. Dormire</u>, 217 F.3d 598 (8th Cir. 2000); <u>United States v. Sanchez-Sotelo</u>, 8 F.3d 202, 211 (5th Cir. 1993); <u>Simmons v. Bowersox</u>, 235 F.3d 1124, 1136-37 (8th Cir. 2001).

For these reasons, the court proposes that the presiding District Judge **FIND** that Petitioner's rights to due process and a fair trial were not violated.  The court further proposes that the District Judge **FIND** that the state court's ruling denying Petitioner habeas corpus relief on this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  The undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on this claim.

### E.  Alleged intoxication of Judge Hey.

As stated in Ground 5 above, Petitioner asserts that he was denied the right to a fair trial and an impartial judge because Judge Hey was allegedly intoxicated during part of the trial, and consumed alcohol before some of the trial proceedings.  Petitioner contends that the appellate court's denial of habeas corpus relief on this basis was an unreasonable application of <u>Tumey v. Ohio</u>, 273 U.S. 510 (1927).

128

Petitioner addressed this issue on page 44 of his Amended Petition (# 44). He states:

> The State Appellate Court has already found Judge Hey guilty of violation of Judicial Code of Ethics by appearing on the bench in an intoxicated state. In the Matter of Hey, 193 W. Va. 572, 575, 457 S.E.2d 509, 512 (1995). As stated by the Supreme Court:
>
> > In this Court's view, it is widely recognized and perceived that intoxication impairs an[] individual's judgment, and we believe that the appearance of a judge on the bench in an intoxicated state would be a circumstance which would create in reasonable minds the perception that the judge's ability to carry out his judicial responsibilities with integrity, impartiality, and competence was impaired.
>
> Hey, 193 W. Va. at 577, 457 S.E.2d at 514.

(# 44 at 44). Petitioner discussed this claim in greater detail in his Memorandum in Support (# 30). There he states:

> McLaurin stated, that before one of the afternoon sessions of trial, he (McLaurin) was brought into the courtroom, Judge Hey was on the bench, appeared intoxicated to McLaurin, and McLaurin stated to Hey, "Judge Hey you are drunk." As indicated in McLaurin's affidavit, Hey replied, "it is just good Christian living."

(# 30 at 25).

Respondent was ordered to address this claim on September 9, 2008. Respondent's Supplemental Response states:

> Judge Frazier carefully analyzed the evidence, which included the testimony of former Circuit Judge John Hey, both of the Petitioner's trial counsel, and the 1989 trial transcript. On the basis of this evidence, Judge Frazier concluded that " . . . Judge Hey was fully in control of the proceedings and was not impaired during the trial."

129

> Judge Frazier's adjudication of this claim did not result
> in a decision that was either (1) " . . . contrary to, or
> involved an unreasonable application of, clearly
> established Federal law," or (2) " . . . based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceedings."  28
> U.S.C. § 2254(d).

(# 85 at 10).

Petitioner's Reply to Respondent's Supplemental Response

asserts:

> The West Virginia Supreme Court found in 1995, that Judge
> Hey appeared on the bench under the influence of alcohol
> on at least two occasions, while the official record
> identifies only one of such incident.  The petitioner
> contends that the second incident occurred during his
> 1989 trial.  Judge Frazier never addressed this evidence
> that the petitioner presented at his Omnibus Habeas
> Corpus hearing, obviously this reflected that Judge
> Frazier did not carefully and fully analyze -- all the
> evidence presented.

(# 86 at 6).

On April 22, 1994, the West Virginia Judicial Investigation

Commission filed a judicial ethics complaint with the Judicial

Hearing Board, which alleged, inter alia, that Judge John Hey had

appeared in court smelling of alcohol and having the physical

appearance of being intoxicated.  Ultimately, Judge Hey agreed to

enter into a settlement agreement.  As part of the settlement

agreement, Judge Hey had to admit on the record that "on at least

two occasions he was under the influence of alcohol while on the

bench, and at that time, made offensive and inappropriate remarks

to litigants and/or attorneys appearing before him."  In the Matter

of Hey, 457 S.E.2d 509, 512 (W. Va. 1995).  Nowhere in the judicial

130

opinion does it identify the proceedings in which Judge Hey admitted to being intoxicated.

Judge Hey was called to testify during Petitioner's omnibus habeas corpus proceedings. Judge Hey indicated that he had no independent recollection of Petitioner's proceedings (# 70, Ex. 50 at 111), but further indicated:

> My alcoholism never affected my duties on the bench and it seems to be the latest sport, once it was determined that I was retired for alcoholism, to file appeals based on my alcoholism and I will point out to you for the record, there's been a half a dozen or so criminal convictions appealed to the Supreme Court and cited my alcoholism as a reason for reversal and not one case has been reversed. I will rely on the trial transcript of every proceeding over which I presided.

(Id. at 107-108). Judge Hey further testified that the actions that Petitioner described in his affidavit, such as speaking to a defendant alone and coming off the bench in a different direction that he usually did, are not characteristic of his behavior. Judge Hey described Petitioner's allegations as "a perversion of the truth." (Id. at 119).

Petitioner's trial counsel, Steven Miller, testified as follows on this issue:

> Q. Can you recall being informed by anyone at anytime that Judge Hey as intoxicated during any trial proceeding?
>
> A. Any of your trial proceedings?
>
> Q. No, sir. No, sir. At any time. Have you ever heard of Judge Hey being intoxicated at any time throughout the time that you practiced before the bar in Kanawha County whether Judge Hey was ever

intoxicated during that time that he was on the
bench?

A.   Well, I don't recall anything specifically relating
to your trial or any trial in which I was defending
somebody.  I would never have observed that during
any trial that I ever handled.  But I think Judge
Hey ultimately took disability retirement partly on
the basis of alcoholism.  And there were rumors, of
course.  But rumors are rumors.

Q.   But you have no -- you're saying you have no
personal knowledge even of the incident I have
referred you to during this November term,
Thanksgiving holiday, right before the Thanksgiving
holiday where I said I informed you and Mr.
Earl[e]s of what I suspected that the judge was
intoxicated?

A.   I don't even recall that was over Thanksgiving, but
it may well have been.  I mean I just don't recall
concluding on my own that Judge Hey was
intoxicated.  I just don't recall any conversation
like that with you.

(# 70, Ex. 49 at 74-75).  Mr. Earles was not asked about his

recollection of whether Judge Hey exhibited any signs of

intoxication during Petitioner's trial, or whether Petitioner

informed him of his belief that the judge was intoxicated.

The state habeas court made the following findings of fact

concerning this claim:

The transcript of the 1989 trial and the testimony during
the evidentiary hearing concerning the alleged
intoxication of the Honorable John Hey, Circuit Judge,
during Petitioner's trial, indicates that Judge Hey was
not intoxicated.  None of the trial attorneys nor anyone
else except the Petitioner testified that Judge Hey was
intoxicated during the trial.  Judge Hey himself
testified that he was not intoxicated and that it was not
his practice during his tenure on the Bench to preside
over his Court room while intoxicated.  There is no
evidence in the trial court Record or testimony during

132

> the hearing in this matter which is persuasive that Judge
> Hey was or may have been intoxicated at any point in the
> Petitioner's trial.

(# 52, Ex. 23 at 7-8).  Petitioner has not rebutted this factual

finding by clear and convincing evidence.   Therefore, it is

entitled to deference by this federal court.   The state habeas

court also made the following findings concerning this claim:

> The Court heard the testimony of Judge John Hey and trial
> counsel regarding Petitioner's claim that Judge Hey was
> intoxicated during the course of his trial.   Judge Hey
> denied this claim, and there was no testimony elicited
> from any other witness, including trial counsel, that
> there was any basis to believe that Judge Hey was
> impaired in any fashion during the trial.   A review of
> the 1989 trial transcript reveals that Judge Hey was
> fully in control of the proceedings and was not impaired
> during the trial.

(Id. at 13-14).

Tumey v. State of Ohio, 273 U.S. 510 (1927), the case cited by

Petitioner, concerned a judicial or quasi-judicial official who had

a pecuniary interest in conducting criminal proceedings for

violations of an intoxicating liquor act because he was paid from

the fines therein imposed.   The defendant in Tumey asserted a

violation of his Fourteenth Amendment due process rights due to the

judicial official's conflict of interest.   The Supreme Court found

as follows:

> All questions of judicial qualification may not
> involve constitutional validity.   Thus matters of
> kinship, personal bias, state policy, remoteness of
> interest would seem generally to be matters merely of
> legislative discretion.   Wheeling v. Black, 25 W. Va.
> 266, 270.   But it certainly violates the Fourteenth
> Amendment and deprives a defendant in a criminal case of

> due process of law to subject his liberty or property to
> the judgment of a court, the judge of which has a direct,
> personal substantial pecuniary interest in reaching a
> conclusion against him in his case.

273 U.S. at 523.  Upon further review of Tumey, it appears that

Petitioner may be relying upon the following language of the

opinion to support his claim:

> Every procedure which would offer a possible temptation
> to the average man as a judge to forget the burden of
> proof required to convict the defendant, or which might
> lead him not to hold the balance nice, clear and true
> between the state and the accused denies the latter due
> process of law.

Id. at 532.

The undersigned finds that this Supreme Court decision is not

wholly relevant to the issue at hand and Petitioner has cited no

other clearly-established federal authority that he believes was

contravened by the state court's denial of this claim for habeas

corpus relief.  Petitioner has not alleged that Judge Hey had any

conflict of interest in his case.  Furthermore, to the extent that

Petitioner asserts that he was denied a fair trial, he has not

identified any particular action by Judge Hey during the trial that

he believes resulted in prejudice to him that Petitioner claims

resulted from Judge Hey's alleged intoxication.

The undersigned proposes that the presiding District Judge

**FIND** that Petitioner has not demonstrated by clear and convincing

evidence that he was denied a fair trial by an impartial judge,

based upon Judge Hey's alleged intoxication during his trial.  The

134

undersigned has exhaustively reviewed the trial transcripts and the testimony at the omnibus hearing and finds no evidence that would support Petitioner's claim.  Thus, the undersigned further proposes that the presiding District Judge **FIND** that the state court's decision denying Petitioner habeas corpus relief on this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  The undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on this claim.

**F.**     **Ineffective assistance of counsel claims.**

In Strickland v. Washington, 466 U.S. 688 (1984), the Supreme Court adopted a two-prong test for determining whether a defendant received adequate assistance of counsel.  A defendant must show (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Id. at 687-91.  Moreover, "judicial scrutiny of counsel's performance must be highly deferential."  Id. at 689.  Furthermore, the AEDPA "adds a layer of respect for a state court's application of the legal standard."  Holman v. Gilmore, 126 F.3d 876, 881 (7th Cir. 1997).

Petitioner initially raised eight claims of alleged ineffective assistance by his trial counsel in his Amended Petition. Petitioner's appellate counsel only raised one claim of ineffective assistance of counsel in his Petition for Appeal from the denial of Petitioner's omnibus habeas corpus petition. That claim, which concerned the failure to present mitigating evidence at Petitioner's sentencing was already addressed and denied by the presiding District Judge in his prior Memorandum Opinion in this matter.

The other seven claims of ineffective assistance of counsel contained in Petitioner's Amended Section 2254 Petition, were raised in various ways, if they were raised at all, in Petitioner's state habeas proceedings. Using the Strickland standard, and based upon all of the evidence of record, the court will address the merit of each of the allegations concerning ineffective assistance of counsel in the order they were presented by Petitioner. To the extent that Petitioner has not properly exhausted any of these claims, 28 U.S.C. § 2254(b)(2) allows a federal court to deny a claim on the merits, notwithstanding the failure to exhaust the claim in the state courts.

**(a) Failure to call an expert witness**.

Petitioner asserts that his counsel was ineffective because they did not call an expert witness on serology to rebut the State's testimony. In his habeas corpus petition filed in his

omnibus proceeding, Petitioner raised a claim of ineffective assistance of counsel on the basis that his counsel failed to question or challenge the testimony of Fred Zain, when the records showed a serious conflict in the reports. The Circuit Court addressed that claim as follows:

> Again, the whole issue of serological evidence has been examined in a prior habeas corpus proceeding and reviewed by the West Virginia Supreme Court of Appeals. Further there was no basis, at the time of Petitioner's trial, to believe that the work of the West Virginia State Police Laboratory was deficient. Additionally, this evidence has already been found by the West Virginia Supreme Court in McLaurin I to have not contributed to Petitioner's convictions. Finally, the independent DNA testing conducted in the Zain habeas corpus proceeding connected the Petitioner to the sexual assaults. Accordingly, if counsel conducted independent serology tests one must assume the same adverse results for the Petitioner. Therefore, any failure to sufficiently challenge the serological testing by counsel could not have contributed to Petitioner's convictions.

(# 52, Ex. 23 at 24-25). Petitioner also addressed this claim in his pro se Petition for Appeal, which was summarily addressed by the SCAWV in McLaurin II.

Pursuant to Strickland, counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." 466 U.S. at 691. However, a petitioner's allegation that his attorney conducted an inadequate investigation cannot succeed without a proffer of what favorable testimony a witness would have given. Bassette v. Thompson, 915 F.2d 932, 940-41 (4th Cir. 1990).

Petitioner's Memorandum states:

In this case, trial counsel was confronted with reports
and testimony from State's serology experts indicating
that McLaurin's blood type and genetic markers were
consistent with those found in the seminal fluid on the
vaginal swabs and slides taken from the three victims.
This evidence was powerful as it supposedly linked
McLaurin to all three crimes.  Because the reliability of
the results was determined by whether the scientific
tests on this serology evidence were properly conducted
and reported, counsel necessarily needed expert
assistance in determining whether this occurred.
Unfortunately, counsel made a decision in this case to
rely upon their skills in cross-examining the State's
experts when they should have obtained their own serology
expert to challenge the State's experts.

(# 30 at 4-5; 9-10).  Petitioner further states:

In this case, there is little question trial counsel
could show the need for a serology expert since one was
reasonably necessary, if not essential, to determine
whether the serology testing and results, an important
part of the State's case, were accurate.  Counsel
otherwise had no way to challenge the State's experts'
conclusion that McLaurin's blood typings and genetic
markers were consistent with those of the victims'
assailants in all three cases.

In addition, trial counsel questioned the
reliability of the State's experts' testing and
conclusions by moving to suppress the serology test
results. (Tr. Vol. II 529-30).  Defense counsel pointed
out inconsistencies in the lab reports but these
revelations were insufficient to convince the court to
suppress the evidence.

(Id. at 6; 11).

Petitioner further asserts:

Given the above evidence and counsel's belief the
serology results were unreliable, counsel had a duty to
further investigate the serology evidence to confirm
counsel's belief that the tests and results were not
accurate.  Counsel could only have done so by obtaining
a defense serology expert.  Counsel's decision not to

138

> further investigate this evidence via an expert was
> unreasonable under the <u>Strickland</u> standard for
> ineffective assistance of counsel. [Citations omitted].

(<u>Id.</u> at 12).

To the extent that Petitioner is alleging that his counsel failed to reasonably investigate and present a defense based upon the validity of the serological testing, Petitioner has not demonstrated what specific testimony any expert witness for the defense would have offered, had one been called. Petitioner largely relies upon the two reports prepared by Mark Stolorow to establish that the tests and results reported by the State's experts were unreliable. Petitioner's Memorandum in Support further asserts that:

> As Stolorow concluded in his November 27, 1995,
> Supplemental Report, page 14, "[t]he large number of
> discrepancies observed gives rise to serious question
> about the reliability of any of the test results."

> McLaurin's trial counsel violated their duty to further
> investigate this serology evidence to show that it was
> unreliable. As shown above, McLaurin was seriously
> prejudiced by this evidence, which was the common link to
> each victim. Had counsel obtained an expert and shown
> this evidence was unreliable, there is a reasonable
> probability McLaurin would have been found not guilty.
> Syllabus Point 5, <u>State v. Miller</u>, 194 W. Va. 3, 459
> S.E.2d 114 (1995).

(<u>Id.</u> at 7-8).

Respondent was ordered to address this claim on September 9, 2008. (# 76). Respondent's Supplemental Response on this issue states:

Inasmuch as the State's serology evidence was struck in this case more than fifteen years ago, the Petitioner cannot meet the second prong of the <u>Strickland</u> [footnote omitted] test even if we assume, *arguendo*, that counsel should have retained his own expert:

> An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment. The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding. Accordingly, any deficiencies in counsel's performance <u>must be prejudicial to the defense</u> in order to constitute ineffective assistance under the Constitution.

(Emphasis supplied and citations omitted).

In [<u>Zain I</u>][citation omitted], the Supreme Court of Appeals of West Virginia set up a procedure whereby every individual convicted in a criminal case involving Fred Zain or Fred Zain evidence could challenge his or her conviction on the ground that the evidence at trial, excluding the Zain evidence, was insufficient to sustain the conviction. In this case, the Petitioner had a Zain hearing and obtained a mixed result: Judge Canady ruled that the non-Zain evidence was insufficient to support the Capone convictions, but sufficient to support the Townsend and Sparks convictions. On appeal, the Supreme Court of Appeals of West Virginia affirmed, specifically finding that " . . .the Zain evidence had no prejudicial effect on the jury." [<u>McLaurin I</u>] [506 S.E.2d at 327]. (# 48, Ex. 15). Further:

> While the circuit [court] indicated the same modus operandi appeared in all three cases, that evidence alone was not the basis for the circuit court upholding the convictions for counts four through nine. Instead, witness identifications along with other compelling evidence provided the basis for sustaining the jury's verdicts of guilt with respect to these counts.

<u>Id.</u>

The long and short of it is that all of the Petitioner's
serology issues are moot insofar as they are presented as
"stand-alone" issues, and unavailing insofar as they are
presented as prongs of an ineffective assistance of
counsel claim.

(# 85 at 2-3).

Petitioner's Reply to Respondent's Supplemental Response (#
86) again challenges the standard of review applied in Zain I
habeas proceedings.

During the omnibus hearings, Petitioner's counsel testified
that they were not aware that there was anything actually wrong or
false in the serology test results presented by the State's expert
witnesses.  When asked if he thought they should have requested an
independent serology expert, Mr. Earles responded:

A.    Well, let's take it one piece at a time.   The
inference is that there was a credibility issue
with respect to the results.   There wasn't.   The
issue was you had one person testifying as to doing
testing when another person was giving reports.
And that's -- those are rules of evidence.   The
underlying validity of the data that we were
provided was not called into question.   We didn't
know then what -- the information that came to
light later.   So there would be no basis just
because you had one witness testifying on one thing
and another witness who actually did the tests,
that would not call into question the data -- the
validity of the data.   Those are evidentiary rules.

* * *

I had no understanding that the data was bad.

(# 70, Ex. 48 at 103-104).

Upon prompting from Mr. Ayers during Petitioner's omnibus

hearing, Mr. Miller testified that he "probably" should have used

141

an expert witness to counter the State's serology evidence. (# 70, Ex. 49 at 38-39). When asked if he thought having such an expert at trial would have made a difference in the outcome of Petitioner's trial, Mr. Miller stated, "it might have." (Id. at 42). Mr. Miller also stated:

> I mean, what I know now, I should have filed a motion for -- to obtain an independent defense serologist. The problem you have with that sort of thing is you have to have a belief that the independent serologist is not going to give the state additional ammunition to use against your client.

(Id. at 129).

Based upon the evidence of record, the undersigned is not aware of any serological evidence which could have contradicted both Zain's and Smith's testimony that Petitioner "could have contributed to the mixture of secretions found on the evidence submitted for testing in each victim's case." Thus, Petitioner cannot demonstrate the requisite prejudice to warrant relief on this claim.

The undersigned proposes that the presiding District Judge **FIND** that Plaintiff cannot demonstrate that his counsel was constitutionally ineffective by failing to call an expert witness at trial, and the State court's denial of habeas relief on this basis was not contrary to, or an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. The undersigned further

142

proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on this claim.

**(b)  Failure to call Trooper Myers to testify to conflicts with Zain's testimony and report.**

Petitioner further asserts that his trial counsel provided ineffective assistance because they failed to call Trooper H.B. Myers as a defense witness to testify about his report in the Sparks case, which conflicted with Fred Zain's report. (# 30 at 4-8).  Petitioner largely makes the same arguments he made in his discussion of the failure to call a defense serology expert above.

As discussed above, Petitioner raised a general claim of ineffective assistance of counsel concerning the failure of his counsel to challenge the serology evidence that was presented at trial.  The Circuit Court's findings concerning that claim are also stated above.  Like the previous claim, this claim of ineffective assistance of counsel was also raised in Petitioner's pro se Petition for Appeal, and was summarily addressed in the SCAWV's McLaurin II opinion.

As previously discussed, Trooper Myers provided testimony in Petitioner's Zain I habeas proceeding via a deposition, and testified during Petitioner's omnibus habeas corpus hearings. Although Petitioner demonstrated that Trooper Myers rewrote Trooper Zain's report to indicate that the vaginal swab evidence in the Sparks case logically had to be a mixture of semen and vaginal fluids (without conducting any re-testing of the evidence), Trooper

143

Myers' results did not exclude Petitioner as a possible semen depositor in that case.  Consequently, his results did not change Zain's overall testimony that Petitioner could have been the semen depositor.  It merely changed the percentages of the population who could be included as possible depositors.

It is unlikely that the defense would have wanted to call Trooper Myers as a witness, considering that his testimony would have still been inculpatory to Petitioner.  Therefore, Petitioner cannot demonstrate that an objectively reasonable defense attorney would have called Trooper Myers; nor can he demonstrate that his defense was unduly prejudiced by the failure to call Trooper Myers.

The undersigned proposes that the presiding District Judge **FIND** that the state court's decision denying habeas corpus relief (<u>see</u> discussion of rulings in section (a) above) was neither contrary to, nor an unreasonable application of, clearly-established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  The undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on this claim.

### (c)  Failure to investigate alibi defense regarding the Sparks crime.

Petitioner listed this claim of ineffective assistance of counsel in his Amended Petition (# 44), but failed to address it in

144

detail therein or in his Memorandum in Support (# 30).  The heading

in his Amended Petition merely states:

> Trial counsel was ineffective when he failed to
> investigate McLaurin's alibi defense on the Sparks counts
> by not interviewing Lee Williams, William Jenkins,
> Milford Ziegler, Arthur Chester, and Robert Martin upon
> McLaurin's request.

(# 44 at 41).  This claim was raised in Petitioner's omnibus habeas

corpus petition, and the Circuit Court denied habeas relief on this

claim.  Petitioner did not raise this claim in either the Petition

for Appeal filed by his appointed counsel, or his pro se Petition

for Appeal.

Respondent was ordered to address this claim on September 9,

2008.  (# 76).  Respondent's Supplemental Response states:

> After the Petitioner's omnibus habeas hearing, Judge
> Frazier analyzed this evidence presented and concluded
> that " . . . it appears from the Record that Petitioner's
> trial counsel did take Petitioner's alibi claim seriously
> and did attempt to develop this defense." (# 52, Ex. 23,
> pp. 8-9).  In this regard, Judge Frazier noted that:

>> While neither of Petitioner's trial counsel
>> recalled investigating Petitioner's claim of
>> alibi witnesses, the voucher submitted by
>> Richard Earles indicated that he had made
>> attempts to locate the witnesses named by
>> Petitioner.  Steven Miller testified that he
>> would have investigated any possible defense
>> raised by his client.

> (# 52, Ex. 23, p. 8).

(# 85 at 4).  Respondent further asserts that Judge Frazier's

findings of fact were not "clearly erroneous" and that the decision

was not contrary to, or an unreasonable application of the

Strickland standard.  (Id.)

Petitioner's Reply on this issue is not really on point.  It states:

> Spin is thought to be synonymous with falsehood or lying, but more accurately it is -- indifferent to the truth, the record.  What became apparent at the Omnibus hearing was that defense counsel was confronted with (2) charges carrying life without mercy, and numerous counts of first degree sexual assault which the Trial Court refused to sever, defense counsel presented no defense.

(# 86 at 3).

At Petitioner's omnibus habeas corpus hearing, Petitioner testified that, on the day of the Sparks crimes, he was in Charleston with some business associates for a meeting about a new construction business they were hoping to start.  Petitioner stated that he recalled discussing his alibi with his attorneys after Mr. Earles had been appointed to the case, but could not recall an exact date.  (# 70, Ex. 49 at 177).  Petitioner further stated:

> A.  I told them I had alibi witnesses.  I had Mr. Milford Ziegler.  I had seen Mr. Ziegler that day. I had Wheatley Williams, Arthur Chester, Jonie, who was Lee Williams and William Jenkins.  I know those individuals could testify.  And I thought the people at Casto Clinic could testify on my behalf.

(Id. at 178).

Petitioner further stated that he told his attorneys of his whereabouts on September 6, 1988.  He stated that he had an appointment for therapy at the Casto Clinic between 1:00 and 2:00 on that day, and that Lee Williams had taken him to the appointment.  (Id. at 180-181).  Petitioner further stated that, on

146

the way back from the appointment, around 3:00 or 3:30 p.m., he met William Jenkins at the Corner Lounge in downtown Charleston. They subsequently met up with Milford Ziegler around 4:30 or 5:00 p.m. on Quarrier Street, and stayed with him until around 6:00 p.m. Petitioner further stated that he and Lee Williams then drove to Pt. Pleasant, Ohio, to get some beer. (Id. at 181-184). He said that Williams, William Jenkins and Arthur Chester were with him. (Id. at 185).

Petitioner was asked about his attorneys' response to his alibi evidence. He stated:

> A.   Yes.  Yes.  And they kept -- the contention was is that if you don't have an alibi to all these charges, you just got out of prison, ain't nobody going to believe you, and the only defense we can put forward for you is an insanity defense.  And, you know, I was insistent that, hey, wait a minute, man, I ain't did this and I'm not going to -- you ain't going to characterize me as just some looney to get me off, you know, I'm not going with that. And that's what the contention was about.

(Id. at 185). Petitioner stated that he intended to plead not guilty to the other charges for which he did not have an alibi. (Id. at 186).

Petitioner's counsel was also asked about their knowledge and investigation concerning this alleged alibi. Mr. Earles testified that, although he had no specific recollection of his investigation of an alibi defense in Petitioner's case, his billing records demonstrate that he attempted to track down at least one of the witnesses Petitioner has listed as his potential alibi witnesses,

147

but was unsuccessful in locating him.  (# 70, Ex. 48 at 108-110; 112-115).

Judge Frazier made the following findings concerning this claim:

> Trial counsel also apparently attempted to develop an alibi defense, based upon the information provided to them by Petitioner prior to trial.  Counsel's vouchers show that some attempt to locate witnesses was made, and this is supported, to some degree, by the testimony of counsel.  Petitioner has failed to provide sufficient evidence of counsel's failure to investigate this possible defense, or indeed the existence of such a defense, to allow for a finding of ineffective assistance.

(# 52, Ex. 23 at 24).  Although the SCAWV did not address this claim, the Court did mention that the Circuit Court had denied relief on this and other claims, and the SCAWV affirmed that decision.  McLaurin II, 640 S.E.2d at 217 n.18.

The record established during the omnibus hearing demonstrates that an unsuccessful attempt was made to locate witnesses and evidence to verify Petitioner's alibi defense for the Sparks crimes, and for tactical reasons, no alibi defense was presented. Petitioner's counsel correctly advised Petitioner that, if he intended to take the stand to testify about his alleged alibi for the Sparks case, he was exposing himself to cross-examination on all of the crimes with which he was charged.  (# 70, Ex. 49 at 125).

The undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that his counsel's

conduct fell below an objective standard of reasonableness.  The evidence developed at Petitioner's omnibus hearing indicated that Mr. Earles had attempted to investigate Petitioner's alibi, but was unsuccessful in locating at least one of the witnesses Petitioner had told him about.  Furthermore, as previously discussed, because Petitioner was being tried for all three crimes in one proceeding, if he took the stand to testify about having an alibi for the Sparks crime, he would have been subject to cross-examination about all three crimes.

Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the state court's denial of habeas corpus relief was neither contrary to, nor an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  The undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on this claim.

**(d)   Should not have introduced victims' and other witnesses' statements to police; failed to request limiting instruction.**

This is another claim of ineffective assistance of counsel that was summarily stated in Petitioner's Amended Petition, and for which there is no further discussion in Petitioner's Amended Petition documents.  The Amended Petition states:

149

> Trial counsel was ineffective in introducing into
> evidence as exhibits the victims' and another witness's
> statements to police, thereby causing prejudice and
> manifest injustice to McLaurin.  McLaurin was further
> prejudiced by counsel's failure to request an instruction
> limiting the jury's use of this evidence.

(# 44 at 41).  Petitioner does not elaborate on how he claims he

was prejudiced by the admission of the full statements of each

witness.

Petitioner raised a similar claim in his omnibus habeas corpus

petition, claiming that his counsel "improperly requested the

introduction of statements as exhibits when he already knew that

exhibits would be available for examination by the jury."  This

claim, however, was not specifically addressed by the Circuit

Court.  Rather, the Circuit Court stated:

> Petitioner's counsel and Petitioner, individually, have
> alleged other grounds for relief.  However, after review
> and consideration of said grounds, the court finds that
> there is no factual or legal basis for habeas corpus
> relief.

(# 52, Ex. 23 at 27-28).  This claim of ineffective assistance of

counsel was not raised in either Petition for Appeal.

Respondent was ordered to address this claim on September 9,

2008.  (# 76).  Respondent's Supplemental Response states:

> The Respondent assumes this is the Petitioner's
> reformulation of an issue he raised in his direct appeal
> [FN 2 omitted], and then again in the omnibus habeas
> corpus proceeding and the appeal therefrom to the Supreme
> Court of Appeals of West Virginia: that introduction of
> evidence concerning one victim was, in effect, 404(b) [FN
> 3 omitted] evidence of other wrongs and acts as to the
> other victims.  Therefore, the argument goes, the trial
> court should have severed the cases of victims C.C., J.T.

150

and B.S., or in the alternative given a limiting instruction.

(# 85 at 5). Respondent then addresses the state courts' rulings on the Rule 404(b) issues. (Id. at 5-6).

Petitioner's Reply to the Supplemental Response states:

The Respondent incorrectly assumes that Petitioner's argument is a reformulation of a claim he raised in his direct appeal, that introduction of evidence concerning one victim was, in effect, 404(b) evidence of other wrongs and acts as to the other victims. The actual argument consist[s] of defense counsel's request of the Trial Court to submit to the jury for consideration statements from the victims and witnesses, without requesting limiting instructions.

And nor did the trial court provide such instruction in its charges to the jury, therefore defense counsel's actions effectively deprived the jury of its discretion in consideration of such statements.

(# 86 at 4).

Mr. Earles was questioned about this issue during the omnibus habeas hearing. His recollection was refreshed by reviewing the portion of the trial transcript where defense counsel moved for the admission of the witness statements to the police. When asked if they had requested a limiting instruction with respect to how the jury could use those statements, Mr. Earles stated that he could not recall what was in the charge to the jury. Mr. Earles further stated that, whether he would want a limiting instruction or not would depend upon the statement being introduced, and whether there was something that he wanted to argue to the jury as being true versus for impeachment. (# 70, Ex. 48 at 115-117).

151

It is clear from a review of the trial transcripts that Petitioner's counsel had attempted to use the statements, which were marked as defense exhibits during the trial, to impeach the various witnesses when they testified, and that counsel made a strategic decision to move for the admission of the statements in order for the jury to see what the witnesses' recollections were at the time they gave their statements, and how they may have been inconsistent from their trial testimony.

The undersigned proposes that the presiding District Judge **FIND** that Petitioner has failed to demonstrate that his counsel's conduct fell below an objective standard of reasonableness, or that the outcome of Petitioner's trial would have been different, had counsel not moved for the admission of the witness statements.  The undersigned further proposes that the presiding District **FIND** that the denial of habeas corpus relief on this claim was neither legally or factually unreasonable, and that Respondent is entitled to judgment as a matter of law on this claim.

> **(e) Failure to seek a writ of prohibition after denial of motion for continuance in order to have competency exam; and**

> **(g) Failure to seek writ of prohibition regarding denial of motion to disclose grand jury selection process and whether indictment was properly obtained.**

Petitioner also contends that his counsel was ineffective for failing to seek two writs of prohibition from the SCAWV prior to his trial.  First, in Ground 1(e), Petitioner contends that his

152

counsel should have sought a writ of prohibition from the SCAWV when the trial court denied his motion for a continuance in order to undergo a competency evaluation one week before trial.  This claim of ineffective assistance of counsel appears to have been raised for the first time in Petitioner's <u>pro</u> <u>se</u> Petition for Appeal.

In Ground 1(g), Petitioner contends that his counsel should have sought a writ of prohibition regarding the denial of Petitioner's motion to disclose the grand jury selection process and to determine whether his indictment was properly obtained.  (# 44 at 41).  Based upon the undersigned's review, Petitioner did not raise this claim of ineffective assistance of counsel in any of his state court pleadings.

Again, Petitioner's Amended Petition does not elaborate on these two claims; his Memorandum in Support thereof, however, does further address both of these claims.  Concerning the failure to seek a writ of prohibition concerning the denial of his motion for a continuance for a competency evaluation, Petitioner's Memorandum states:

> McLaurin's fundamental due process right to a fair trial as guaranteed by the Fourteenth Amendment to the U.S. Constitution and Article III, § 10 of the W. Va. Constitution were denied by the trial court's failure to observe the statutory procedures that would ensure McLaurin's right not to be tried or convicted while incompetent or when he was not criminally responsible.

* * *

153

When the trial court denied defense counsel a
continuance to obtain a psychiatric exam, the only way
counsel could protect McLaurin's right not to be tried
while incompetent was to seek a writ of prohibition.
Accordingly, McLaurin was unduly prejudiced by his trial
counsel's failure to file for a writ of prohibition upon
the trial court's denial of counsel's motion for a
continuance to obtain a psychiatric evaluation.

(# 30 at 2-3).

Respondent was ordered to address this claim on September 9,

2008. (# 76). Respondent's Supplemental Response states:

Respondent cannot find any indication in the record that
this issue was ever raised in either Petitioner's Zain
habeas proceeding or in his omnibus habeas hearing. In
light of the Magistrate Court's [sic; Magistrate Judge's]
conclusion however, that the issue has not been waived,
Respondent states as follows:

The Supreme Court of Appeals of West Virginia held that
under the facts and circumstances of Petitioner's case,
the trial court did not err in denying a continuance in
order for Petitioner to have a competency exam.

(# 85 at 6). After citing to Judge Frazier's findings on the

competency issues, Respondent further states that, "[i]n light of

these findings, Petitioner's claim that his counsel should have

filed a writ of prohibition is moot. (Id. at 7).

Petitioner's Reply to the Supplemental Response states:

Again, the Respondent's failure to find this claim in
Petitioner's prior petition is more probity of both its
efforts and argument. For the last time hopefully, the
trial court . . . "Only ordered (1) psychiatric
examination," on June 2, 1989. Moreover, in light of
defense counsel's representation, that should the Court
deprive them of raising such defense, said actions would
effectively constitute ineffective assistance of counsel.

(# 86 at 4).

154

Denial of a trial continuance is a matter of discretion. While the determination of whether a criminal defendant is competent to stand trial may be addressed at any time, Petitioner had declined to undergo a competency evaluation for several months before his trial. The fact that he changed his mind one week before trial weighs heavily in favor of a finding that Petitioner sought such an evaluation for the purpose of delay.

A trial court's discretion exceeds constitutional bounds only when the denial of a continuance is arbitrary in the face of a justifiable request for delay. See Morris v. Slappy, 461 U.S. 1 (1983); Ungar v. Sarafite, 376 U.S. 575 (1964). In order to gain the reversal of the denial of a continuance, a defendant must show prejudice. Thus, in order to have successfully obtained a writ of prohibition from the SCAWV concerning the denial of his request for a continuance, Petitioner would have had to show that the denial was arbitrary and fundamentally unfair.

The presiding District Judge has previously found that the denial of Petitioner's request for a continuance just days before his trial was set to begin in order to undergo a psychiatric examination that had been approved by the court months before, was not arbitrary, and that Petitioner could not demonstrate that he was not competent to stand trial. Accordingly, it is unlikely that Petitioner would have successfully obtained a writ of prohibition.

155

As described in Ground 1(g) above, Petitioner asserts that his counsel also should have sought a writ of prohibition concerning the trial court's denial of Petitioner's pre-trial motion for disclosure of the grand jury selection procedures.  Once again, Petitioner's amended section 2254 petition does not address this claim in any detail.  (# 44 at 41).  It is summarily addressed in his Amended Petition as follows:

> Trial counsel rendered ineffective assistance by failing to file for a writ of prohibition when the trial court erroneously denied his motion to disclose the manner in which the grand jury was selected and whether the requisite number of jurors had concurred in the finding of the indictment.

(# 44 at 41).  Nor does his Memorandum in Support address this claim at all.  (# 30).

Respondent was ordered to address this claim on September 9, 2008.  (# 76).  Respondent's Supplemental Response asserts:

> At his omnibus hearing, the Petitioner was given leave to present any evidence he chose, on any issue he wished to raise.  (# 66, Ex. 35.)  As Judge Frazier noted in his Opinion Order (# 52, Ex. 23, pp. 11-12):
>
>> The Petitioner has failed to present sufficient evidence to sustain his claims for relief on the issue of the racial makeup of the grand jury.  West Virginia law requires that jurors (and grand jurors) be selected through the use of voter registration records from the County Clerk's Office and from records of licensed drivers within the county from the Department of Motor Vehicles.  W. Va. Code § 52-1-5; § 52-2-2.  The statutes are racially neutral on their face and there is no indication that either the Circuit Clerk or the County Clerk applied these statutes incorrectly or in a way that created a

discriminatory pattern.   Furthermore, there
was no evidence that the Circuit Judges were
racially bias (sic) in their selection of
grand jury forepersons.  Therefore, this claim
by the Petitioner must fail.

In light of these findings, Petitioner's claim that his
counsel should have filed a writ of prohibition is moot.

(# 86 at 8).

As previously noted, Petitioner has failed to demonstrate that
the selection of grand jurors and grand jury forepersons was not
racially neutral and, thus, the likelihood that the SCAWV would
have granted a writ of prohibition concerning the denial of
Petitioner's motion for disclosure of grand jury selection
procedures was slim.  Furthermore, Petitioner has not developed any
evidence concerning his claim that an insufficient number of jurors
concurred in the handing down of his indictment.  The undersigned
proposes that the presiding District Judge **FIND** that counsel's
tactical decision not to pursue a likely unsuccessful avenue of
review did not fall below an objective standard of reasonableness,
and that Petitioner has not demonstrated that, but for his
counsel's failure to seek a writ of prohibition, the outcome of
Petitioner's trial would have been different.

Accordingly,  the  undersigned  further  proposes  that  the
presiding District Judge **FIND** that the denial of habeas corpus
relief on these claims was neither contrary to, nor an unreasonable
application of, clearly established federal law, and was not based
on an unreasonable determination of the facts in light of the

157

evidence presented in the state court proceedings.  The undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law these claims.

### (f)  Failure to seek voir dire regarding cross-racial crime bias.

This is another claim of ineffective assistance of counsel that was summarily stated in Petitioner's Amended Petition, and of which there is no further discussion in Petitioner's Amended Petition documents.  The Amended Petition states:

> Trial counsel was ineffective when he failed to offer or request any voir dire questions of the jury regarding their possible cross-racial crime bias.

(# 44 at 41).  Petitioner further addressed this claim in his Memorandum in Support.  He states:

> McLaurin contends that his trial counsel erred in failing to ask or request any voir dire of the venire concerning the possibility of cross-racial crime bias.  During voir dire conducted entirely by the trial court, not one question was asked as to whether any of the jurors would be prejudiced or biased against McLaurin because the victims were Caucasian and McLaurin was African-American. (Tr. Vol. I 161-204).
>
> In Turner v. Murray, 476 U.S. 28, 30-33, 106 S. Ct. 1683, 1685-87 (1986), the United States Supreme Court reversed the defendant's death sentence because the trial court refused to ask voir dire questions requested by defense counsel as to whether the race of the defendant (black) and the victim (white) would prejudice the juror[s'] ability to render a fair and impartial verdict.  The West Virginia Supreme Court of Appeals has similarly found that a defendant in a capital case "is entitled to question the jury panel on the issue of racial bias and to advise the jury panel of the race of the parties involved."  Syllabus Point 1, State v. Garrett, 182 W. Va. 166, 386 S.E.2d 823 (1989).

158

(# 30 at 13).   Petitioner asserts that his counsel's failure "provided the prosecution with a tactical advantage of reminding the jury during both its closing and rebuttal summation on thirteen (13) different occasions, without objection, of the racial identity of the victims and the defendant.  (Tr. Vol. III 815-30; 859-875). (Id.) Petitioner further asserts that "these overt references were directly intended to interject cross-racial crime bias into the jury's consideration of their guilt/innocence verdict.  Even more egregious was the improper influence of these highly prejudicial remarks used to implore the jury to return a verdict of guilty without a recommendation of mercy." (Id. at 14-15).

In his omnibus habeas petition, Petitioner raised a claim of ineffective assistance of counsel asserting that there was "inadequate voir dire."  The Circuit Court made the following findings concerning that claim:

> Both of Petitioner's trial attorneys testified at his evidentiary hearing.  Neither attorney was questioned concerning the issues raised herein regarding the conduct of *voir dire*.  Therefore, it is impossible for this Court to determine whether there may have been strategic reasons for conducting *voir dire* in the manner complained of.  For this reason, the Petitioner has not met the minimum threshold to allow this Court to review these issues.

(# 52, Ex. 23 at 23).

Respondent was ordered to address this claim on September 9, 2008.  (# 76).  Respondent's Supplemental Response states:

> At his omnibus hearing, the Petitioner was given leave to present any evidence he chose, on any issue he wished to

159

raise.  (# 66, Ex. 35.)  As Judge Frazier noted in his
Opinion  Order  (#  52,  Ex.  23,  p.  23),  "[b]oth  of
Petitioner's trial attorneys testified at his evidentiary
hearing.  Neither attorney was questioned concerning the
issues raised herein regarding the conduct of voir dire.
Therefore, it is impossible for this Court to determine
whether  there  may  have  been  strategic  reasons  for
conducting voir dire in the manner complained of.   For
this reason,  the Petitioner has not met  the minimum
threshold to allow this Court to review these issues."

Judge Frazier's reasoning for denying the ineffective
assistance/voir dire claim is unassailable.   It is
Petitioner's  obligation  to  present  all  evidence  in
support  of  his  claim  to  the  state  court  and  " .  .  .
whether a state court's decision was unreasonable must be
assessed in light of the record the court has before it."
Holland v. Jackson, 542 U.S. 649, 652 (2004)(emphasis
supplied and citations omitted).

(# 85 at 7).

Petitioner's Reply to the Supplemental Response addresses this

claim as follows:

It  is  obvious  the  Respondent's  counsel  failed  to
understand that it was the trial counsel who conducted
voir dire, and although defense counsel failed to request
voir dire on this issue, ultimately it was the trial
court's  responsibility  to  subject  the  jury  to  the
necessary voir dire to uncover any such cross-racial
crime bias.   It's the trial court whom has the
responsibility as gatekeeper, although defense counsel
should have requested such voir dire, and their failure
does constitute ineffective assistance of counsel.

(# 86 at 4-5).

A defendant is guaranteed a trial by an impartial jury under

the Sixth and Fourteenth Amendments.   See, e.g., Duncan v.

Louisiana, 391 U.S. 145, 149 (1968); Sheppard v. Maxwell, 384 U.S.

333, 362 (1966)("Due Process requires that the accused receive a

trial by an impartial jury free from outside influence.").   "The

160

essential function of voir dire is to allow for the impaneling of a fair and impartial jury through questions which permit the intelligent exercise of challenges by counsel . . . ." United States v. Brown, 799 F.2d 134, 135-36 (4th Cir. 1986).

Absent contrary indications, jurors are presumed to be impartial. Poynter v. Ratcliff, 874 F.2d 219, 221 (4th Cir. 1989). The defendant bears the burden of showing a strong possibility of juror bias. Wells v. Murray, 831 F.2d 468, 472 (4th Cir. 1987). Petitioner has not offered any actual evidence to indicate that the jurors in his case exhibited any cross-racial crime bias, so as invalidate his convictions. Furthermore, to the extent that Petitioner is claiming that the failure to request this area of voir dire allowed the prosecution to make racial references during its closing arguments, the undersigned has previously proposed that the presiding District Judge find that Petitioner's defense was not unduly prejudiced by those references in the arguments.

The undersigned proposes that the presiding District Judge **FIND** that Petitioner has not demonstrated that his counsel was constitutionally ineffective in this regard, and that the state court's denial of habeas corpus relief was not legally or factually unreasonable. The undersigned further proposes that the presiding District Judge **FIND** that Respondent is entitled to judgment as a matter of law on this claim.

161

## RECOMMENDATION

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **DENY** Petitioner's remaining claims for habeas corpus relief and dismiss this civil action from the docket of the court.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the district court and a waiver of appellate review by the circuit court of appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.

1984).  Copies of such objections shall be served on the opposing party, Judge Copenhaver, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to mail a copy of the same to Petitioner and counsel of record.

_____May 13, 2009_____                    _Mary E. Stanley_____
           Date                              Mary E. Stanley
                                             United States Magistrate Judge

163